UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL ABRAMSON | No. 18 CR 681<br><br>Hon. Virginia M. Kendall |

**GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*** 

The UNITED STATES OF AMERICA, through its attorney JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following motions *in limine*: (1) seeking the Court's permission to recall the case agent during the government's case-in-chief; (2) providing notice to the Court of the government's intention to ask the Court to treat government witness Jerilyn Totani as a witness identified with an adverse party and ask limited leading questions during her direct examination; and (3) asking the Court to rule that any missing witness arguments be raised with the Court in advance.[1] In support of its motions, the government states as follows:

---

[1] As of the date of this filing, the parties are preparing for trial on September 7, 2020. In light of the COVID-19 pandemic and Chief Judge Rebecca R. Pallmeyer's Fourth Amended General Order 20-0012 dated May 26, 2020, trials through August 3, 2020 have been continued indefinitely and, pursuant to the initial General Order and first three Amended Orders, criminal filing deadlines have been extended 77 days. Thus far, the parties have timely tendered expert disclosures and filed motions *in limine*. The parties have agreed to a two-week extension to file responses and replies to any motions *in limine*, making the new operative date June 29, 2020 for responses and July 13, 2020 for replies. Those dates fall within the 77-day extension included through the first three Amended Orders.

**Background**

The indictment charges defendant Michael Abramson with fourteen counts of false statements in corporate and individual tax filings, in violation of Title 26, United States Code, Section 7206(1). R. 1. These false statements relate to hundreds of thousands of dollars of payments from defendant Michael Abramson to his decades-long romantic partner, Jerilyn Totani, through one of his companies, Eastern Advisors. The false statements enabled Abramson to take unwarranted corporate tax deductions and disguise gift payments to Totani as loans to avoid additional taxable income.

*Abramson's Extramarital Relationship with Totani*

Beginning in the 1990s, Abramson, an attorney and business owner, began a romantic relationship with Jerilyn Totani. *Id.* ¶ 1(j). The two met when Totani was an exotic dancer at VIP's Gentlemen's Club (in which Abramson had a financial interest). Early on during their relationship, Abramson rented Totani an apartment at 1122 North Clark in Chicago to support Totani and facilitate their extramarital relationship. In around 1999, 1122 North Clark converted to a condominium building and Abramson purchased the condominium for approximately $250,000. Totani lived in 1122 North Clark full time and Abramson put the condominium in a nominee's name in order to conceal his connection to the condominium and Totani.

*Abramson Directs Payments to Totani Through Eastern Advisors*

During this time, Abramson, owned and operated several companies including Leasing Employment Services, Eastern Advisors, and PayTech. *Id.* ¶¶ 1(f) and (g).

In around 2001, Outfront Media (formerly Viacom and CBS Outdoor, hereinafter "Outfront") retained Abramson in connection with potential litigation with the Village of Rosemont relating to a land dispute involving several billboards in the area. During the course of his representation of Outfront, Abramson connected Outfront representatives with a business associate, Robert Durkin. Durkin helped Outfront negotiate a resolution to the dispute with Village officials (the "Rosemont Billboards Deal"). In or around June 2003, at Abramson's direction, Outfront began directing payments to Eastern Advisors in connection with the Rosemont Billboards Deal. Thereafter, Outfront made quarterly payments of approximately $29,500 to Eastern Advisors. *Id.* ¶ 1(m). At Abramson's direction, the bookkeeper for Leasing Employment Services, Eastern Advisors, and PayTech, Jill Roth, had Eastern Advisors make regular payments of $2,500 to Totani on the 15th and 30th of each month, booking those payments as "advance on commissions." If the commissions ultimately received by Eastern Advisors from Outfront were less than the funds advanced to Totani, the remainder of the money already paid out to Totani was reclassified to a loan account (the "JT Loan Account").

Throughout this same time-period, Abramson used Eastern Advisors to pay for Totani's living expenses, medical appointments and procedures, and credit card bills. Between 2006 and 2014, Abramson personally made and caused Roth to make approximately $681,000 in payments either to or on behalf of Totani and to record the payments as loans from Abramson to Totani through the JT Loan Account. While characterized as "loans" from Eastern Advisors, these payments were taxable

3

distributions from Abramson to Totani. There was no loan document, interest rate, or payment schedule. Totani never repaid or plan to repay Eastern Advisors or Abramson for any of these payments. Moreover, these payments supplemented regular cash gifts given to Totani on a weekly basis (and her subsidized housing at the condominium Abramson had purchased for her). Abramson also purchased Totani several cars, including two Corvettes, a Ferrari, and the shell of a 1974 Corvette. Abramson also leased Totani a 1999 Porsche 911 C2 and purchased her a motorcycle. Abramson also purchased Totani thousands of dollars' worth of jewelry.

Between its inception in 2002 and 2013, Eastern Advisors, the entity funneling hundreds of thousands of dollars to Totani, was required to and did not file an annual United States Corporation Income Tax Return, Form 1120. *Id.* ¶ 1(q).

*IRS Inquiry and Amended Tax Returns*

In or around October 2013, the IRS began requesting records relating to Eastern Advisors and made a formal request to another business associate of Abramson – William Vickerman – through the Mexican tax authorities (the "Hacienda"). Vickerman and Abramson owned a spice distributing company, Grupo Mexquitic ("Grupo"), which operated in Mexico. Shortly after receiving the request from the Hacienda, Vickerman informed Abramson that the IRS was requesting information about Eastern Advisors. Soon after, despite having worked with tax preparers Krol & Associates for his personal income tax returns and Leasing Employment Services' returns since 1998, Abramson repeatedly asked Roth, his bookkeeper, to prepare and file amended returns for his companies (including

4

Eastern Advisors). Roth refused. On August 6, 2014, Abramson personally drafted and submitted a determination letter request to the IRS requesting an extension of time under various provisions of the IRS code in order to file amended consolidated returns reflecting that that the entities (Leasing Employment Services, PayTech, and Eastern Advisors) were consolidated and should have been deemed consolidated as far back as 2006.

Between 2014 and 2015, Abramson then caused his tax prepares to prepare United States Corporation Income Tax Returns, Forms 1120 and 1120X, including schedules and attachments, for Leasing Employment Services, PayTech, and Eastern Advisors for calendar years 2006 through 2014. *Id.* ¶ 1(s). The returns included information concerning the income and business expenses of Eastern Advisors. *Id.* The tax filings included improper deductions related to the personal payments made to Totani from Eastern Advisors and a schedule (Schedule L) referencing a loan receivable from "JT" (Jerilyn Totani), which, in truth, reflected additional personal payments from Abramson to Totani through Eastern Advisors. Those additional payments were not a loan and, thus, not an asset to Eastern Advisors. The false statements in Leasing Employment Services' amended returns for 2006 through 2012 and returns for 2013 and 2014 and Abramson's personal income tax returns for 2011 through 2014 resulted in tax loss to the IRS in the amount of approximately $190,559.

## I. Motion to Recall Case Agent

In order to present its case in a chronological and coherent manner, the government requests that the Court permit the government to recall the case agent,

Special Agent Jason Gibson, during its case-in-chief. The government expects that Special Agent Gibson will first: (1) testify about background relating to the Internal Revenue Service; (2) testify about background of the investigation; and (3) introduce several exhibits into the record. Following this initial testimony, several witnesses will testify regarding Totani's relationship with Abramson, the Rosemont Billboard Deal, Abramson's payment of commissions and other funds to Totani through Eastern Advisors, and the various tax returns at issues, including tax loss to the IRS. After that testimony, it might be necessary to recall Special Agent Gibson regarding other aspects of the investigation, including to introduce summary charts and evidence regarding Totani's other work.

The Seventh Circuit has held that "[t]he district court has substantial discretion in its control of the presentation of evidence at trial." *United States v. Dent*, 984 F.2d 1453, 1463 (7th Cir. 1993) (citing Fed. R. Evid. 611(a)) (overruled on other grounds). Included in its authority and sound discretion is the ability to permit the recalling of witnesses. *Id.* (citing *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991)). Courts regularly permit parties to recall witnesses as part of the presentation of evidence. *See United States v. Vasquez*, 635 F.3d 889, 897 (7th Cir. 2011) (no abuse of discretion for district court to allow the government to recall a witness based on new information); *United States v. Williams-Ogletree*, No. 11 CR 203, 2013 WL 66207, at *3 (N.D. Ill. Jan. 4, 2013) (granting the government's motion *in limine* to allow the recalling of certain witnesses in order to present evidence in a coherent manner).

Here, as noted above, Special Agent Gibson will initially provide generalized testimony about the IRS and the background of the investigation and introduce certain documents obtained during the course of the investigation.  After several witnesses testify and certain evidence is admitted into the record, the government may seek to recall Special Agent Gibson to present summary charts under Federal Rule of Evidence 1006 and other evidence regarding Totani's other work.

Accordingly, in order to facilitate the presentation of evidence at trial and to facilitate juror comprehension, the government respectfully requests that the Court permit the government to recall Special Agent Gibson during its case-in-chief.

## II. Notice of Government's Intention to Request Court's Approval to Treat Witness Totani as a Witness Identified with an Adverse Party and Ask Limited Leading Questions During Her Direct Examination

During its case-in-chief, the government expects to call Totani, Abramson's romantic partner and financial dependent as a witness.  Through this filing, the government provides notice to the Court of its intention to request the Court's approval to treat Totani as a witness identified with an adverse party and use leading questions during certain portions of her direct examination.  Such a determination "clearly falls within the area of control by the judge over the mode and order of interrogation and presentation . . . ." Fed. R. Evid. 611 advisory committee's note to subdivision (c).

Typically, on direct examination of a witness, leading questions should not be used except as necessary to develop that witness' testimony.  Fed. R. Ev. 611(c).  If, however, a party calls a hostile witness, an adverse party, or a witness identified with

7

an adverse party, the party calling the witness is permitted to use leading questions in its examination of the witness. *Id.* The limitation on the use of leading questions was "designed to guard against the risk of improper suggestion inherent in examining *friendly* witnesses through the use of leading questions." *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir. 1981) (emphasis added). "The exception in rule 611(c)(2) recognizes the risks of suggestion are reduced where the witness has an interest in promoting a version of the facts contrary to that suggested." *Sec. & Exch. Comm'n v. Goldstone*, 317 F.R.D. 147, 163 (D.N.M. 2016).

Under Rule 611(c), a witness "identified with an adverse party" is generally an employee, agent, friend, or relative of an adverse party. *See Ratliff v. City of Chicago, et al.*, No. 10 C 739, 2012 WL 7993412, at *1 (N.D. Ill. Nov. 20, 2012); *see also Goldstone*, 317 F.R.D. at 163 ("Although the precise meaning of witness identified with an adverse party is not clearly defined, a few relationships fall within its meaning. These relationships include: (i) employee/employer relationships; (ii) romantic partners; and (iii) law enforcement investigators.") (internal quotations and citations omitted). Notably, in the context of a witness identified with an adverse party, the party calling the witness need not even establish that the witness is "hostile." *See* 4-611 Weinstein's Federal Evidence § 611.06 (2015) ("Rule 611 is designed to enlarge the categories of witnesses automatically considered to be adverse without any further showing of hostility so that leading questions may be used during their examination."). Cooperating witnesses testifying pursuant to a grant of immunity may be designated hostile witnesses and subject to leading questions

8

during their direct examinations. *See United States v. Diaz*, 662 F.2d 713, 718 (11th Cir. 1981) (denying the defendant's motion to treat immunized government witness as a hostile witness because prior trial testimony reflected hostility towards government rather than defendant).

Typically, courts wait to observe the witness testify before determining whether or not they are hostile. *See St. Clair v. United States*, 154 U.S. 134, 150 (1894); *United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979) (affirming ruling by the district court that the prosecutor be allowed to use leading questions where witness and defendant were close friends, witness was a participant in the crime, and witness testified about his "susceptibility to suggestion" and continued contact with the defendant right up to trial). In *United States v. Dingle*, No. 12-30098, 2014 WL 6812457, at *3 (S.D. Ill. Dec. 3, 2014), the court conditionally granted the government's pre-trial motion to use leading questions during direct examination of a witness to the extent that the government called the witness and submitted an offer of proof outside the presence of the jury.

Here, there is substantial evidence of Totani's identification with Abramson. Totani and Abramson have maintained an extramarital romantic relationship since the mid-1990s. Throughout that time, Abramson purchased a condominium in which Totani lived for approximately twenty years for around $250,000. According to Totani, at some point, Abramson took out a life insurance policy in the mid-1990s in the amount of approximately $1,000,000 for her benefit. At some point, Totani asked that Abramson increase the policy to $5,000,000.

9

The condominium and life insurance policy are just the tip of the iceberg of Abramson's financial support of Totani. Abramson has also provided Totani with financial support through regular cash payments ($500 per week for decades), hundreds of thousands of dollars of commissions payments from Eastern Advisors, and the payment of her living expenses, credit card bills, and other miscellaneous expenditures again, through Eastern Advisors (the purported "loan payments"). In total, between 2003 and 2014, Abramson distributed in excess of $1.4 million to Totani through Eastern Advisors. As discussed above, during this same time-period, Abramson purchased Totani vehicles, including Corvettes, a Ferrari, and a motorcycle and leased her a Porsche. Abramson covered tens of thousands of dollars of Totani's gambling losses and purchased Totani thousands of dollars' worth of expensive jewelry. During all of these years, Abramson handled Totani's tax filings through Krol & Associates and paid her taxes through Eastern Advisors.

Totani's financial reliance on Abramson is ongoing. Based on a review of banking records relating to Totani's account, between October 2016 and March 2020, Abramson personally transferred approximately $134,410 to Totani's bank account. Between October 2016 and June 1, 2017, Eastern Advisors, through Abramson, continued to pay Totani commissions and advance on commissions in the amount of approximately $37,500. Between October 2016 and March 5, 2020, Totani made deposits of approximately $123,050 in cash into her bank account.

On or about November 16, 2017, the government provided Totani with letter immunity. During the course of meetings between Totani and the government,

Totani said that Abramson was paying for her legal representation and that she would "die" for Abramson. Totani also informed that, upon being approached and subpoenaed by law enforcement officials in connection with this investigation in August 2016, she immediately contacted Abramson and sent him a picture of the subpoena. Totani and Abramson met soon after to discuss the subpoena and investigation. When discussing the investigation, Abramson mentioned issues, including the payments from Eastern Advisors and the Rosemont Billboards Deal, about which expected the government to question her. Abramson then reminded Totani that she had "brought the [Rosemont Billboards] deal." Around that time, Abramson also refreshed Totani's recollection about an Independent Contractor Agreement between Totani and Abramson, which Abramson then sent to her by email and Totani purportedly later found underneath a dresser.

Moreover, following his arraignment on or about October 18, 2018, Magistrate Judge Maria Valdez released Abramson on bond pursuant to certain conditions of release, including that Abramson avoid all contact with Totani (Individual A, as identified in the indictment). Less than a month later, on November 15, 2018, Abramson moved to modify his conditions of release to remove the condition of release precluding contact with Totani. R. 28. The government did not object on the condition that Abramson and Totani avoided discussing the case and the Court modified Abramson's conditions of release accordingly. However, the fact that Abramson sought to remove this condition less than a month after it was imposed in order to

facilitate contact with Totani underscores their close personal relationship and Totani's identification with Abramson.

The government expects that Totani will testify about a number of subject matters, including her long-standing relationship with Abramson, her financial dependence on him, the lavish lifestyle he supported, and how she did not consider the hundreds of thousands of dollars Abramson spent on her behalf on living expenses and bills to be loan payments. The government also expects Totani to testify that, after Abramson refreshed her recollection, she recalled bringing the Rosemont Billboards Deal to him following a brief encounter at a bowling alley in 2001. The government also expects that Totani will testify that she believed she earned the commissions payments from Eastern Advisors (by both bringing the deal to Abramson and occasionally taking photographs of the billboards in Rosemont).

Totani's defense of her commissions' payments, as supplied by Abramson during the course of the investigation, is inconsistent with the government's evidence. At trial, the government intends to call witnesses who will testify that Totani did not have any involvement in setting up the Rosemont Billboards Deal. Of course, "[a]ny party, including the party that called the witness, may attack the witness's credibility." *See United States v. Davis*, 896 F.3d 784, 789 (7th Cir. 2018) (quoting Fed. R. Evid. 607). Here, because of Totani's romantic relationship and close ties with Abramson and her financial dependence on him, Totani should be deemed a witness identified with an adversary.

Accordingly, during the course of her direct examination at trial, the government anticipates moving the Court, pursuant to Federal Rule of Evidence 611(c), to ask Totani leading questions during certain portions of her testimony.

### III. Motion to Require Notice of Missing Witness Argument

Through this motion, the government requests that the parties bring to the Court's attention any missing witness argument before any such argument is made in front of the jury. In particular, during the course of the investigation, multiple witnesses with potentially relevant information declined to speak with law enforcement officials and to testify pursuant to grand jury subpoenas and asserted their Fifth Amendment rights to avoid self-incrimination.

"'The rule . . . is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)). "[W]here the witness appears to be equally available or unavailable to both sides, we think it is well within the district court's discretion to refuse to allow [a missing witness] argument." *United States v. Keplinger*, 776 F.2d 678, 703 (7th Cir. 1985). Nor is it appropriate for a defendant to comment on the government's refusal to call and immunize a witness. "The immunization statutes are not designed to benefit defendants. Absent a substantial showing of prosecutorial abuse of discretion, courts will not review a prosecutor's

13

immunization decision." *United States v. Flomenhoft*, 714 F.2d 708, 713 (7th Cir. 1983) (internal citation omitted).

As discussed above, multiple witnesses invoked their Fifth Amendment rights and refused to speak with investigators and testify before the grand jury during the course of the investigation. Thus far, one of those witnesses has been subpoenaed to testify at trial. As of the date of this filing, that witness' attorney informs that the witness intends to again invoke his/her Fifth Amendment right with regard to trial. As such, the government anticipates that this witness will be equally unavailable to both sides and any missing witness argument or inference relating to this witness would be inappropriate. For that reason, the government requests that any missing witness argument be brought to the Court's attention so that it may be addressed by both parties.

## **Conclusion**

For the reasons set forth above, the government moves to recall Special Agent Gibson during trial, provides the Court with notice that it will move to treat witness Jerilyn Totani as a witness identified with an adversary on direct examination and ask leading questions during portions of her testimony, and require the parties to provide notice to the Court of any missing witness argument.

Date: June 1, 2020                                     Respectfully submitted,

                                                  JOHN R. LAUSCH, JR.
                                                  United States Attorney

By:   */s/ Richard M. Rothblatt*
        Richard M. Rothblatt
        Ankur Srivastava
        Assistant U.S. Attorneys
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300