# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL ABRAMSON,<br><br>    Defendant | Case No: 18 CR 681<br><br>Hon. Virginia M. Kendall |

## DEFENDANT MICHAEL ABRAMSON'S MOTION TO EXCLUDE CERTAIN TESTIMONY OF GOVERNMENT EXPERT MICHAEL WELCH

Defendant Michael Abramson ("Abramson"), by and through his undersigned counsel, respectfully submits this motion seeking a pretrial ruling to exclude the testimony offered by the government's tax expert, Michael Welch, regarding estimated tax loss, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

## INTRODUCTION

The government has charged Abramson, a 71-year-old attorney and former equity partner at Arnstein and Lehr, with willfully making false statements on his personal and corporate tax returns. The government's aggressive theory depends on proving that funds Abramson's real estate brokerage company paid to Jerilyn Totani ("Totani"), a licensed real estate broker, were not truly real estate commissions and loans but rather were taxable payments to himself. The government ignores that its own immunized witness, Totani, will testify that the funds she received were in fact commissions and that her testimony is corroborated by bank and corporate records demonstrating that the funds were treated as commissions since they began in 2003. The government also ignores that Abramson hired a reputable certified public accounting firm to prepare his personal and corporate tax returns each year, and these accountants agreed that it was appropriate to treat certain payments to Totani as loans and real estate commissions.

Not only is the government's case theory contradicted by its own witnesses and documents, but this is also a zero-tax loss case. In an attempt to show otherwise, the government seeks to introduce the testimony of IRS Revenue Agent Welch. Mr. Welch's calculations of tax loss on Abramson's personal and corporate tax returns are based on unreliable methodologies and insufficient facts and data, and therefore, his tax loss opinions should be excluded.

1

**BACKGROUND**

The government has charged Abramson in a thirteen-count indictment with violations of [Title 26, United States Code, Section 7206(1)](). Counts One, Two, Eleven and Thirteen charge Abramson with making false statements on his personal tax returns for tax years 2011 through 2014. Counts Three through Ten and Count Twelve charge him with making false statements on corporate tax returns for Leasing Employment Services ("LES") for tax years 2006 through 2014. Specifically, the government alleges that Abramson's corporate tax returns contain willful false statements that: (1) the commissions paid to Jerilyn Totani qualified as business deductions; and (2) certain other payments made to her qualified as loans. The government further alleges that Abramson's personal tax returns contained willful false statements because he under-reported his income by not including the commissions and loans paid to Totani as his personal income. Abramson's jury trial is scheduled to begin on September 8, 2020.[1]

**I.     Payments to Totani**

During the relevant time period, Abramson owned LES and two other companies that were consolidated with LES for corporate tax purposes, namely Eastern Advisors and PayTech. Eastern Advisors provided real estate brokerage and consulting services and employed several real estate brokers as independent contractors. Totani was one of the licensed real estate brokers who worked for Eastern Advisors as an independent contractor. She also was involved in a romantic relationship with Abramson.

In 2001, Totani learned that a company called CBS Outdoor, an advertising company that owned and leased large advertisement billboards, was involved in a dispute with the Village of

---

[1] Abramson hopes to keep this trial date, and therefore, the government and defense counsel agreed to keep the pre-pandemic schedule for filing motions *in limine* but also further agreed to extend response dates by two weeks, to June 29, 2020, and not to object if either party desires to file additional motions in the coming weeks.

Rosemont ("the Village") about the company's billboards. Totani understood that Abramson knew people in Rosemont and subsequently shared the information she obtained with Abramson. She also told him that she expected a share of the commissions if Eastern Advisors obtained business as a result of her tip. Abramson pursued the lead, and CBS Outdoor retained him to represent the company in lease termination lawsuits that the Village filed. CBS Outdoor also retained Eastern Advisors to assist the company in negotiating a new lease deal with the Village (resulting in the settlement of the lawsuits), pursuant to which CBS Outdoor would rent billboards and the land on which the billboards were erected from the Village. Abramson brought Robert Durkin ("Durkin") into the deal to assist in connecting CBS Outdoor to the Village decisionmakers and to provide consulting services related to the deal. Like Totani, Durkin was employed as an independent contractor with Eastern Advisors since its inception.

In 2003, CBS Outdoor began paying Eastern Advisors commissions as a result of Eastern Advisors' assistance in negotiating the billboard lease deal. Consistent with the 20-year term of the Village-CBS Outdoor lease, the commissions were scheduled to be paid to Eastern Advisors for 20 years. On average, during the relevant time period, the commissions that CBS Outdoor paid to Eastern Advisors totaled approximately $120,000 per year. Pursuant to written independent contractor agreements, Eastern Advisors paid Durkin and Totani 50% of the commissions each. Totani's commissions were advanced in bi-weekly check payments of $2,500 (i.e., approximately $5,000 per month/$60,000 per year).

Eastern Advisors began paying Totani commissions at the same time Eastern Advisors began receiving the commission payments from CBS Outdoor, namely June 2003. Totani will testify that she always understood these checks to be commission payments she earned for finding the deal. This testimony will be consistent with the typed/pre-prepared grand jury statement that

3

the government had her read to the grand jury after granting her immunity, conditioned on the requirement that her testimony was truthful.

Eastern Advisors also loaned funds to third parties, including Totani for the payment of her personal bills. These payments were recorded contemporaneously in Eastern Advisors' books and records as loans to Totani. Abramson loaned his personal funds to Eastern Advisors as shareholder loans, which covered the amount of the Totani bill payments and loans to other third parties. The funds that Abramson loaned to Eastern Advisors were recorded in Eastern Advisors' books and records under the "Loan-MAA" account. In total, between 2006 and 2014, Abramson made or directed to be made approximately 432 deposits into this account, totaling several million dollars.

Abramson hired a certified public accounting firm to prepare his corporate and personal tax returns. He gave his accountants full access to Eastern Advisors' books and records before they prepared the corporate tax returns at issue, and the payments to Totani were disclosed in these records. The accountants agreed that the personal bill payments were properly treated as loans based on Abramson's belief that they would be repaid.

## II. The Government's Expert Notice

On May 1, 2020, the government provided the defense with notice that it intends to call IRS Revenue Agent Michael Welch as an expert at trial on the issue of tax loss calculations. The notice also stated that Mr. Welch will testify about his review of financial and accounting documentation and bank records for LES, Eastern Advisors, and PayTech. The government later informed defense counsel via telephone and email correspondence that Mr. Welch's testimony about the financial and accounting documentation will support his opinion that the funds Abramson deposited into his Eastern Advisors shareholder loan account were not funds belonging to Abramson. Although this opinion is not set forth explicitly in the government's written expert

4

notice, the accuracy of Mr. Welch's tax loss calculations related to Abramson's personal tax returns is wholly dependent on this opinion.

As discussed in more detail below, the government's expert notice fails to describe any methodology Mr. Welch used to determine that the numerous deposits of funds Abramson made into his "Loan-MAA" account did not actually belong to Abramson. Indeed, the records included in the government's discovery support the opposite conclusion.

### III. The Defense's Tax Loss Calculations

Contrary to Mr. Welch's opinions, which are based on unreliable and undisclosed methodologies as detailed below, the tax loss in this case is zero.

#### A. Corporate Tax Returns

It is undisputed that there is no tax loss associated with labeling the bill payments made on behalf of Totani as loans on LES' tax returns. Mr. Welch does not attribute any loss to these statements in his loss calculations.

There also was no corporate tax loss related to the commissions paid to Totani. If the commissions should not have been paid to Totani, as the government alleges, the appropriate tax adjustment based on the facts and circumstances would be to attribute the commissions as if they were paid to Abramson for his work on the billboard deal. Indeed, the government contends Abramson is the true recipient of the funds. LES, therefore, reported an accurate commission expense even if the government is correct that the individual who earned the commissions was Abramson and not Totani.

#### B. Personal Tax Returns

There was no tax loss on Abramson's personal tax returns related to the Totani payments. Eastern Advisors' books and records demonstrate that Abramson made numerous shareholder loans to Eastern Advisors during the relevant time period. As a result, even if the government is

5

correct that the payments to Totani should have been treated as payments for the benefit of Abramson, then the proper accounting treatment would be to net Abramson's shareholder loan balance at Eastern Advisors against the amount of the Totani payments, thereby treating the Totani payments as Eastern Advisors' loan repayments to Abramson. This treatment is consistent with how other payments to and from Abramson were treated. Abramson's receipt of loan repayments from Eastern Advisors would have no effect on Abramson's personal tax liability.

## ARGUMENT

I. **Mr. Welch's Opinion on the Tax Loss Related to Abramson's Personal Tax Returns Should Be Excluded Because It Is Based on an Unreliable Methodology and Insufficient Facts and Data.**

   A. **Standard of Review**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 as construed by the United States Supreme Court in *Daubert* and its progeny. *See, e.g.*, *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Rule 702 allows an expert to testify in the form of an opinion if it is necessary to help the trier of fact "understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. An expert is only permitted to testify, however, if his testimony is "based on sufficient facts or data," "is the product of reliable principle and methods," and the expert "has reliably applied the principles and methods to the facts of the case." *Id*.

The purpose of the court's inquiry into expert admissibility "is to scrutinize proposed expert witness testimony to determine whether it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *United States v. Neushwander*, No. 15 CR 542-1, 2017 WL 4572212, at *2 (N.D. Ill. Oct. 14, 2017) (quoting *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012)). In this way, district courts perform a critical gatekeeper function. *Id*. To determine whether expert testimony is admissible, courts apply a three-prong analysis and consider the following: (1)

whether an expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether his testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011).

The government, as the proponent of Welch's proposed expert testimony, has the burden of proving the foundational requirements of Rule 702. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019) ("An expert's proponent has the burden of establishing the admissibility of the opinions by a preponderance of the evidence.").

### B. Mr. Welch's Methodology for His Tax Loss Calculations

Mr. Welch offers the conditional opinion that if the payments to Totani were not legitimate commissions and loans, then the payments should have been treated as distributions by Eastern Advisors to Abramson and reported as his own income on his personal tax returns. According to Mr. Welch, Abramson's failure to report these distributions on his personal tax returns caused a tax loss of $79,244 between 2011 and 2014.

Mr. Welch's methodology for calculating the tax loss on Abramson's personal tax returns involved several steps. First, he calculated Eastern Advisors' earnings and profits for each tax year. His expert notice explains that this calculation is necessary because the earnings and profits of a C Corporation, like Eastern Advisors, affects shareholder distributions. Specifically, he will testify that earnings and profits are distributed to shareholders in the following order: (1) dividends up to the amount of a company's annual earnings and profits (which are taxable as income to the shareholder), (2) returns on capital (which are not taxable to the shareholder), and (3) capital gains (which are taxable to the shareholder). Mr. Welch next totaled the amount paid to Totani in loans and commissions for each tax year. He treated the payments to Totani as distributions to Abramson, specifically, dividends up to the amount of Eastern Advisors' earnings and profits. For the remainder of the distributions that exceeded the earnings and profits, he gave zero credit to

7

Abramson for return of capital and treated the funds as capital gains. Finally, he applied a 15% tax rate to these distributions to arrive at the tax loss of $79,244.[2]

      **C.    Mr. Welch's Personal Tax Loss Calculations Rely on Component Opinions That Fail to Meet the Requirements of Rule 702**

Mr. Welch's tax loss calculations must be excluded because they depend on unsupported and unreliable "component opinions." *See United States v. Crabbe*, 556 F.Supp.2d 1217, 1224 (D. Colo. 2008) (defining "component opinions" as opinions underlying the expert's main opinion on which the main opinion depends). "[A] party proffering an opinion that depends on one or more component opinions must also demonstrate that each component opinion satisfies all of the requirements of Rule 702." *Id.*; *see also McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1244–45 (11th Cir. 2005) (that expert "did not show the reliability of each of his steps" in arriving at his opinion is a "fatal defect under Daubert"); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1312 (N.D. Fla. 2018) ("every aspect of the expert's analysis—including his methodology, the combination of facts and scientific evidence on which he relies, and the links between the evidence and his conclusions—must be shown to satisfy Rule 702 and *Daubert*.").

          1.    <u>Mr. Welch's Component Opinions Are Contradicted by Generally Accepted Accounting Standards and Legal Precedent.</u>

Although not explicitly disclosed in the government's expert notice, Mr. Welch's tax loss calculations depend on two component opinions that do not meet Rule 702's admissibility standards. Mr. Welch's first component opinion is that the payments to Totani should be treated as taxable distributions to Abramson rather than repayment of Abramson's shareholder loans to Eastern Advisors. The determination of whether payments from a closely held corporation to a

---

[2] Counsel for Mr. Abramson did not attach Mr. Welch's calculations as an exhibit to this motion because the government is currently working on an updated version of the calculations that incorporates some changes resulting from the parties' earlier meet and confer discussions. Although the anticipated changes are unrelated to this motion, Mr. Abramson did not want to attach an outdated version.

shareholder should be treated as loan repayment or distributions is based on the facts and circumstances of the particular case and the intent of the parties at the time of the transactions. *Jennings v. United States*, 272 F.2d 842, 845 (7th Cir. 1959) (tax treatment of payments from corporation to shareholder depends on facts and circumstances, including contemporaneous intent of the parties); *see also Busch v. Comm'r*, 728 F.2d 945, 948-49, 951 (7th Cir. 1984) (intent, as evidenced by facts and circumstances, determinative of whether payment from corporation is loan or dividend); *Illinois Tool Works Inc. v. Comm'r*, 116 T.C.M. (CCH) 124, *10 (T.C. 2018) (same); Internal Revenue Manual, Section 9.5.9.7.4.10(1) ("If the subject made a loan in prior years and contends that part of the understatement of income is in fact a repayment of that loan, the special agent must document the repayment of principal by contacting the borrower. All repayments of principal loaned by the subject should be treated as a non-income item."). Mr. Welch fails to identify the facts and circumstances on which he relied to conclude that the payments to Totani should be treated as distributions to Abramson rather than repayment of his shareholder loans. In addition to failing to provide his methodology and the facts and data for reaching this opinion, his opinion contradicts the facts and circumstances of this case, including that the funds Abramson directed to Eastern Advisors were placed in an account explicitly designed as his loan account. Accordingly, if the payments to Totani actually were payments for Abramson, as the government alleges, the proper accounting treatment would be to reduce Abramson's loan account at Eastern Advisors by the amount paid to Totani. *See Jones v. Comm'r*, 74 T.C.M. (CCH) 473, at *9 (T.C. 1997), *aff'd sub nom. Jones v. Comr. of IRS*, 177 F.3d 983 (11th Cir. 1999) (amount stockholder paid to corporation should be netted from amounts paid to stockholder before identifying any remaining funds as constructive dividends); *see also* EFFECT OF SHAREHOLDER'S REPAYMENT OF BORROWINGS EARLIER TREATED AS CONSTRUCTIVE DIVIDENDS, FEDERAL TAX COORDINATOR,

9

¶ J-2706.1, 1997 WL 723583 (shareholder payments into a corporation offset loans made to shareholder in the same tax year and the net amount is treated as a capital contribution). Reducing Abramson's shareholder loan balance by the amount of payments he made to Totani would be consistent with how other funds that Abramson paid to third parties via Eastern Advisors were treated. *See* Internal Revenue Manual, Section 9.5.9.3 ("For the purpose of criminal prosecution, taxable income must be computed by way of the accounting method regularly used by the subject to compute his/her income.")

Mr. Welch's second component opinion is that any distributions over and above Eastern Advisor's earnings and profits should be treated as taxable capital gains to Abramson rather than non-taxable return of capital. This opinion also contradicts well-established accounting principles. If Mr. Welch rejects treating the contributions Abramson made to Eastern Advisors as shareholder loans, they must be treated as capital contributions. Accordingly, if the payments to Totani were for the benefit of Abramson, as the government alleges, then they should be treated as a non-taxable return of Abramson's capital, not taxable capital gains. *See Jones*, 74 T.C.M. (CCH) 473, at *9 ("The amount distributed by [the corporation] to petitioner is the excess of the total amount he withdrew during each year less the amount he paid to the corporation during the same year…. [T]he amount that petitioner paid to the corporation in any year in excess of the amount that he withdrew in that year is a contribution to capital[.]"); *Stovall v. Comm'r*, 46 T.C.M. (CCH) 894 (T.C. 1983), *aff'd*, 762 F.2d 891 (11th Cir. 1985) ("The amount of [money shareholder infused into the company] exceeds the amount potentially taxable as dividends to petitioner, thus reducing the amount of dividend income realized to zero."); *Foster v. Comm'r*, 391 F.2d 727, 739 (4th Cir. 1968) (taxable income should be reduced by amounts redeposited into the corporate account by the stockholder); *see also Boulware v. United States*, 552 U.S. 421, 439 (2008). (taxpayer does not

have to prove intent to treat distributions as a return of capital rather than a capital gain); Internal Revenue Manual, Section 9.5.9.7.4.13(1) ("Generally, any return of capital is classified as a non-income item in the bank deposits method" of proving income). Put simply, Mr. Welch inexplicably ignores over 400 deposits of funds that Abramson made into his loan account at Eastern Advisors, totaling millions of dollars, even though treating them as shareholder loans would reduce the tax loss to zero and treating them as capital contributions would reduce the purported tax loss on Abramson's personal returns to $22,696 over the four-year period charged.

> 2. There Is No Information to Suggest that Mr. Welch's Component Opinions Are Based on a Reliable Methodology.

In order to establish that his component opinions are the product of a reliable methodology, Mr. Welch must demonstrate "that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F.Supp.3d at 1221. Contrary to the requirements of Rule 702 and *Daubert*, the government's expert notice does not identify Mr. Welch's methodology for reaching the component opinions, let alone describe the facts and data or otherwise demonstrate that his method was reliable. Relatedly, Mr. Welch does not cite to any tax or accounting principles or any other standards or regulations in support of his component opinions.

In recent communications with the government about Mr. Welch's anticipated testimony, defense counsel learned that Mr. Welch intends to support his component opinions with information indicating that the funds Abramson directed into his Eastern Advisors loan account were not his personal funds, and therefore, they would not qualify as either shareholder loans or capital contributions. The government's expert notice, however, fails to identify: (1) the methodology Mr. Welch utilized in forming his component opinions, and (2) the facts and data to which he applied his methodology. *See* Internal Revenue Manual, Section 9.5.9.1 (describing

methods of proof available to a special IRS agent in a criminal tax investigation). With respect to the methodology, the expert notice did not address whether Mr. Welch conducted an audit of Eastern Advisor's books and records and/or audited bank records to trace the source of the 432 deposits that Abramson directed into his Eastern Advisors' loan account.[3] If Mr. Welch did attempt some sort of audit, the expert notice did not address how he traced the funds or the findings of the audit. With respect to the facts and data, the expert notice does not identify the documents on which Mr. Welch relied in reaching a conclusion that the funds did not belong to Abramson, let alone the specific facts and data within those records on which he relied. The notice merely states that Mr. Welch will testify about "financial and accounting documentation" and "bank records" for Eastern Advisors, PayTech, and LES. The notice does not even generally reference Abramson's personal bank accounts, thus precluding an effective trace of the source of the funds that Abramson paid into his Eastern Advisors loan account. Accordingly, the government's expert notice wholly fails to satisfy the rigors of Rule 702 and *Daubert*. *See also* Internal Revenue Manual, Section 9.5.8.6.3.3(1)(A) ("[S]ufficient information should be supplied to familiarize the reader with how the books and records were used to report the subject's income, expenses, and deductions."); *Id.* at 1(i) ("A reconciliation of books and records to the return(s) is required in all tax and tax-related investigations to the extend [sic] the records are available. The reconciliation must be presented as an appendix.").

---

[3] For Mr. Welch's methodology to be reliable, he would need to trace Abramson's source for all 432 deposits, especially in light of the fact that there were multiple sources for Abramson's funds and Eastern Advisors' books and records indicate that the funds belonged to Abramson. *See Crabbe,* 556 F.Supp.2d at 1227-1228 (court found the IRS revenue agent's methodology was unreliable because in verifying the accuracy of a summary wage report on which he relied, he only checked 100 entries against the actual bank records and pay stubs; court credited defense expert's unrebutted testimony that the IRS auditing practices in criminal cases required the expert to reconcile all of the summary information against the actual records); *see also* Internal Revenue Manual, Sections 9.5.9.4.3.1, 9.5.9.2.1 (basic approach for preferred method of proof includes detailed analysis of each item at issue).

### 3. The Basis for Mr. Welch's Component Opinions Is Contradicted by the Government's Discovery.

Mr. Welch's component opinions are contradicted by records produced by the government that demonstrate the funds that Abramson directed to Eastern Advisors were his own funds, thereby further indicating the unreliability of Mr. Welch's methodology. First, the funds were recorded in Eastern Advisors' books and records as loans from Abramson. Abramson's loan account was broken down into several subaccounts in Eastern Advisors' books and records to provide further detail about the nature of the transactions. The "Loan-MAA-Other" was credited with loan funds that Abramson loaned directly to Eastern Advisors, totaling over $2.8 million dollars between 2004 and 2014. The "AA Sayia-Other" subaccount reflected personal loan repayments that Abramson received from a company called Grupo Mexquitic ("Grupo") via Grupo's vendor, AA Sayia. The government produced a loan register confirming that Abramson made substantial personal loans to Grupo. Government-conducted witness interviews and related correspondence further support the loan payments and repayments between Abramson and Grupo. Due to Mr. Welch's failure to disclose any methodology or factual support for his component opinions and the opinions' inconsistency with the factual record, accounting standards, and legal precedent, his tax loss calculations related to Abramson's personal returns must be excluded pursuant to Rule 702. *See Crabbe*, 556 F. Supp. 2d at 1228, 1230 (finding IRS revenue agent lacked a reliable method and sufficient facts to support his component opinion that a tax summary report accurately reflected wages); *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186–87, 192 (7th Cir. 1993) (failure to apply "methodology that experts in valuation find essential" results in an unreliable opinion that should be excluded); *Noveletsky v. Metro. Life Ins. Co*., 49 F. Supp. 3d 123, 153 (D. Me. 2014) (opinions based on flawed assumptions or that do not fit the facts of

the case should be excluded); *Boltar, LLC v. Comm'r*, 136 T.C. 326, 334–35 (2011) (opinions that fail to account for "relevant facts affecting valuation or exaggerate value to incredible levels are rejected," and an expert loses usefulness "when giving testimony tainted by overzealous advocacy").

II. **Mr. Welch's Opinion on the Tax Loss Related to LES' Tax Returns Should Be Excluded Because It Is Based on Unreliable Methodologies and Insufficient Facts and Data.**

A. **Mr. Welch's Methodology**

Mr. Welch's opinion on the tax loss for LES' returns relies on an assumption that the commissions that Eastern Advisors paid to Totani between 2006 and 2014 were not legitimately earned by her and were really payments for the benefit of Abramson. Mr. Welch intends to testify that if this is true, then LES improperly deducted the commission payments from its net income on its tax returns, causing a corporate tax loss of approximately $111,315 between 2006 and 2014.

To calculate the purported loss on LES' tax returns, Mr. Welch first totaled the amount that Eastern Advisors paid to Totani in commissions and advances for each tax year at issue (i.e., the amount that LES claimed as business deductions on its tax returns). Mr. Welch then added those commission amounts back into LES' net income, as reported in the company's books and records, to calculate LES' taxable corporate income. He then applied a corporate tax rate to this income to identify the "correct" corporate tax due.

B. **Mr. Welch's Corporate Tax Loss Calculations Rely on a Component Opinion That Fails to Meet the Requirements of Rule 702.**

Mr. Welch's tax loss calculations for the corporate returns rely on a component opinion that fails to satisfy the rigors of Rule 702. Specifically, his tax loss calculation depends on an unsupported opinion that Eastern Advisors could not legitimately deduct the commission payments as business expenses if the commission payments had been issued directly to Abramson,

14

who the government alleges was the true beneficiary of the funds that Totani received. This defies common sense. Someone at the company had to earn the commissions. If the government is correct that Ms. Totanti did not deserve the commissions, Abramson certainly earned the commissions for his work on the billboard deal. Mr. Welch has not identified any accounting or tax principles that would preclude Eastern Advisors from deducting the commissions as business expenses if they were paid directly to Abramson. Moreover, his approach is contrary to well-established accounting and tax principles that would treat this issue as a technical adjustment that should be resolved in favor of Abramson. *See* Internal Revenue Manual, Section 9.5.9.7.4.18 (In a criminal investigation, "[t]echnical adjustments in favor of the government cannot be made, offset, or netted against technical adjustments in favor of the subject."). Accordingly, Mr. Welch's tax loss calculations for LES' returns must be excluded, pursuant to Rule 702. *See Crabbe*, 556 F.Supp.2d at 1224 (when considering the reliability of an expert's methodology, courts consider "whether there is too great an analytical gap between the data and the opinion proffered" and "whether the expert adequately accounted for obvious alternative explanations.").

## **CONCLUSION**

For the reasons stated above, Abramson respectfully asks this Court to grant his motion to exclude Mr. Welch's testimony regarding tax loss.

Dated: June 1, 2020

Respectfully submitted,

/s/ *Valarie Hays*
Valarie Hays (ARDC No. 6272380)
Matthew C. Crowl (ARDC No. 6201018)
Lauren Jaffe (ARDC No. 6316795)
RILEY SAFER HOLMES & CANCILA LLP
70 West Madison Street, Suite 2900
Chicago, Illinois 60602
Telephone: 312.471.8700

*Counsel for Michael Abramson*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2020, I caused the foregoing document to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Valarie Hays*
Valarie Hays