UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 681 |
| v. | |
| MICHAEL ABRAMSON | Hon. Virginia M. Kendall |

**GOVERNMENT'S REPLY IN SUPPORT OF
CONSOLIDATED MOTIONS *IN LIMINE***

The UNITED STATES OF AMERICA, through its attorney JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following reply in support of its motion *in limine* providing notice to the Court of the government's intention to ask the Court to treat government witness Jerilyn Totani as a witness identified with an adverse party and ask limited leading questions during her direct examination.[1]

**Background**[2]

In his response, defendant does not dispute that Jerilyn Totani is a witness identified with an adverse party. Nor could he. Defendant and Totani carried on an extramarital affair for at least two decades and, for approximately twenty-five years (including up to present), defendant has been the sole provider supporting Totani's lavish lifestyle. The evidence of Totani's complete and utter reliance on defendant

---

[1] Defendant does not object to the government's first and third motions, to recall the case agent, IRS Special Agent Jason Gibson, and to require advance notice of any missing witness arguments, respectively. *See* R. 57 at 1.

[2] The government incorporates by reference the background section of its motions *in limine*, (R. 50), with additional factual information included below.

throughout her adult life is overwhelming. In addition, the government has set forth ample evidence of defendant's attempts to influence Totani's testimony throughout the course of the investigation.

Rather, defendant contends that, by asking leading questions of Totani in a limited fashion during her direct examination, the government seeks "an unwarranted strategic advantage at trial." R. 57 at 2. In reality, the government's request comports with the Rules of Evidence and would be an appropriate measure in light of defendant's numerous attempts to influence Totani's testimony and Totani's bias towards defendant.

For the reasons set forth below, if the Court is to make a pretrial determination on the issue, as defendant requests, the Court should find that Totani is a witness identified with an adverse party and permit the government to ask leading questions during portions of Totani's direct examination.

## Argument

### I. Totani is a Witness Identified with an Adverse Party Under Federal Rule of Evidence 611(c).

Defendant's response does not dispute that Totani is identified with defendant, acknowledging, by way of significant understatement, that "Mr. Abramson and Ms. Totani have close ties . . . ." *See* R. 57 at 2. As discussed in the government's motion, (R. 50 at 8), courts interpreting Rule 611(c) have determined that a witness "identified with an adverse party" includes employees (defendant purports that Totani was an independent contractor for Eastern Advisors earning hundreds of thousands of dollars of payments booked as commissions), friends (as discussed in the

government's motion, defendant moved to modify his conditions of release to enable non-case related contact with Totani), and romantic partner (defendant does not dispute that he carried on an approximately two-decade long extramarital affair with Totani).

Evidence of Totani's identification with defendant comes from Totani directly. As discussed in the government's motion, during the course of preparing for her grand jury testimony, Totani told law enforcement officials that she would "die" for defendant. R. 50 at 11. In a recorded jail call between Totani and an inmate, on October 7, 2017, five weeks before Totani received letter immunity and eight months before Totani testified in the grand jury, Totani referenced several people she considered "family," including "*my* Michael [defendant]." (emphasis added).[3]

The evidence is clear – and defendant does not truly dispute – that Totani is a witness identified with an adverse party.

## II. The Government Should Be Permitted to Ask Totani Leading Questions on Direct Examination to Develop Her Testimony.

As discussed in the government's motion, the purpose behind asking Totani leading questions during portions of her direct examination is based, in part, upon the factual inconsistencies in her testimony, defendant's substantive communications with Totani about the Rosemont Billboards Deal during the course of the

---

[3] Totani also described an individual named "Jamie Mika" as family. Mika, and the information he provided to law enforcement after Totani testified in the grand jury and after the grand jury returned an indictment in this case, is further discussed below.

3

investigation (and, as discussed below, potentially post-indictment in violation of his conditions of release), and Totani's substantial bias towards defendant.

The Court should reject defendant's attempts to add a requirement of hostility to a finding that a witness is identified with an adverse party and subject to leading questions on direct examination. Contrary to defendant's argument, (R. 57 at 6), a party calling a witness identified with an adverse party need not establish "hostility" to ask leading questions. The exceptions highlighted in Rule 611(c) are framed in the disjunctive, not the conjunctive. Fed. R. Evid. 611(c) ("When a party calls a hostile witness, an adverse party, **_or_** a witness identified with an adverse party, interrogation may be by leading questions.") (emphasis added). Defendant failed to respond to the government's citation in its brief emphasizing that the very purpose of Rule 611 was to "enlarge the categories of witness automatically considered to be adverse without any further showing of hostility so that leading questions may be used during their examination." *See* R. 50 at 8 (citing 4-611 Weinstein's Federal Evidence § 611.06 (2015)). The case law bears that proposition out. Courts routinely allow parties, including the government in a criminal prosecution, to ask witnesses identified with an adverse party leading questions without any finding of hostility. *See United States v. O'Brien*, 618 F.2d 1234, 1242 (7th Cir. 1981) (use of leading questions at various stages of co-schemer and crucial witness was appropriate without finding of hostility) and cases cited *infra* at 6.

Defendant relies on *United States v. McDonnell*, No. 14 CR 12, 2014 WL 3545206, at *1 (E.D. Va. July 16, 2014), where the district court precluded the

government from leading *eight* different family member witnesses during their direct examination. While the district court relied on the lack of hostility from the defendant's family members in denying the government's motion, the record did not reflect any witness, like Totani, with substantial ties to the defendant who was so utterly dependent upon the defendant and had evidenced prior collaboration with the defendant in connection with their testimony. As noted above, the government also requested to lead eight witnesses (not one) and preclude the defense from asking leading questions on cross-examination. Clearly, the government's request here is more narrowly tailored.

Defendant also cites to *United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979), but there, the First Circuit affirmed the district court's *sua sponte* finding that a government witness, who was close friends with the defendant, was hostile and sought to accelerate the testimony "as coherently as possible." In *Brown*, the government did not move to ask leading questions—the court ordered it on its own based on the demeanor of the witness. Finally, in *United States v. Dingle*, No. 12-30098, 2014 WL 6812457, at *2 (S.D. Ill. Dec. 3, 2014), the government moved to ask leading questions of a cooperator on direct examination based both on the witness' close relationship with the defendant and the witness' hostility (non-abidance with a cooperation agreement). On that basis, the court conditionally granted the motion subject to an offer of proof outside the presence of the jury. *Id.* at *3.

Defendant contends that the government should not be able to ask Totani leading questions on direct examination because it was able to "develop her

testimony" during the course of the investigation. R. 57 at 6. Defendant misunderstands the purpose of Rule 611(c)'s reference to "develop[ing] the witness' testimony." The language does not refer to pre-trial investigation and access to the witness, but the flow of the examination at trial. *See United States v. Hansen*, 434 F.3d 92, 105 (1st Cir. 2006) ("The Government's [leading] questions were used primarily to develop coherent testimony from [the witness identified with defendant]."); *United States v. Mulinelli-Navas*, 111 F.3d 983, 990 (1st Cir. 1997), as amended (May 23, 1997) (use of leading questions appropriate during direct examination of cooperating "witness who was, at times, unresponsive or showed a lack of understanding" in order "to lay a foundation for a line of questioning or to assist in developing coherent testimony"); *United States v. Haden*, 116 F.3d 1483 at *3 (7th Cir. 1997) (no abuse of discretion where district court permitted leading questions to multiple witnesses on direct "to clarify ambiguities in witnesses' testimony").[4]

In his response, defendant falsely contends that the government did not obtain new evidence after Totani testified in the grand jury that contradicted her statement. R. 57 at 3. As defendant is aware, on February 22, 2019, Totani's friend, Jamie Mika, contacted the FBI after Totani testified in the grand jury and after defendant was

---

[4] In fact, prosecutors often seek leave to lead victim witnesses on direct examination without any showing or finding of "hostility" and for the purpose of clarifying testimony. *See .e.g., United States v. Wright*, 540 F.3d 833, 844-45 (8th Cir. 2008); *United States v. Flute*, 363 F.3d 676, 678-79 (8th Cir. 2004). Clearly, the issue in developing a witnesses' testimony has nothing to do with pre-trial access to a witness, but rather the clarity of the testimony for the jury.

6

indicted.[5] According to Mika, Totani explicitly acknowledged that she did not earn the Rosemont Billboard Deal payments, informing him that she had to occasionally take pictures of the Rosemont billboards to justify her receipt of the Eastern Advisors money. *Id.* at 3.[6] Mika understood that Totani and defendant were manufacturing a justification for the Eastern Advisors money. *Id.* As she prepared to testify in the grand jury, Totani told Mika: "I gotta go do this for [defendant]. On paper we're making it look like I worked for [defendant] taking pictures of billboards." *Id.* at 4.

Mika further informed law enforcement that, as Totani was meeting with law enforcement in preparation for her grand jury testimony, Mika lived with Totani and defendant often visited Totani's residence. *Id.* During those visits, Mika observed defendant providing Totani with cash and the two would often separate for private conversations. *Id.* Mika's account is, in part, corroborated by Totani, who testified before the grand jury about her contacts with defendant about the Rosemont Billboards Deal and the investigation generally.

The Mika 302 issue also raises questions about defendant's post-indictment contacts with Totani about the case. As discussed in the government's motion, the Court modified defendant's conditions of release to permit contact between defendant and Totani as long as they did not discuss the investigation. However, on October 13, 2019, five months after the Mika 302 was produced to defendant, in a recorded jail

---

[5] A redacted version of the FBI 302 Report of Investigation of Jamie Mika (the "Mika 302") is attached as Exhibit A. The government produced the report to defendant on May 24, 2019.

[6] Totani testified in the grand jury that, every few months, she took photographs of the Rosemont billboards at defendant's direction. That claim is also belied by the government's evidence.

7

call, Totani discussed Mika's interview with the FBI. Totani said: "[Mika] went to people. He tried to cut a deal." Totani then said: "When I found out that there's six pages . . . I can't read it until after the trial . . . ." Moments later in the call, Totani discussed an argument that she had with Mika and said: "I have all the records of exactly when [he] did it [spoke with the FBI] and it shows."[7] Thus, not only is there post-indictment evidence contradicting Totani's account to the grand jury, but defendant knew it, and so did Totani. Although, in the jail call, Totani incorrectly references the number of pages of the 302 – it is four pages rather than six – the fact that she knows about the FBI interview and that Mika reached out to the FBI and claims to have in her possession "the records" is problematic, considering the only person with access to the Mika 302 was defendant and defendant was (and still is) subject to Court-ordered conditions of release precluding him from discussing the case with Totani.[8] Even if Totani's knowledge of the Mika interview does not violate defendant's conditions of release, the issue underscores the government's need to fully develop Totani's testimony on direct examination with leading questions.

---

[7] In addition, in a recorded jail call on January 13, 2020, Totani said that "M [defendant] thinks they're [the government] going to drop everything [the charges]." Totani then referenced the trial date (September). This communication further reflects potential communications between Totani and defendant in violation of the Court's order and conditions of release.

[8] There is also a protective order imposed by the Court. R. 26. Pursuant to that order, all materials provided by the government in connection with the case are subject to the protective order and disclosure is limited to "authorized persons." While persons who are interviewed as potential witnesses and counsel for such witnesses are included as "authorized persons," Totani's counsel has denied ever receiving the Mika 302 or discussing it with his client prior to the October 13, 2019 jail call. Thus, to the extent Totani "[has] all the records" and received them from defendant or reviewed the Mika 302 during a meeting with defendant, defendant may have violated the protective order.

Defendant highlights Totani's participation in interviews with law enforcement officials and her grand jury testimony. R. 57 at 2-3. Defendant fails to highlight that, for approximately fifteen months after first being approached by law enforcement, Totani: (1) refused to speak with law enforcement officials (asserting her Fifth Amendment rights); and (2) regularly spoke with defendant about the investigation and what they perceived to be the government's focus—the Rosemont Billboards Deal and Totani's involvement, if any, in that deal.[9] Defendant also ignores that Totani's purported compilation and production of documents, (R. 57 at 2), includes Totani's recovery of an independent contractor agreement with Eastern Advisors long after she initially responded to a grand jury subpoena for records without the document and only after *defendant* reminded her that it existed and emailed the agreement to her.

The government does not contend that Totani will necessarily have perjured herself if she testifies consistently with her grand jury statement.[10] At this point, it

---

[9] Defendant contends that Totani acknowledged that she never understood gifts and payments made by Eastern Advisors to Totani (the purported loan payments) to be loans. R. 57 at 3. Defendant implicitly argues that Totani's honest testimony about the payments not being loans should preclude the government from asking leading questions on her direct. However, Totani also informed law enforcement that, from the first time she spoke with defendant about the investigation after she was subpoenaed in 2016, defendant assumed the issue of interest to law enforcement was the Rosemont Billboards Deal, i.e., not the payments to Totani that defendant had falsely labeled as loans from Eastern Advisors. Accordingly, Totani's honesty about the purported loans may simply reflect defendant's failure to anticipate all aspects of law enforcement's investigation rather than Totani's good faith.

[10] A witness perjures him or herself if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Sims*, 329 F.3d 937, 945 (7th Cir. 2003) (internal quotations omitted).

9

is unclear whether Totani would be willfully providing false testimony or if her memory is faulty and she was susceptible to defendant's influence. However, considering Totani's overwhelming bias towards defendant (someone she said she would "die" for), defendant's role in repeatedly influencing Totani's testimony throughout the course of the investigation and prosecution, and the nature of Totani's expected testimony, which is inconsistent with the weight of the evidence, the government submits that in order to fully develop Totani's testimony and highlight its issues to the jury, the Court should permit the government to ask Totani leading questions during portions of her direct examination.

## Conclusion

For the reasons set forth above, if the Court intends to rule pretrial on the issue, the government respectfully requests that the Court allow the government to treat witness Jerilyn Totani as a witness identified with an adverse party on direct examination and ask her leading questions during portions of her testimony.

Date: July 13, 2020            Respectfully submitted,

                                          JOHN R. LAUSCH, JR.
                                          United States Attorney

By:    */s/ Richard M. Rothblatt*
        Richard M. Rothblatt
        Ankur Srivastava
        Assistant U.S. Attorneys
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300