UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL ABRAMSON | No. 18 CR 681<br><br>Hon. Virginia M. Kendall |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT CERTAIN EVIDENCE AT TRIAL PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., the United States Attorney for the Northern District of Illinois, hereby respectfully moves this Court, *in limine*, for entry of an order admitting certain evidence at trial pursuant to Federal Rule of Evidence 404(b).

## Background

The indictment charges defendant Michael Abramson with fourteen counts of false statements in corporate and individual tax filings, in violation of Title 26, United States Code, Section 7206(1). R. 1. These false statements relate to hundreds of thousands of dollars of payments from defendant to his romantic partner, Jerilyn Totani, through one of his companies, Eastern Advisors. The false statements enabled defendant to take unwarranted corporate tax deductions and disguise gift payments to Totani as loans to avoid additional taxable income on his tax returns.

*Defendant's Extramarital Relationship with Totani*

Beginning in the 1990s, defendant, an attorney and business owner, began a romantic relationship with Jerilyn Totani, an exotic dancer whom he met at a club then known as The Doll House. *Id.* ¶ 1(j). Early on during their relationship,

defendant rented Totani an apartment at 1122 North Clark in Chicago to support Totani and facilitate their extramarital relationship. In around 1999, 1122 North Clark converted to a condominium building and defendant purchased the condominium for approximately $250,000. Totani lived in 1122 North Clark (the "Clark Condominium") full time and defendant put the condominium in a trust in the name of a nominee (Richard Forcone) in order to conceal his connection to the condominium and Totani.

Forcone testified before the grand jury[1] that, despite not being friendly or particularly close with defendant: "[defendant] asked me to put a condominium or something in Chicago in my name because he wanted to keep it from his wife and keep it off his tax returns because he had a girlfriend [Totani] there." *See* Ex. A at 7, 9 ("[Defendant] said he had a girlfriend that he was taking care of and he didn't want his wife to know about it. [Defendant] didn't want it on his taxes or anything else.]."). Forcone testified that he had no sense as to why defendant asked him to put the condominium in his (Forcone's) name. *Id.* at 9-10. Forcone never personally saw the condominium or received rent from defendant in connection with Totani's use of the condominium.

*Defendant Directs Payments to Totani Through Eastern Advisors*

During this time, defendant, owned and operated several companies including Leasing Employment Services, Eastern Advisors, and PayTech. *Id.* ¶¶ 1(f) and (g).

---

[1] *See* Exhibit A (Transcript of Forcone's Grand Jury Testimony, filed under seal pursuant to the Court's order. R. 61.

In around 2001, Outfront Media (formerly Viacom and CBS Outdoor, hereinafter "Outfront") retained defendant in connection with potential litigation with the Village of Rosemont relating to a land dispute involving several billboards in the area. During the course of his representation of Outfront, defendant connected Outfront representatives with a business associate, Robert Durkin. Durkin helped Outfront negotiate a resolution to the dispute with Village officials (the "Rosemont Billboards Deal"). In or around June 2003, at defendant's direction, Outfront began directing payments to Eastern Advisors in connection with the Rosemont Billboards Deal. Pursuant to an agreement between Eastern Advisors and Outfront, Eastern Advisors received 10% of the adjusted gross rent paid to Outfront for the Rosemont Billboards. Thereafter, Outfront made quarterly payments of approximately $29,500 to Eastern Advisors. *Id.* ¶ 1(m).

At defendant's direction, the bookkeeper for Leasing Employment Services, Eastern Advisors, and PayTech, Jill Roth, had Eastern Advisors make regular payments of $2,500 to Totani on the 15th and 30th of each month, booking those payments as "advance on commissions." Irrespective of the amount of money Eastern Advisors received from Outfront, Totani received $2,500 on the 15th and 30th of each month. Defendant also directed Roth to pay Totani's expenses, including credit card bills and medical bills, and to reclassify any funds paid to Totani in excess of 50% of the Outfront money to a loan account (the "JT Loan Account").

Between 2006 and 2014, defendant personally made and caused Roth to make approximately $681,000 in payments either to or on behalf of Totani and to record

3

the payments as loans from defendant to Totani through the JT Loan Account. While characterized as "loans" from Eastern Advisors, these payments were taxable distributions from defendant to Totani. There was no loan document, interest rate, or payment schedule. Totani never repaid or plan to repay Eastern Advisors or defendant for any of these payments. Moreover, these payments supplemented regular cash gifts given to Totani on a weekly basis (and her subsidized housing at the condominium defendant had purchased for her). Defendant also purchased Totani several cars, including two Corvettes, a Ferrari, and the shell of a 1974 Corvette. Defendant also leased Totani a 1999 Porsche 911 C2 and purchased her a motorcycle and thousands of dollars' worth of jewelry.

Between its inception in 2002 and 2013, Eastern Advisors, the entity through which defendant provided hundreds of thousands of dollars to Totani, was required to and did not file an annual United States Corporation Income Tax Return, Form 1120. *Id.* ¶ 1(q).

*IRS Inquiry and Amended Tax Returns*

In or around October 2013, the IRS began requesting records relating to Eastern Advisors and made a formal request to another business associate of defendant – William Vickerman – through the Mexican tax authorities (the "Hacienda"). Vickerman and defendant owned a spice distributing company, Grupo Mexquitic ("Grupo"), which operated in Mexico. In 2014, defendant asked Roth, his bookkeeper, to prepare and file amended returns for his companies (including Eastern Advisors). On August 6, 2014, defendant personally drafted and submitted

4

a determination letter request to the IRS requesting an extension of time under various provisions of the IRS code in order to file amended consolidated returns reflecting that that the entities (Leasing Employment Services, PayTech, and Eastern Advisors) were consolidated and should have been deemed consolidated as far back as 2006.

Between 2014 and 2015, defendant caused his tax prepares to prepare United States Corporation Income Tax Returns, Forms 1120 and 1120X, including schedules and attachments, for Leasing Employment Services, PayTech, and Eastern Advisors for calendar years 2006 through 2014. *Id.* ¶ 1(s). The returns included information concerning the income and business expenses of Eastern Advisors. *Id.* The tax filings included improper deductions related to the personal payments made to Totani from Eastern Advisors and a schedule (Schedule L) referencing a loan receivable from "JT" (Jerilyn Totani), which, in truth, reflected additional personal payments from defendant to Totani through Eastern Advisors. Those additional payments were not a loan and, thus, not an asset to Eastern Advisors. The false statements in Leasing Employment Services' amended returns for 2006 through 2012 and returns for 2013 and 2014 and defendant's personal income tax returns for 2011 through 2014 resulted in tax loss to the IRS in the amount of approximately $190,559.

## Argument

Through this motion, the government seeks to admit evidence of defendant's non-filing of tax returns for Eastern Advisors from 2002 through 2013 and defendant's purchase of the Clark Condominium and its placement in a trust in a nominee's name. While defendant's failure to file annual tax returns (Form 1120s)

5

for Eastern Advisors is referenced in the indictment, (R. 1 ¶ 1(q)), the non-filing was not independently charged as criminal activity. It is the government's position that the purchase of the Clark Condominium and its placement into a trust in a nominee's name is not "other acts" evidence, but the government discloses it out of an abundance of caution. Both pieces of evidence are admissible under Federal Rule of Evidence 404(b) because such evidence would be offered for a relevant, non-propensity purposes – to prove defendant's willfulness, motive, knowledge of the falsity of the charged returns, and lack of good faith.

Rule 404(b)(1) prohibits the use of "other acts" evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1); *United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019). But Rule 404(b)(2) provides a non-exhaustive list of other purposes for which such evidence is admissible. It states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b)(2). *See also Brewer*, 915 F.3d at 415 (explaining that Rule 404(b)(2) permits the introduction of other act evidence to prove identity and modus operandi) (citing *United States v. Carson*, 870 F.3d 584, 599 (7th Cir. 2017)); *United States v. Taylor*, 522 F.3d 731, 734-36 (7th Cir. 2008) (evidence of other bad acts is admissible so long as the evidence is not introduced to show the defendant's bad character).

In *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*), the Seventh Circuit "set the roadmap for determining which camp a particular piece of other-act evidence falls into." *Brewer*, 915 F.3d at 415. Under *Gomez*, "after a Rule 404(b) objection, the proponent of the other-act evidence must demonstrate that the evidence is relevant to a legitimate purpose 'through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case.'" *Id*. (quoting *Gomez*, 763 F.3d at 860). "If the proponent does so, the district court must then use Rule 403 to determine 'whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice,' taking into account 'the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.'" *Id.* (quoting *Gomez*, 763 F.3d at 860); *see also United States v. Thomas*, 897 F.3d 807, 813 (7th Cir. 2018).

In a false tax statements case such as this one, the government must establish defendant's willfulness, or that "the law imposed a duty on the defendant, that defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States,* 498 U.S. 192, 201 (1991).

### I. The Court Should Permit the Government to Introduce Evidence of the Non-Filing of Eastern Advisors' Tax Returns.

In tax cases, courts have repeatedly held that the government can use uncharged acts, including previous failures to file tax returns, to establish defendant's willfulness, knowledge, and intent. In *United States v. Mendoza*, 382 F. App'x 507, 511 (7th Cir. 2010), the Seventh Circuit found evidence of uncharged

7

fraud, which generated the income the defendant failed to disclose and report in a Section 7206(1) prosecution, relevant to the defendant's willfulness. Notably, the court also found that the defendant's failure to disclose income (the proceeds of the uncharged fraud) was admissible evidence of the defendant's willfulness.

Similarly, in *United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027, at *15 (N.D. Ill. Sept. 29, 2011), this Court denied the defendant's request for a new trial and found that evidence of prior failure to file tax returns was admissible in a tax fraud prosecution as evidence that the defendant was attempting to conceal illegally obtained income. This Court specifically precluded any reference to the unfiled tax returns to show propensity to commit crimes and found such evidence was relevant to the defendant's knowledge or intent. *Id.*; *see also United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (affirming admission of the defendant's attempt to structure fees in a way that would avoid government attention because the "[the defendant] would not attempt to hide from the government her involvement with these tax returns if she truly believed her tax positions were legitimate"); *United States v. Curtis*, 781 F.3d 904, 909-11 (7th Cir. 2015) (finding that district court did not abuse its discretion in admitting evidence of unpaid payroll taxes in tax evasion case where the defendant opened the door to the evidence and government used the evidence to rebut a good-faith defense); *United States v. Taylor*, No. 17 CR 658-2, 2019 WL 4410279, at *6 (N.D. Ill. Sept. 16, 2019) ("Government, therefore, offered evidence that Taylor failed to file tax returns in order to hide evidence from the IRS as evidence

8

of his knowledge and intent to defraud, which are proper purposes under Rule 404(b).").[2]

Here, the government intends to introduce the non-filing of the Eastern Advisors' tax returns in order to explain to the jury why the amended tax returns were filed and to provide context for defendant's determination letter, which is evidence of defendant's willfulness and legal obligations with regard to tax filings. The government will not be using the non-filing to argue defendant's propensity to commit tax crimes. At no point will the government argue that defendant's non-filing of tax returns for Eastern Advisors from 2002 through 2013 should lead to an inference that defendant is more likely to have not complied with the tax laws related to the charged returns.

The non-filing evidence is also admissible under Rule 403. Here, the probative value of the evidence is high, as it explains the reason for the amended tax returns which included a consolidation of Leasing Employment services with Eastern Advisors and Paytech. Moreover, the government intends to introduce defendant's letter to the IRS, which provided his justification for not filing returns for Eastern Advisors between 2002 and 2013. Accordingly, defendant's explanation will be in evidence for the jury to consider and mitigates any potential prejudice of the evidence.

---

[2] Likewise, in *United States v. Borchert*, No. 13 CR 81, 2014 WL 1031433, at *2 (N.D. In. Mar. 17, 2014), the district court denied a motion for acquittal and found that evidence related to defendant's failure to file income tax returns for a period of years, among other things, was relevant evidence of the defendant's willfulness in a prosecution under Section 7206(1).

Finally, the government will propose a limiting instruction, instructing the jury that it should consider the evidence of defendant's non-filing in prior years only as relevant to assessing defendant's willfulness with regard the charged offenses.

Accordingly, the Court should permit the government to admit evidence of defendant's failure to file Eastern Advisors corporate tax returns between 2002 and 2013, which was alleged in the indictment and is relevant to the elements of the charged offense.

## II. The Court Should Permit the Government to Introduce Evidence of Defendant's Use of a Nominee as the Owner of the Clark Condominium.

In considering whether defendant's personal and corporate tax returns were false, the jury will have to assess whether Totani legitimately earned the commissions payments from Eastern Advisors and whether the loan payments were a legitimate asset on the books of the company or whether defendant was using Eastern Advisors as a way to pay and support his girlfriend (Totani). The condominium evidence is relevant to the key issues of the accuracy of the tax filings and defendant's intent.

It is the government's position that the evidence is not other acts evidence under Rule 404(b), and *United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987) and *Gomez*, 763 F.3d at 856. There is nothing inherently unlawful or sinister about using a nominee to hold property. *See United States v. Northern States Investments, Inc.*, 670 F. Supp. 2d 778, 789 (N.D. Ill. 2009) (applying nominee test under the federal common law to establish whether a corporation was a nominee for federal tax lien purposes). Nor is the purpose of the condominium evidence to argue defendant's

10

propensity to commit crimes (the issue is not the legitimacy of the trust or defendant's efforts to evade taxes), but rather as evidence of defendant's concealment of his relationship with Totani and the benefits that he bestowed upon her. Defendant's history of concealing his relationship with Totani by purchasing a condominium for her benefit, in which she lived, rent-free, and involving a third-party (Forcone) for no reason other than concealment makes it more likely that defendant would use Eastern Advisors to conceal payments to Totani. The common factor is not his propensity to do such things, but the fact that Totani was his extramarital girlfriend. In addition, defendant's subsidization of Totani's housing from the mid-1990s through 2014 make it less likely that the purported loan funds were legitimate, as creditors typically do not fully subsidize debtors' housing.

However, to the extent that such evidence is other acts evidence under Rule 404(b), evidence of defendant's use of a nominee for the trust that owned the Clark Condominium is admissible to prove defendant's motive, intent, willfulness, and lack of good faith when filing and causing to be filed the tax returns charged in the indictment. In particular, defendant's purchase of the condo by means of a nominee—which defendant did to keep his wife from knowing about the condo, according to Forcone—is evidence of the same motive that caused defendant to use Eastern Advisors to give gifts to Totani. By paying Totani from Eastern Advisors, defendant was able to support her without having to spend or withdraw money from his personal accounts.

Finally, the probative value of the evidence of defendant's use of a nominee with regard to the Clark Condominium is high—it will, among other things, establish the nature of defendant's relationship with Totani, reflect concealment of his extramarital relationship consistent with paying Totani through Eastern Advisors, and provide further evidence of the non-existence of a legitimate loan. As discussed above, because the use of a nominee is not an unlawful practice, the evidence is not unduly prejudicial.

Accordingly, the government requests that the Court permit the government to introduce evidence of defendant's use of a nominee on a trust holding the Clark Condominium and defendant's admissions to the nominee regarding the condominium.

## Conclusion

For the reasons set forth above, the government respectfully requests that this Court enter an order, *in limine*, admitting evidence of defendant's non-filing of Eastern Advisors tax returns for the years 2002 to 2013 and defendant's purchase of the Clark Condominium and placement of the condominium into a trust in a nominee's name to prove defendant's motive, willfulness, intent, and lack of good-faith pursuant to Federal Rule of Evidence 404(b)(2).

Date: December 16, 2021   Respectfully submitted,

                                         JOHN R. LAUSCH, JR.
                                         United States Attorney

By:   */s/ Richard M. Rothblatt*
        Richard M. Rothblatt
        Andrew C. Erskine
        Assistant U.S. Attorneys
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300