UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL ABRAMSON | No. 18 CR 681<br><br>Hon. Virginia M. Kendall |

**GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE***

The UNITED STATES OF AMERICA, through its attorney JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following motions *in limine*: (1) seeking to recall the case agent during the government's case-in-chief; (2) providing notice to the Court of the government's intention to request to treat government witness Jerilyn Totani as a witness identified with an adverse party and ask leading questions during her direct examination; and (3) seeking to admit evidence of defendant's extramarital relationship with Totani. In support of its motions, the government states as follows:

**Background**[1]

The indictment charges defendant with fourteen counts of false statements in corporate and individual tax filings, in violation of Title 26, United States Code, Section 7206(1). R. 1. These false statements relate to hundreds of thousands of dollars of payments from defendant Michael Abramson to his decades-long romantic partner, Jerilyn Totani, through one of his companies, Eastern Advisors. The false

---

[1] The background of this case is discussed at length in the background section of the government's motion *in limine* to admit certain evidence pursuant to Federal Rule of Evidence 404(b). R. 76.

statements enabled Abramson to take unwarranted corporate tax deductions and disguise gift payments to Totani as loans to avoid additional personal income.

## I. Motion to Recall Case Agent

In order to present its case in a chronological and coherent manner, the government requests that the Court permit the government to recall the case agent, Special Agent Jason Gibson, during its case-in-chief. The government expects that Special Agent Gibson will first testify about: (1) background relating to the Internal Revenue Service; (2) background of the investigation; and (3) introduce several exhibits into the record relating to the entities that the jury will be hearing about throughout trial. Following this initial testimony, several witnesses will testify regarding Totani's relationship with Abramson, the Rosemont Billboard Deal, Abramson's payment of commissions and other funds to Totani through Eastern Advisors, and the various tax returns at issues. After that testimony, it might be necessary to recall Special Agent Gibson regarding other aspects of the investigation, including to introduce summary charts and analyses of bank records.

The Seventh Circuit has held that "[t]he district court has substantial discretion in its control of the presentation of evidence at trial." *United States v. Dent*, 984 F.2d 1453, 1463 (7th Cir. 1993) (citing Fed. R. Evid. 611(a)) (overruled on other grounds). Included in its authority and sound discretion is the ability to permit the recalling of witnesses. *Id.* (citing *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991)). Courts regularly permit parties to recall witnesses as part of the presentation of evidence. *See United States v. Vasquez*, 635 F.3d 889, 897 (7th Cir.

2011) (no abuse of discretion for district court to allow the government to recall a witness based on new information); *United States v. Williams-Ogletree*, No. 11 CR 203, 2013 WL 66207, at *3 (N.D. Ill. Jan. 4, 2013) (granting the government's motion *in limine* to allow the recalling of certain witnesses in order to present evidence in a coherent manner).

Here, as noted above, Special Agent Gibson will initially provide generalized testimony about the IRS, the background of the investigation, and introduce certain documents obtained during the course of the investigation. After several witnesses testify and certain evidence is admitted into the record, the government may seek to recall Special Agent Gibson to present summary charts under Federal Rule of Evidence 1006.

Accordingly, in order to facilitate the presentation of evidence at trial and to facilitate juror comprehension, the government respectfully requests that the Court permit the government to recall Special Agent Gibson during its case-in-chief.

**II. Notice of Government's Intention to Request Court's Approval to Treat Witness Totani as a Witness Identified with an Adverse Party and Ask Limited Leading Questions During Direct Examination**

During its case-in-chief, the government expects to call Totani, Abramson's romantic partner and financial dependent as a witness. The government expects that Totani will testify about, among other things, her decades long extramarital relationship with defendant, the financial support she received from defendant, and how she did not consider payments from defendant to be loan payments that she needed to repay.

3

Through this filing, the government provides notice to the Court of its intention to request the Court's approval to treat Totani as a witness identified with an adverse party and use leading questions during her direct examination. Such a determination "clearly falls within the area of control by the judge over the mode and order of interrogation and presentation . . . ." Fed. R. Evid. 611 advisory committee's note to subdivision (c). Here, Totani has indicated on multiple occasions that she is wholly dependent on and beholden to defendant. Moreover, when law enforcement officials recently served Totani with a trial subpoena in this case, Totani indicated that she intends to disavow her sworn grand jury testimony at trial.

Typically, on direct examination of a witness, leading questions should not be used except as necessary to develop that witness' testimony. Fed. R. Ev. 611(c). If, however, a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, that party calling the witness is permitted to use leading questions in its examination of the witness. *Id.* The limitation on the use of leading questions was "designed to guard against the risk of improper suggestion inherent in examining *friendly* witnesses through the use of leading questions." *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir. 1981) (emphasis added). "The exception in rule 611(c)(2) recognizes the risks of suggestion are reduced where the witness has an interest in promoting a version of the facts contrary to that suggested." *Sec. & Exch. Comm'n v. Goldstone*, 317 F.R.D. 147, 163 (D.N.M. 2016).

Under Rule 611(c), a witness "identified with an adverse party" is generally an employee, agent, friend, or relative of an adverse party. *See Ratliff v. City of Chicago*,

4

*et al.*, No. 10 C 739, 2012 WL 7993412, at *1 (N.D. Ill. Nov. 20, 2012); *see also Goldstone*, 317 F.R.D. at 163 ("Although the precise meaning of witness identified with an adverse party is not clearly defined, a few relationships fall within its meaning. These relationships include: (i) employee/employer relationships; (ii) romantic partners; and (iii) law enforcement investigators." (internal quotations and citations omitted). "Rule 611 is designed to enlarge the categories of witnesses automatically considered to be adverse without any further showing of hostility so that leading questions may be used during their examination." 4-611 Weinstein's Federal Evidence § 611.06 (2015). Cooperating witnesses testifying pursuant to a grant of immunity may be designated hostile witnesses and subject to leading questions during their direct examinations. *See United States v. Diaz*, 662 F.2d 713, 718 (11th Cir. 1981) (denying the defendant's motion to treat immunized government witness as a hostile witness because prior trial testimony reflected hostility towards government rather than defendant).

A party calling a witness identified with an adverse party need not establish "hostility" to the party calling the witness in order to ask leading questions. The exceptions highlighted in Rule 611(c) are framed in the disjunctive, not the conjunctive. Fed. R. Evid. 611(c) ("When a party calls a hostile witness, an adverse party, **or** a witness identified with an adverse party, interrogation may be by leading questions.") (emphasis added). Courts routinely allow parties, including the government in a criminal prosecution, to ask witnesses identified with an adverse party leading questions without any finding of hostility. *See United States v. O'Brien*,

5

618 F.2d 1234, 1242 (7th Cir. 1981) (use of leading questions at various stages of co-schemer and crucial witness was appropriate without finding of hostility); *United States v. Hansen*, 434 F.3d 92, 105 (1st Cir. 2006) ("The Government's [leading] questions were used primarily to develop coherent testimony from [the witness identified with defendant]."); *United States v. Mulinelli-Navas*, 111 F.3d 983, 990 (1st Cir. 1997), as amended (May 23, 1997) (use of leading questions appropriate during direct examination of cooperating "witness who was, at times, unresponsive or showed a lack of understanding" in order "to lay a foundation for a line of questioning or to assist in developing coherent testimony"); *United States v. Haden*, 116 F.3d 1483 at *3 (7th Cir. 1997) (no abuse of discretion where district court permitted leading questions to multiple witnesses on direct "to clarify ambiguities in witnesses' testimony").[2]

Typically, courts wait to observe the witness testify before determining whether or not they are hostile or identified with an adverse party. *See St. Clair v. United States*, 154 U.S. 134, 150 (1894); *United States v. Brown*, 603 F.2d 1022, 1026 (1st Cir. 1979) (affirming ruling by the district court that the prosecutor be allowed to use leading questions where witness and defendant were close friends, witness was a participant in the crime, and witness testified about his "susceptibility to suggestion" and continued contact with the defendant right up to trial). In *United States v. Dingle*, No. 12-30098, 2014 WL 6812457, at *3 (S.D. Ill. Dec. 3, 2014), the

---

[2] Prosecutors often seek leave to lead victim witnesses on direct examination without any showing or finding of "hostility" and for the purpose of clarifying testimony. *See e.g., United States v. Wright*, 540 F.3d 833, 844-45 (8th Cir. 2008); *United States v. Flute*, 363 F.3d 676, 678-79 (8th Cir. 2004).

court conditionally granted the government's motion to use leading questions during the direct examination of a witness to the extent the government called the witness and submitted an offer of proof outside the presence of the jury.

Here, the evidence of Totani's identification with defendant is overwhelming. On a personal level, Totani and defendant have maintained an extramarital romantic relationship since the mid-1990s. As discussed at length in the background section of the government's motion *in limine* to admit certain evidence pursuant to Federal Rule of Evidence 404(b) (R. 76), throughout that time, defendant purchased a condominium for Totani for approximately $250,000. According to Totani, defendant took out a life insurance policy in the mid-1990s in the amount of approximately $1,000,000 for her benefit. At some point, Totani asked that defendant increase the policy to $5,000,000.

The condominium and life insurance policy are just the tip of the iceberg of defendant's financial support of Totani. Defendant has also provided Totani with financial support through regular cash payments ($500 per week for decades), and payments from Eastern Advisors, covering living expenses, credit card bills, and other miscellaneous expenditures. In total, between 2003 and 2014, defendant distributed in excess of $1.4 million to Totani through Eastern Advisors. As discussed in the government's 404(b) notice, during this same time period, defendant purchased Totani vehicles, including Corvettes, a Ferrari, and a motorcycle and leased her a Porsche. Defendant covered tens of thousands of dollars of Totani's gambling losses and spent thousands of dollars on jewelry for her. During all these years, defendant

handled Totani's tax filings through his tax preparer and paid her taxes through Eastern Advisors.

On or about November 16, 2017, the government provided Totani with letter immunity. During the course of later meetings between Totani and the government, Totani informed the government that defendant was paying for her legal representation and that she would "die for [defendant]." As Totani testified before the grand jury,[3] upon being approached and subpoenaed in connection with this investigation in early 2016, she immediately contacted defendant and sent him a picture of the subpoena. Totani and defendant met soon after to discuss the subpoena and investigation. When discussing the investigation, defendant told Totani about issues, including the payments from Eastern Advisors and the Rosemont Billboards Deal, about which he expected the government to question her. Defendant then reminded Totani that she had "brought the [Rosemont Billboards Deal]." Around that time, defendant also refreshed Totani's recollection about an Independent Contractor Agreement between Totani and defendant, which defendant then sent to her by email and Totani purportedly later found underneath a dresser.

Totani's financial reliance on defendant lasted into (at least) 2020. Based on a review of banking records relating to Totani's account, between October 2016 and March 2020, defendant transferred approximately $134,410 to Totani's account. Between October 2016 and June 1, 2017, Eastern Advisors continued to pay Totani commissions and advance on commissions in the amount of approximately $37,500.

---

[3] The transcript of Totani's grand jury testimony is attached as Exhibit A and is filed under seal pursuant to the Court's order. R. 61.

Between October 2016 and March 5, 2020, Totani made deposits of approximately $80,000 in cash into her bank account.[4] In a recorded jail call between Totani and an inmate on October 7, 2017, five weeks before Totani received letter immunity and eight months before Totani testified in the grand jury, Totani referenced several people she considered "family," including "*my* Michael [defendant]." (emphasis added).

Moreover, following his arraignment, Judge Maria Valdez released defendant on bond under certain conditions of release, including that defendant avoid all contact with Totani (Individual A, as identified in the indictment). On November 15, 2018, defendant moved to modify his conditions of release to permit him to contact Totani. R. 28. The government did not object on the condition that defendant and Totani avoid discussing the case and the Court modified defendant's conditions of release.

On February 22, 2019, Totani's friend, Jamie Mika, contacted the FBI after Totani testified in the grand jury and after defendant was indicted.[5] According to Mika, Totani explicitly acknowledged that she did not earn the Rosemont Billboard Deal payments, informing him that she had to occasionally take pictures of the Rosemont billboards to justify her receipt of the Eastern Advisors money. *Id*. at 3.[6]

---

[4] As discussed above and as Totani informed law enforcement officials, defendant regularly delivered her cash payments of $500 per week.

[5] A redacted version of the FBI 302 Report of Investigation of Jamie Mika (the "Mika 302") is attached as Exhibit B. The government produced the report to defendant on May 24, 2019.

[6] Totani testified in the grand jury that, every few months, she took photographs of the Rosemont billboards at defendant's direction. That claim is also belied by the government's evidence.

9

Mika understood that Totani and defendant were manufacturing a justification for the Eastern Advisors commissions payments. *Id.* As she prepared to testify in the grand jury, Totani told Mika: "I gotta go do this for [defendant]. On paper we're making it look like I worked for [defendant] taking pictures of billboards." *Id.* at 4.

Mika further informed law enforcement that, as Totani was meeting with law enforcement in preparation for her grand jury testimony, Mika lived with Totani and defendant often visited Totani's residence. *Id.* During those visits, Mika observed defendant providing Totani with cash and the two would often separate for private conversations. *Id.* Mika's account is, in part, corroborated by Totani, who testified before the grand jury about her contacts with defendant about the Rosemont Billboards Deal and the investigation generally.

The Mika 302 issue also raises questions about defendant's post-indictment contacts with Totani about the case. On October 13, 2019, five months after the Mika 302 was produced to defendant, in a recorded jail call, Totani discussed Mika's interview with the FBI. Totani said: "[Mika] went to people. He tried to cut a deal." Totani then said: "When I found out that there's six pages . . . I can't read it until after the trial . . . ." Moments later in the call, Totani discussed an argument that she had with Mika and said: "I have all the records of exactly when [he] did it [spoke with the FBI] and it shows."[7] Thus, not only is there post-indictment evidence

---

[7] In addition, in a recorded jail call on January 13, 2020, Totani said that "M [defendant] thinks they're [the government] going to drop everything [the charges]." Totani then referenced the trial date (September). This communication further reflects potential communications between Totani and defendant in violation of the Court's order and conditions of release.

10

contradicting Totani's account to the grand jury, but defendant knew it, and so did Totani. Although, in the jail call, Totani incorrectly references the number of pages of the Mika 302 – it is four pages rather than six – the fact that she knows about the FBI interview and that Mika reached out to the FBI and claims to have in her possession "the records" is problematic, considering the only person with access to the Mika 302 was defendant and defendant was (and still is) subject to Court-ordered conditions of release precluding him from discussing the case with Totani.[8] Even if Totani's knowledge of the Mika interview does not violate defendant's conditions of release, the issue underscores the government's need to fully develop Totani's testimony on direct examination with leading questions.

The government expects that Totani will testify about a number of subject matters, including her long-standing relationship with defendant, her financial dependence upon him, the lavish lifestyle he supported, and how she did not consider the hundreds of thousands of dollars defendant spent on her behalf on living expenses and bills to be loan payments. Totani may testify that, after defendant refreshed her recollection, she recalled bringing the Rosemont Billboards Deal to him and that she believed she earned the commissions payments from Eastern Advisors (by both

---

[8] There is also a protective order imposed by the Court. R. 26. Pursuant to that order, all materials provided by the government in connection with the case are subject to the protective order and disclosure is limited to "authorized persons." While persons who are interviewed as potential witnesses and counsel for such witnesses are included as "authorized persons," Totani's counsel has denied ever receiving the Mika 302 or discussing it with his client prior to the October 13, 2019 jail call. Thus, to the extent Totani "[has] all the records" and received them from defendant or reviewed the Mika 302 during a meeting with defendant, defendant may have violated the protective order.

11

bringing the deal to defendant and occasionally taking photographs of the billboards in Rosemont).

Totani's version of events, as supplied by defendant during the course of the investigation, is inconsistent with the government's evidence and the government will affirmatively call witnesses to disprove that Totani had any involvement in the Rosemont Billboards Deal or earned the commissions payments from Eastern Advisors. Of course, generally, "[a]ny party, including the party that called the witness, may attack the witness's credibility." *See United States v. Davis*, 896 F.3d 784, 789 (7th Cir. 2018) (quoting Fed. R. Evid. 607). However, because of Totani's romantic relationship and financial dependence on defendant, Totani is a witness identified with an adversary.

Finally, on November 10, 2021, law enforcement officials served Totani with a trial subpoena in the present matter. *See* Memorandum of Interview from November 10, 2021, attached hereto as Exhibit C. During the ensuing encounter, Totani told the law enforcement officials that the "indictment against [defendant] is stupid." *Id.* at 1. Totani accused the government of changing her grand jury statement before she went into the grand jury and that she now does not agree with some of the grand jury statement "and was just reading it without really knowing what she was saying." *Id.* at 2. Totani informed that "the old Jerilyn who went before the grand jury was bad and that bad things had happened to her; Totani feels more like herself now." *Id.* Totani said that "[t]he government previously took [defendant] away from her for 30 days, and [she] almost committed suicide over it because [defendant] is her lifeline."

12

*Id.* Totani said that "the first thing she'd do if she did win [the lottery] would be to pay off [defendant's] attorneys." *Id.* Totani's representations that she intends to disavow her sworn statement to the grand jury, made under the penalties of perjury, and her ongoing devotion to defendant reflect her identification with defendant.

Accordingly, pursuant to Federal Rule of Evidence 611(c), during the course of her direct examination, the government will move the Court to ask Totani leading questions.

### III. Motion to Admit Evidence of Defendant's Extramarital Relationship with Totani

Through this motion, the government seeks to admit evidence of defendant's extramarital relationship with Totani, which evidence is relevant to defendant's motivation for using Eastern Advisors to pay Totani. That motivation was to conceal payments to his mistress, which would be unnecessary if Totani were merely a romantic partner. As discussed in the background section of the government's motion *in limine* to admit certain evidence pursuant to Federal Rule of Evidence 404(b) (R. 76), Richard Forcone testified to the grand jury: "[defendant] asked me to put a condominium or something in Chicago in my name because he wanted to keep it from his wife and keep it off his tax returns because he had a girlfriend [Totani] there." *See* Ex A. to R. 76 at 7, 9 ("[Defendant] said he had a girlfriend that he was taking care of and he didn't want his wife to know about it. [Defendant] didn't want it on his taxes or anything else.]."). Defendant's use of Eastern Advisors to conceal payments to Totani from his wife and keep it off his tax return makes it more likely that Totani did not legitimately earn the money paid to her by Eastern Advisors, but

13

rather that defendant used Eastern Advisors to pay his extramarital romantic partner.

Courts routinely admit evidence of extramarital relationships to provide the jury with context of relationships and explain financial motivations. *See United States v. Dingle*, 862 F.3d 607, 612 (7th Cir. 2017) (affirming district court's admission of evidence relating to extramarital relationship between co-conspirators, which explained the structure of the fraud scheme and the power dynamic and trust between the parties); *United States v. Poole*, 451 F. App'x 298, 307 (4th Cir. 2011) (finding evidence of the defendant's marital infidelity relevant to the defendant's motive and need to finance an extravagant lifestyle and that evidence was not unduly prejudicial where the district court issued a limiting instruction not to use the evidence improperly); *United States v. Moe*, No. 18-1795, 2020 WL 1899565, at *2 (3rd Cir. Apr. 17, 2020) (evidence of extramarital relationship relevant and not unduly prejudicial to show the defendant's whereabouts in fraud case); *United States v. Powell*, 42 F. App'x 565, 568-69 (4th Cir. 2002) (evidence of extramarital affair was relevant to dispute the defendant's theory of the case "and give a complete picture of the situation"); *United States v. Nosal*, No. 08 CR 0237, 2013 WL 11327121, at **6-7 (N.D. Cal. Mar. 29, 2013) (finding evidence of extramarital relationship relevant to provide jury with insight into relationship between co-conspirators, explain co-conspirators' knowledge of certain facts, motive for certain actions taken by defendant and that evidence did not run afoul of Rule 403 where government represented it would not inquire into "any prurient details" of the affair); *United States v. Shayota*,

14

No. 15 CR 264, 2016 WL 6534248, at *3 (finding that even if there had been a timely motion *in limine* to exclude evidence of extramarital affair, the evidence was relevant to the defendant's financial motivation for the committing the charged crimes and admissible); *United States v. Bonner*, No. 12 CR 3429, 2014 WL 347439, at *2 (S.D. Cal. Jan. 30, 2014) ("The Court concludes that the evidence of the Defendant's marital status and alleged extramarital affair has significant value in proving that the Defendant knowingly engaged in the acts charged in the indictment and acted with intent to defraud.").

As to the potential for undue prejudice under Federal Rule of Evidence 403, "[a]lthough evidence of an extra-marital affair may certainly be prejudicial, the potential prejudice is not overwhelming . . . Potential jurors who feel that evidence of infidelity might affect their impartiality may be identified during jury selection and challenged for cause." *United States v. Mermelstein*, 487 F. Supp. 2d 242, 262 (E.D.N.Y. 2007). Here, without the context that the relationship was an extramarital affair, the jury would likely be left confused as to why defendant went to the lengths that he did – using Eastern Advisors to make hundreds of thousands of dollars of commissions payments and purported loans to Totani – if Totani were just a romantic partner. The reason defendant went to these lengths is that he was concealing the relationship and his payments to Totani. This evidence is critical to the jury's understanding of the case and any potential prejudice can be addressed through juror *voir dire* and a limiting instruction.

To enable the jury to have full background on defendant and Totani's relationship, to explain defendant's motivation for using Eastern Advisors to pay Totani, and to provide the necessary context on the relationship as it pertains to the purported commissions and loans, the Court should allow the government to introduce evidence that defendant's relationship with Totani was an extramarital affair.

## Conclusion

For the reasons set forth above, the government moves to recall Special Agent Gibson during trial, provides the Court with notice that it will move to treat witness Jerilyn Totani as a witness identified with an adversary on direct examination and ask leading questions, and moves to introduce evidence of defendant's extramarital relationship with Jerilyn Totani.

Date: December 27, 2021

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Richard M. Rothblatt*
Richard M. Rothblatt
Andrew C. Erskine
Assistant U.S. Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300