**UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.: 18 CR 681 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| MICHAEL ABRAMSON, | ) | |
| | ) | |

**DEFENDANT MICHAEL ABRAMSON'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF GOVERNMENT EXPERT**

Defendant, Michael Abramson, by and through his attorneys, Nishay K. Sanan and Cece White, respectfully moves this Court to exclude the testimony offered by government's tax expert, Agent Michael Welch, regarding estimated tax loss, pursuant to Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny. In support, Mr. Abramson states as follows:

**I.    Background**

Michael Abramson is charged in the indictment with 13 counts of filing false tax returns in violation of 26 U.S.C. 7206(1). (ECF No. 1). Counts 1, 2, 11, and 13 charge Mr. Abramson with making false statements on his personal tax returns for tax years 2011-2014. Counts 3-9 charge Mr. Abramson with making false statements on amended consolidated corporate tax returns for Leasing Employment Services (LES), a business in which Mr. Abramson has an ownership interest, for tax years 2006-2012. Counts 10 and 12 charge Mr. Abramson with making false statements on the same business's corporate tax returns for tax years 2013-2014.

The allegations all relate to Mr. Abramson's ownership stake in a business that made payments to Jerilyn Totani, a licensed real estate broker who had a contract with Mr. Abramson's business. The government's theory is that Mr. Abramson's real estate brokerage company paid Ms. Totani commissions and loans that were not related to her real estate work but were instead either non-

1

deductible personal payments to Ms. Totani or taxable payments to Mr. Abramson himself. As such, the government alleges that there were false statements on the corporate tax returns in that they described these payments to Ms. Totani as related to the business and that there were false statements on the personal tax returns in that they failed to include the amounts paid to Ms. Totani as Mr. Abramson's income.

### a. Payments to Jerilyn Totani

Mr. Abramson owned LES and two other companies, Eastern Advisors and PayTech, which were consolidated with LES for corporate tax purposes. Eastern Advisors provided real estate brokerage and consulting services and employed several real estate brokers as independent contractors, including Ms. Totani. She was also involved in a romantic relationship with Mr. Abramson, both before and throughout the relevant time periods in this case.

In 2001, Ms. Totani learned that a company called CBS Outdoor, an advertising company that owned and leased large advertisement billboards, was involved in a dispute with the Village of Rosemont. Ms. Totani shared this information with Mr. Abramson. She also told him that she expected a cut if Eastern Advisors obtained business from her tip. Mr. Abramson pursued the lead, and CBS Outdoor retained him to represent the company in lease termination lawsuits filed by the Village of Rosemont. CBS Outdoor also retained Eastern Advisors to assist the company in negotiating a new lease deal with the Village of Rosemont, which resulted in a settlement of the lawsuits. Pursuant to the new deal, CBS Outdoor would rent billboards and the land on which they stood, from the Village of Rosemont. Mr. Abramson brought Robert Durkin into the deal to provide consulting services. Robert Durkin, like Jerilyn Totani, was employed as an independent contractor with Eastern Advisors.

In 2003, CBS Outdoor started paying Eastern Advisors commissions owed for its assistance in negotiating the billboard lease deal. The lease between the Village of Rosemont and CBS Outdoor,

was a 20-year term lease under which Eastern Advisors would receive commissions for the same 20-year term. On average, during the relevant time period, the commissions that CBS Outdoor paid to Eastern Advisors totaled approximately $120,000 per year. Pursuant to written independent contractor agreements, Eastern Advisors paid Mr. Durkin and Ms. Totani 50% of the commissions each. Ms. Totani's commissions were advanced in bi-weekly check payments of $2,500 (i.e., approximately $5,000 per month/$60,000 per year).

Eastern Advisors began paying Ms. Totani commissions at the same time Eastern Advisors began receiving the commission payments from CBS Outdoor, namely June 2003. Ms. Totani will testify that she always understood these checks to be commission payments she earned for finding the deal. Ms. Totani also testified to this fact before the grand jury after she was granted immunity, conditioned on the requirement that her testimony was truthful.

Eastern Advisors also loaned funds to third parties, including loans provided to Ms. Totani for the payment of her personal bills. These payments were recorded contemporaneously in Eastern Advisors' books and records as loans to Ms. Totani. Further, Mr. Abramson loaned his personal funds to Eastern Advisors as shareholder loans. The loans from Mr. Abramson were sufficient to cover the amount of the loans to Ms. Totani and the amount of loans to other third parties. The funds that Mr. Abramson loaned to Eastern Advisors were recorded in Eastern Advisors' books and records under the "Loan-MAA" account. In total, between 2006 and 2014, Mr. Abramson made or directed to be made approximately 432 deposits into this account, totaling several million dollars.

Mr. Abramson hired a certified public accounting firm to prepare his corporate and personal tax returns. He gave his accountants full access to Eastern Advisors' books and records before they prepared the corporate tax returns at issue, and the payments to Totani were disclosed in these records. The accountants agreed that the personal bill payments were properly treated as loans based on Mr. Abramson's belief that they would be repaid.

### b.  The Government's Expert Disclosure

On December 13, 2021, the government provided the defense with notice that it intends to present expert testimony from IRS Agent Michael Welch. The notice states that Agent Welch will testify about general tax code requirements for both corporate and personal income taxes. It states that Agent Welch has reviewed records from Eastern Advisors, LES, and PayTech, including financial and accounting documents. It states that Agent Welch will "opine as to whether defendant's income was properly accounted for and whether the amount of tax paid by Leasing Employment Services and defendant personally was correct." More specifically, the notice claims he will testify that additional tax was owed by Mr. Abramson based on assumptions that "(1) commissions payments to Jerilyn Totani were not actual commission payments; and (2) the "JT Loans Receivable" in Schedule L, Line 14 of the Leasing Employment returns for 2006-2014 did not reflect actual loan payments made by Eastern Advisors to Jerilyn Totani." The notice also states that Agent Welch reviewed bank records for an Eastern Advisors loan account, "AA Saiya-Other" relating to an entity called Grupo Mexquitic, and that "he did not see any documentation supporting booking those payments from AA Sayia to Eastern Advisors as loans or capital contributions to Eastern Advisors by defendant." Finally, Agent Welch will testify as to LES' and Mr. Abramson's personal tax deficiencies based on his review of documents in this case.

### c.  Loss Calculations

The government claims that the false statements alleged here resulted in a loss of $190,559. However, there is no loss in this case. As for the corporate tax returns, there is no tax loss associated with labeling the payments made on behalf of Ms. Totani as loans on LES' tax returns. This is undisputed in that Mr. Welch does not attribute any loss to these statements regarding loans. Further, there was no corporate tax loss related to the commissions paid to Ms. Totani. If the commissions should not have been paid to Ms. Totani, as the government alleges, the appropriate

tax adjustment based on the facts and circumstances would be to attribute the commissions as if they were paid to Mr. Abramson for his work on the billboard deal. Indeed, the government contends Mr. Abramson is the true recipient of the funds. LES, therefore, reported an accurate commission expense even if the government is correct that the individual who earned the commissions was Mr. Abramson and not Ms. Totani.

There was no tax loss on Mr. Abramson's personal tax returns related to the payments made to Ms. Totani. Eastern Advisors' books and records demonstrate that Mr. Abramson made numerous shareholder loans to Eastern Advisors during the relevant time. As a result, even if the government is correct that the payments to Ms. Totani should have been treated as payments to Mr. Abramson, the proper accounting treatment would be to net Mr. Abramson's shareholder loan balance at Eastern Advisors against the amount of the payments, thereby treating the payments to Ms. Totani as Eastern Advisors' loan repayments to Mr. Abramson. This treatment is consistent with how other payments to and from Mr. Abramson were treated. Mr. Abramson's receipt of loan repayments from Eastern Advisors would have no effect on Abramson's personal tax liability.

## II.    Argument

The admissibility of expert evidence is governed by Federal Rule of Evidence 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702

The admissibility of expert testimony-whether based on "scientific," "technical," or "other specialized" knowledge, is governed by the Supreme Court's general holding in *Daubert*, which requires the district court to exercise a "gatekeeping" function to ensure that such testimony is both

reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1991). The fundamental purpose of this gate-keeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

In considering *Daubert* and *Kumho Tire*, the Seventh Circuit has endorsed a two-step analysis for district courts to use in evaluating expert testimony under Rule 702: first, the Court must determine whether the expert's testimony is "reliable," and second, the Court must determine whether the expert's testimony is "relevant." *See, e.g., United States v. Hall*, 165 F.3d 1095, 1101-02 (7th Cir.1999).

## A. Reliability

For an expert opinion to satisfy the reliability requirement, the expert must be qualified in the relevant field and the expert's opinion must be based on sound scientific or other relevant methodology. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Specifically, a Court may consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their potential rate of error; and (4) whether the theories and techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

### Personal Tax Returns

#### i.   Agent Welch's Methodology

Agent Welch offers the opinion that, if the payments to Ms. Totani were not legitimate commissions and loans, then the payments should have been treated as distributions by Eastern Advisors to Mr. Abramson and reported as income on his personal tax returns. According to Mr.

Welch, Abramson's failure to report these distributions on his personal tax returns caused a tax loss of $79,244 between 2011 and 2014.

Mr. Welch's methodology for calculating the tax loss on Mr. Abramson's personal tax returns involved several steps. First, he calculated Eastern Advisors' earnings and profits for each tax year. His expert notice explains that this calculation is necessary because the earnings and profits of a C Corporation, like Eastern Advisors, affects shareholder distributions. Specifically, he will testify that earnings and profits are distributed to shareholders in the following order: (1) dividends up to the amount of a company's annual earnings and profits (which are taxable as income to the shareholder), (2) returns on capital (which are not taxable to the shareholder), and (3) capital gains (which are taxable to the shareholder). Mr. Welch next totaled the amount paid to Ms. Totani in loans and commissions for each tax year. He treated the payments to Ms. Totani as distributions to Mr. Abramson himself, specifically, as dividends up to the amount of Eastern Advisors' earnings and profits. For the remainder of the distributions that exceeded the earnings and profits, he gave zero credit to Mr. Abramson for return of capital and treated the funds as capital gains. Finally, he applied a 15% tax rate to these distributions to arrive at the tax loss of $79,244.

### ii. Mr. Welch's Methodology for Calculating Loss is Contradicted by Generally Accepted Accounting Standards and Legal Precedent

Mr. Welch's proposed testimony should be excluded as unreliable because the accounting techniques on which it rests are not the accepted standards for determining tax liability and because it is based on assumptions that are not supported by the facts in this case. Specifically, Mr. Welch's methodology for calculating tax loss is unreliable because it (1) treats the payments from Eastern Advisors to Ms. Totani as distributions to Mr. Abramson instead of repayments on loans without any basis, and (2) treats those distributions as taxable capital gains to Mr. Abramson rather than the non-taxable return of capital. Neither of these assumptions are supported by the generally accepted principles for determining tax liability in the situations relevant here.

First, Agent Welch's loss calculations rely on an unsupported assumption that if the payments were not commission payments to Ms. Totani, they must be taxable distributions to Mr. Abramson. It is well accepted that determining the tax classification of a distribution provided from corporation to shareholder requires a detailed analysis of the facts and intent at the time of the transaction. *See generally Boulware v. United States*, 552 U.S. 421 (2008). Tax classifications like "dividend" and "return of capital" turn on "the objective economic realities of a transaction rather than…the particular form the parties employed." *Boulware,* 552 U.S. at 427 citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). "In economic reality, a shareholder's informal receipt of corporate property "may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend or as effective a means of returning a shareholder's capital." *Id.*

The same contextual analysis is applicable when a payment from a corporation could be either a taxable distribution or the repayment of a loan. The determination of whether payments from a closely held corporation to a shareholder should be treated as loan repayment or as distributions is based on the facts and circumstances and the intent of the parties at the time of the transactions. *See e.g., Jennings v. United States*, 272 F.2d 842, 845 (7th Cir. 1959) (tax treatment of payments from corporation to shareholder depends on facts and circumstances, including contemporaneous intent of the parties); *see also Busch v. Comm'r*, 728 F.2d 945, 948-49, 951 (7th Cir. 1984) (intent, as evidenced by facts and circumstances, is determinative of whether payment from corporation is loan or dividend); *Illinois Tool Works Inc. v. Comm'r*, 116 T.C.M. (CCH) 124, *10 (T.C. 2018) (same); Internal Revenue Manual, Section 9.5.9.7.4.10(1) ("If the subject made a loan in prior years and contends that part of the understatement of income is in fact a repayment of that loan, the special agent must document the repayment of principal by contacting the borrower. All repayments of principal loaned by the subject should be treated as a non-income item.").

Here, Agent Welch fails to provide any facts or circumstances suggesting that Eastern Advisors intended payments made to Ms. Totani to serve as taxable distributions to Mr. Abramson, nor does he consider the parties' intent. He merely concludes that any distribution made to Ms. Totani was in fact a payment to Mr. Abramson and going even further, he merely concludes that any payment to Mr. Abramson must have been a taxable distribution. As such, Agent Welch fails to provide any reasoning for classifying the payments as such, in contradiction to well-established methods for determining tax liability.

In addition to failing to identify any basis for his conclusion, Agent Welch ignores evidence of the parties' intent to treat the payments instead as loan repayments. Mr. Abramson provided funds to Eastern Advisors into an account explicitly designated as his loan account. The corporation owed Mr. Abramson money, and if the payments to Ms. Totani were intended payments to Mr. Abramson, that would not result in additional income under standard accounting practices. It would be proper to instead reduce Mr. Abramson's loan account by those amounts. *See Jones v. Comm'r,* 74 T.C.M. (CCH) 473, at *9 (T.C. 1997), *aff'd sub nom.* 177 F.3d 983 (11th Cir. 1999) (amount stockholder paid to corporation should be netted from amounts paid to stockholder before identifying any remaining funds as constructive dividends).

The second underlying issue with Mr. Welch's methodology is that he assumes that distributions over and above Eastern Advisor's earnings and profits should be treated as taxable capital gains to Mr. Abramson rather than the non-taxable return of capital. If Agent Welch rejects treating the contributions Mr. Abramson made to Eastern Advisors as shareholder loans, they must be treated as capital contributions. Accordingly, if the payments to Ms. Totani were for the benefit of Mr. Abramson, as the government alleges, then they should be treated as a non-taxable return of Mr. Abramson's capital, not taxable capital gains. *See Jones*, 74 T.C.M. (CCH) 473, at *9 ("The amount distributed by [the corporation] to petitioner is the excess of the total amount he withdrew

9

during each year less the amount he paid to the corporation during the same year…. [T]he amount that petitioner paid to the corporation in any year in excess of the amount that he withdrew in that year is a contribution to capital."); *Stovall v. Comm'r,* 46 T.C.M. (CCH) 894 (T.C. 1983), aff'd, 762 F.2d 891 (11th Cir. 1985) ("The amount of [money shareholder infused into the company] exceeds the amount potentially taxable as dividends to petitioner, thus reducing the amount of dividend income realized to zero."); *Foster v. Comm'r,* 391 F.2d 727, 739 (4th Cir. 1968) (taxable income should be reduced by amounts redeposited into the corporate account by the stockholder); *see also Boulware v. United States,* 552 U.S. 421, 439 (2008). (taxpayer does not have to prove intent to treat distributions as a return of capital rather than a capital gain); Internal Revenue Manual, Section 9.5.9.7.4.13(1) ("Generally, any return of capital is classified as a non-income item in the bank deposits method" of proving income).

Put simply, Mr. Welch inexplicably ignores over 400 deposits of funds that Mr. Abramson made into his loan account at Eastern Advisors, totaling millions of dollars, even though treating them as shareholder loans would reduce the tax loss to zero and treating them as capital contributions would reduce the purported tax loss on Mr. Abramson's personal returns to $22,696 over the four-year period charged. Agent Welch's findings are thus based on unreliable methods and his testimony should be excluded.

### iii. The Government's Expert Notice Fails to Provide Any Indication that Agent Welch's Methodology is Reliable or was Reliably Applied

In addition to its reliance on unfounded assumptions as described above, the expert notice fails to identify Agent Welch's methods or how they were reliably applied to the data that he reviewed. The expert notice includes only broad conclusions such as a statement that Mr. Welch will assume that "the commissions payments to Jerilyn Totani were not actual commissions payments," without providing any basis for that assumption. It fails to cite to any provisions of the tax code, nor does it describe any other standards or regulations that were relied upon to reach conclusions. While the

notice does state that Agent Welch reviewed financial documents and bank accounts, it fails to describe any of his methods in sufficient detail.

Indeed, the notice even suggests that Agent Welch will reach broad conclusions based on the nonexistence of documents. The notice explains that Agent Welch will testify that in his review, he discovered payments from AA Sayia to Eastern Advisors relating to an entity called Grupo Mexquitic. Such payments were booked as loans or capital contributions from the defendant, but "he did not see any documentation supporting booking those payments…as loans or capital contributions to Eastern Advisors by defendant." There were approximately 432 deposits directed by Mr. Abramson into the Eastern Advisors' loan account. There is no indication whether Agent Welch traced these funds to determine their origins, nor is there an indication of the documents on which Agent Welch relied in reaching a conclusion that the funds did not belong to Mr. Abramson, nor a description of the specific facts and data within those records on which he relied.

There is no explanation as to what documentation the agent expected to have in support of the company's own bookkeeping stating that the funds were contributions from Mr. Abramson. In other calculations, Agent Welch relies on Eastern Advisors' bookkeeping, but here, without further explanation, he rejects the bookkeeping, claiming there is no "documentation supporting," Mr. Abramson's contributions. *See also* Internal Revenue Manual, Section 9.5.8.6.3.3(1)(A) ("[S]ufficient information should be supplied to familiarize the reader with how the books and records were used to report the subject's income, expenses, and deductions."); and Section 1(i) ("A reconciliation of books and records to the return(s) is required in all tax and tax-related investigations to the extend [sic] the records are available. The reconciliation must be presented as an appendix."). Accordingly, the government's expert notice fails to satisfy the rigors of Rule 702 and *Daubert*.

11

### iv. The Government's Discovery Contradicts Agent Welch's Findings

Further, while the exact bases for his opinions are not provided, there are nonetheless documents in discovery that contradict Agent Welch's expert opinion. First, the funds referenced by the expert were recorded in Eastern Advisors' books and records as loans from Mr. Abramson. Mr. Abramson's loan account was broken down into several subaccounts in Eastern Advisors' books and records to provide further detail about the nature of the transactions. The "Loan-MAA-Other" was credited with loan funds that Mr. Abramson loaned directly to Eastern Advisors, totaling over $2.8 million dollars between 2004 and 2014. The "AA Sayia-Other" subaccount reflected personal loan repayments that Mr. Abramson received from Grupo Mexquitic via Grupo's vendor, AA Sayia. The government produced a loan register confirming that Abramson made substantial personal loans to Grupo. Government-conducted witness interviews and related correspondence further support the loan payments and repayments between Mr. Abramson and Grupo Mexiquitic. In sum, Agent Welch's testimony is contradicted by the government anticipated evidence, further casting doubt on his reliability as an expert.

### Corporate Tax Returns

### i. Agent Welch's Methodology

Agent Welch's opinion on the tax loss for LES' returns relies on an assumption that the commissions that Eastern Advisors paid to Ms. Totani between 2006 and 2014 were not legitimately earned by her and were really payments for the benefit of Abramson. Mr. Welch intends to testify that, assuming this is true, LES improperly deducted the commission payments from its net income on its tax returns, causing a corporate tax loss of approximately $111,315 between 2006 and 2014.

To calculate the purported loss on LES' tax returns, Mr. Welch first totaled the amount that Eastern Advisors paid to Ms. Totani in commissions and advances for each tax year at issue (i.e., the amount that LES claimed as business deductions on its tax returns). Mr. Welch then added those

commission amounts back into LES' net income, as reported in the company's books and records, to calculate LES' taxable corporate income. He then applied a corporate tax rate to this income to identify the corporate tax due.

### ii. Agent Welch's Loss Calculations as to Corporate Returns are Contrary to Established Accounting Principles

Agent Welch's expert opinion as to the loss on corporate tax returns is not based on any accepted accounting method, nor is that method described. The government contends that all payments made by Eastern Advisors to Ms. Totani were instead payments made to Mr. Abramson that he should have included as his income. However, Agent Welch provides no explanation as to why Eastern Advisors' tax liability would change as a result. If the government is correct that the commission payments were instead for Mr. Abramson's own work on the billboard deal, these payments would nonetheless be deductible. Mr. Welch has not identified any accounting or tax principles that would preclude Eastern Advisors from deducting the commissions as business expenses if they were paid directly to Mr. Abramson. Moreover, his approach is contrary to well-established accounting and tax principles that would treat this issue as a technical adjustment that should be resolved in favor of Mr. Abramson. *See* Internal Revenue Manual, Section 9.5.9.7.4.18 (In a criminal investigation, "[t]echnical adjustments in favor of the government cannot be made, offset, or netted against technical adjustments in favor of the subject."). Accordingly, Mr. Welch's tax loss calculations for LES' returns must be excluded.

### B. Relevancy

In addition to a determination on reliability, the Court must consider the relevance of proposed expert testimony and admit it "only if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999). This requires that the Court consider whether the testimony fits the issue to which the expert is testifying. *Daubert*, 509 U.S. at 591; This analysis considers general rules of relevancy including the

13

Court's responsibilities under Rule 403 to "determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury. *United States v. Schiro,* 679 F.3d 521, 529 (7th Cir. 2012).

Here, the expert testimony on the issue of loss amount is not relevant. Mr. Abramson stands accused of filing a false tax return in violation of 26 U.S.C. § 7206(1). A conviction under § 7206(1) requires proof that: (1) a person made or subscribed to a federal tax return which he verified as true; (2) the return was false as to a material matter; (3) the defendant signed the return willfully and knowing it was false; (4) the return contained a written declaration that it was made under the penalty of perjury, and (5) the return was filed with the IRS. *See Pattern Criminal Jury Instructions of the Seventh Circuit*, "26 U.S.C. § 7206(1) Fraud and False Statements – Elements," 944 (2020 Ed.) *See also United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998). The government is not required to prove a tax deficiency. *United States v. Minneman*, 143 F.3d 274, 279 (7th Cir. 1998).

Agent Welch's proposed testimony is not relevant because it will not help the jury determine a fact of consequence. Agent Welch is expected to provide some background information on tax code, but the primary purpose of his testimony is to describe the loss amount associated with the alleged false statements. The expert notice describes how Agent Welch will testify about "whether the amount of tax paid… was correct," and that "defendant owed additional tax payments." Further, the exhibits that have been tendered relate solely to the issue of calculating loss. Agent Welch is expected to testify at length as to his review of bank accounts towards his efforts to calculate tax deficiencies, but loss is not an element of the offense with which Mr. Abramson is charged. Overall, Agent Welch's testimony is not relevant because the jury will have to determine whether the statements on the tax return were false, not whether those false statements resulted in an incorrect amount of taxes being paid.

Should the Court find that loss amount is relevant for some other purpose, the Court should nonetheless exclude or limit expert testimony on the topic of loss. Under Rule 403, the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Here, the probative value is low in that loss is an issue for sentencing, not a fact of consequence for the jury to determine. In contrast, the risk of prejudice, confusing the issues, and presenting cumulative evidence is high in that the jury could convict for Mr. Abramson's failure to pay the correct amount and in that the government intends to put forth other witnesses, such as IRS Agent Soline, who could provide the background information on tax code and regulations.

## III.     Conclusion

In sum, the government has failed to comply with Rule 702, *Daubert*, and its progeny in that its anticipated expert testimony is both unreliable and irrelevant. For these reasons, the Defendant, Michael Abramson, respectfully requests that this Court bar the government's proposed expert witness from testifying at trial as to tax deficiencies and alleged loss.

Respectfully submitted,

/s/ Nishay K. Sanan
nsanan@aol.com

Respectfully submitted,

/s/ Cece White
cece@sananlaw.com

Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
Tel: 312-692-0360
Fax: 312-957-0111

15