UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL ABRAMSON

No. 18 CR 681

Hon. Virginia M. Kendall

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT

The UNITED STATES OF AMERICA, through its attorney JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant Michael Abramson's motion *in limine* seeking to exclude certain testimony of government expert Michael Welch (R. 85). The Court should deny defendant's motion.

## Introduction

Although the government need not establish a tax deficiency in a false statements case under Section 7206(1), such testimony is regularly permitted to enable the government to satisfy its burden to prove the materiality of a defendant's false statements. In this case, the government intends to admit the testimony of IRS Revenue Agent Michael Welch, who will testify about his tax loss calculations, which were based on records that defendant provided to his accountants in order to prepare the tax filings for the years in question. Revenue Agent Welch's use of the records provided by defendant and the reliable methodology he employed to make his tax deficiency calculations will assist the jury in understanding the materiality of the false statements in defendant's tax filings.

1

### Background[1]

As discussed in the background section of the government's motion *in limine* to admit certain evidence at trial pursuant to Federal Rule of Evidence 404(b) (R. 76), starting in or around 1995, defendant began carrying on an extramarital relationship with Jerilyn Totani. During the course of their ensuing romantic relationship, defendant purchased a condominium, at which Totani lived without paying any expenses, regularly provided Totani with cash, and purchased Totani several expensive vehicles. In around 2003, defendant began using a company, Eastern Advisors, to provide Totani with large amounts of money. As discussed at length in the government's motion *in limine*, two years earlier, defendant had briefly been involved in representing Outfront in connection with potential litigation with the Village of Rosemont. After defendant's business associate, Robert Durkin, assisted Outfront in negotiating a resolution, Outfront began making quarterly payments to Eastern Advisors. In the ensuing years, defendant never directed any of the Rosemont Billboards Deal money to himself and thus, never had Eastern Advisors issue him a Form W-2 as an officer of the corporation.[2]

---

[1] The government incorporates by reference the background section of its Motion *in Limine* to Admit Certain Evidence Pursuant to Rule 404(b) (R. 76), with additional factual information included below.

[2] As discussed *infra*, defendant's argument that if the commissions payments had not been directed to Totani they would have been directed to defendant and therefore Leasing Employment Services' deduction was appropriate, is plainly wrong. In reality, if the commissions payments had not been directed to Totani, they would have been taxable income to Eastern Advisors.

Approximately 85% of the deposits coming into Eastern Advisors' loan account (Loan-MAA) (approximately 369 of the 432 deposits defendant references in his motion (R. 85 at 3)), were payments from a broker (A.A. Sayia) or from clients of a Mexican oregano company (Grupo) in which defendant was a 48% equity owner. As discussed *infra*, it is the Grupo receipts directed to Eastern Advisors' bank account which lie at the heart of the dispute between the government and defendant's experts' testimony. Defendant claims that the Grupo money wired from A.A. Sayia to Eastern Advisors and left in Eastern Advisors' bank account should be treated as a loan or capital contribution from defendant to Eastern Advisors solely because defendant told his bookkeeper, Jill Roth, to book the payments as loans. Defendant's argument is contrary to the facts and relevant legal, tax, and accounting principles.

With regard to the loans, defendant claims that "Eastern Advisors also loaned funds to third parties, including Totani for the payment of her personal bills." R. 85 at 3. That these payments were booked as loans by Eastern Advisors would have been unwelcome news to Totani. Totani testified in the grand jury that she did not consider defendant's payments of her living expenses and credit card bills as loans that she was expected to repay. *See* R. 79 at 19 ("Outside of certain gambling losses, I never considered anything that [defendant] gave me a loan. The only times that [defendant] has said anything about paying him back was when he compensated me for certain gambling losses . . . although I would like to pay that money back, I didn't consider the money that [defendant] gave me to cover gambling losses loans at the time [defendant] gave it to me."), *id.* at 20 ("I never received or signed any loan

documents because the money that [defendant] and his companies gave me was mine to spend and use as I saw fit. I have never paid [defendant] back.") As discussed *infra*, defendant's direction to his bookkeeper to classify money sent to and from Eastern Advisors bank account as "loans" is not determinative of whether they were, in fact, loans.

For approximately ten years, defendant operated in this manner—funneling over a million dollars in purported commissions and loan payments to Totani while concealing what he was doing by failing to cause Eastern Advisors to file any tax returns or issue any Form 1099s to Totani. After the IRS investigation went overt in the fall of 2013, defendant asked Roth, for the first time, to prepare a Form 1099 for Totani from Eastern Advisors and to prepare consolidated returns for all of his entities (to include Eastern Advisors, which had never filed before). After Roth refused to prepare amended tax returns for defendant's corporate entities, defendant filed the false returns. Contrary to defendant's representation, his accountants never "agreed" that personal payments to Totani "were properly treated as loans," (R. 85 at 3). Rather, the tax preparers took the documents that defendant gave them and prepared tax returns assuming that the documents defendant provided contained the truth. They did not and defendant filed the false returns anyway. For that reason, defendant is charged with fourteen counts of false statements in his tax filings.

I.   **The Court Should Deny Defendant's Motion to Exclude Certain Testimony of Government Expert Michael Welch.**

Defendant's motion to exclude certain testimony of government expert Revenue Agent Michael Welch asks the Court to accept defendant's unsupported and self-serving interpretation of the evidence in order to preclude the jury from hearing the well-reasoned testimony of an IRS Revenue Agent who has worked for the IRS for over 36 years and testified in 21 cases as a summary witness and/or an expert witness, including 15 in the Northern District of Illinois.  As discussed below, Revenue Agent Welch's expected testimony is based on reasonable assumptions and facts and data and is the product of reliable principles and methodology.  Defendant's motion should be denied.

a.  <u>Applicable Law</u>

"The offense of filing a false tax return requires the government to prove that (1) the defendant made or caused to be made a federal income tax return that he verified as true; (2) the return was false with regard to a material matter; (3) the defendant signed the return willfully, knowing that it was false; and (4) the return contained a written declaration that it was made under penalty of perjury." *United States v. Hill*, 618 F.3d 619, 634 (7th Cir. 2010 (citing *United States v. Oggoian*, 678 F.2d 671, 673 (7th Cir. 1982)).

Because "Section 7206(1) is a perjury statute," *United States v. Pansier*, 576 F.3d 726, 736 (7th Cir. 2009) (citation omitted), the government need not prove a tax deficiency to establish the materiality of a false statement,  *United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998) (citing *United States v. Minneman*, 143 F.3d 274,

279 (7th Cir. 1998)).[3] "A false statement is 'material' when it has the *potential* for hindering the IRS's efforts to monitor and verify the tax liability of the corporation and the taxpayer." *Id.* (internal quotation omitted) (emphasis added).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 609 U.S. 579 (1993). Expert testimony is admissible if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005) (citing Fed. R. Evid. 702). The court plays an essential "gate-keeping" role to determine whether proffered testimony is reliable and relevant. *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006). "In considering whether testimony based on 'specialized knowledge' is admissible, Rule 702 must be construed liberally." *United States v. Frantz*, No. 02 CR 01267, 2004 WL 5642909, at *14 (C.D. Cal. Apr. 23, 2004) (internal quotation omitted) (permitting IRS Revenue Agent to testify as summary and expert witness and opine on the nature of payments from a corporation to an individual assuming the corporation was "fictitious").

To determine relevance, the proponent of the testimony must show that the expert's "reasoning or methodology properly can be applied to the facts in issue," and that "the testimony will assist the trier of fact with its analysis of any of the issues

---

[3] Where the government does not introduce evidence of a tax deficiency in a Section 7206(1) prosecution, courts can preclude a defendant from introducing evidence that there was no tax deficiency. *United States v. Giambalvo*, 810 F.3d 1086, 1099 (8th Cir. 2016).

involved in the case." *Daubert*, 509 U.S. at 593; *Smith v. Ford Motor Co*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702. To determine reliability, the proponent of the testimony must show that the expert's testimony is based on "sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702.

Once the proponent establishes, by a preponderance of the evidence, Fed. R. Evid. 104(a), that an expert's testimony is relevant and reliable, "[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719; *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed."). "[A]ny questions or problems concerning the expert's opinion and testimony may be thoroughly explored during the cross-examination of the expert witness." *United States v. Perez*, 612 F.3d 879, 886 (7th Cir. 2010) (rejecting the defendant's argument about the IRS's net worth evidence on a sufficiency basis in a Section 7206(1) case and observing that the jury credited the government's expert's testimony over the defendant's expert's testimony) (internal quotations omitted).

IRS Revenue Agents typically testify as "summary witnesses" insofar as they "draw conclusions from the evidence presented at trial." *United States v. Esser*, 520 F.2d 213, 218 (7th Cir. 1995). They also may provide expert testimony applying their specialized knowledge of tax and accounting principles. *United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005); *United States v. Vallone*, No. 04 CR 0372, 2008 WL 516715, at ** 3-4 (N.D. Ill. Feb. 21, 2008) (finding disclosure appropriate under Rule 16 and that Revenue Agent Welch's summary and expert testimony was admissible to establish tax loss in a conspiracy case).

      b.  <u>Analysis</u>

Revenue Agent Welch's expert opinions regarding the tax deficiency resulting from the false statements in defendant's corporate and personal income tax returns are based on sound methodology and will assist the jury in assessing the materiality of the false statements.

Courts regularly admit evidence of tax deficiencies in § 7206(1) prosecutions. While defendant is correct that the government need not prove a tax deficiency to prevail in a § 7206(1) prosecution (R. 85 at 14), "circuit courts that have addressed the issue are unanimous that 'expert testimony by an IRS agent which expresses an opinion as to the proper tax consequences of a transaction is admissible evidence.'" *United States v. Stadtmauer*, 620 F.3d 238, 269 (3d Cir. 2010) (quoting *United States v. Windfelder*, 790 F.2d 576, 581 (7th Cir. 1986)); *see also Pree*, 408 F.3d at 870 (finding that, despite lack of expert disclosure by the government, the district court properly admitted Revenue Agent Welch's testimony on tax consequences of stock sale transactions in prosecution under 26 U.S.C. §§ 7203 (failure to file) and 7206(1)

(false statements in tax filings)).  Defendant's motion claims that Revenue Agent Welch's testimony is not relevant and is unduly prejudicial (R. 85 at 13-15) but fails to cite to a single case where a district court precluded IRS agent testimony regarding the tax consequences of a transaction in a § 7206(1) prosecution under Federal Rules of Evidence 401 or 403 and the government is aware of none.

Revenue Agent Welch's expected testimony regarding assumptions that he was asked to make when calculating tax deficiencies in this matter is appropriate.

> Experts routinely base their opinions on assumptions that are at odds with their adversary's view of the evidence.  That does not mean that the expert has made impermissible credibility determinations that preclude him from testifying.  If an expert could not base his opinion on assumptions-which in turn are based on testimony-there could be little meaningful and informative expert testimony in any case in which there was a divergence of testimony.  The question is not whether the opinion is based on assumptions, but whether *there is some factual support for them*.  If there is not, they are by hypothesis unreliable and inadmissible.

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) (internal citations and quotations omitted) (emphasis added).  Here, there is ample factual support for the government's assumptions that Totani did not earn the commissions payments deducted in the corporate income tax returns in question, the schedule to the corporate income tax returns regarding an asset on the books of Eastern Advisors in the form of a loan to Totani was false, and that Grupo's receipts, paid directly to Eastern Advisors by way of A.A. Sayia and other spice companies, were neither loans nor capital contributions by defendant.  Moreover, even if Revenue Agent Welch's assumptions were subject to criticism, and they are not, "[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony

9

irrelevant or inadmissible." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013).

While the parties disagree about the tax deficiency conclusions reached by the others' expert, only defendant seeks to keep the issue from the jury. For the reasons discussed below, defendant's analysis is flawed and the Court should find that Revenue Agent Welch's opinions and methodology were reliable and that the assumptions upon which he plans to testify are factually supported and reasonable.

> i. *Revenue Agent Welch's Assumption That Payments from A.A. Sayia to Eastern Advisors Were Not Capital Contributions from Defendant to Eastern Advisors is Reliable Under Federal Rule of Evidence 702.*

In his tax deficiency computations, Revenue Agent Welch appropriately assumed that payments by A.A. Sayia and Grupo's clients to Eastern Advisors were not capital contributions by defendant to Eastern Advisors. The basis for Revenue Agent Welch's assumption that the funds from A.A. Sayia and Grupo's customers were not capital contributions by (or, as discussed below, loans from) defendant is based on his review of the Eastern Advisors QuickBooks, which reflected that the payments were from third parties to Eastern Advisors.

Defendant contends that Revenue Agent Welch "inexplicably ignores over 400 deposits of funds that Mr. Abramson made into his loan account at Eastern Advisors," (R. 85 at 10), but this argument is highly misleading. As discussed above, the flow of funds for the "A.A. Sayia-Other Account" (which constitutes approximately 85% of the deposits) **reflects payments from A.A. Sayia (a non-shareholder) or Grupo's clients** to Eastern Advisors (a corporation). Contrary to defendant's suggestion,

*defendant* did not make these payments to Eastern Advisors at all. The fact that these payments came from third parties and went directly to Eastern Advisors is critical to understanding why there is no basis to treat the Grupo receipts as capital contributions by defendant.

In the cases cited by defendant (R. 85 at 9-10), courts found that money *directly put into a corporation by a shareholder* in excess of the amount withdrawn could be considered a capital contribution. *See Jones v. Comm'r*, 74 T.C.M. (CCH) 473, 1997 WL 595092, at *9 (T.C. 1997), *aff'd sub nom. Jones v. Comr. of IRS*, 177 F.3d 983 (11th Cir. 1999) ("[T]he amount that *petitioner paid to the corporation* in any year in excess of the amount that he withdrew in that year is a contribution to capital . . . .") (emphasis added); *Stovall v. Comm'r*, 46 T.C.M. (CCH) 894 (T.C. 1983), 1983 WL 14432, *aff'd*, 762 F.2d 891 (11th Cir. 1985) ("But he repaid the amounts to the corporation in the same tax year by purchasing certificates of deposit worth $6,550,000 in American's name."); *Foster v. Comm'r*, 391 F.2d 727, 739 (4th Cir. 1968) (reduction in taxable income attributable to redeposit of funds from taxpayer to corporation).[4]

"Under the Supreme Court's decisions and the Internal Revenue Code, whether a payment to a corporation by a *non-shareholder* is income or a capital contribution to the corporation is controlled by the intention or motive of the

---

[4] *Boulware v. United States*, 552 U.S. 421, 439 (2008) does not speak to the issue of capital contributions by a shareholder to a corporation. Rather, defendant cites *Boulware* for the noncontroversial and irrelevant proposition that a shareholder and corporation need not establish that they intended a distribution to be a return of capital rather than capital gain in a tax evasion prosecution. R. 85 at 8.

transferor." *AT&T, Inc. v. United States*, 629 F.3d 505, 511 (5th Cir. 2011) (emphasis added); *United States v. Chicago, B. & Q. R. Co.*, 412 U.S. 401, 411 (1973) (determination as to whether money from non-shareholder to corporation was capital contribution or income depended on "intent or motive of the transferor"). As the Fifth Circuit observed in *AT&T*, the Supreme Court has identified several characteristics of non-shareholder contributions to capital under the Internal Revenue Code, including that the transfers: (1) are part of the transferee's working capital structure; (2) may not be compensation for services; (3) are bargained for; (4) must foreseeably result in benefit to the transferee commensurate with the contributions; and (5) will be put to the production of additional income. *AT&T*, 629 F.3d at 513.

The payments from A.A. Sayia and Grupo's clients to Eastern Advisors share none of the characteristics described above. They were payments as part of a service (with respect to A.A. Sayia, as part of a brokering arrangement with Eastern Advisors, and with respect to Grupo's clients, as part of the sale and distribution of oregano). There is and was no basis for Revenue Agent Welch to assume that they were capital contributions by A.A. Sayia or Grupo's clients.

> ii. *Revenue Agent Welch's Assumption That Payments from A.A. Sayia to Eastern Advisors Were Not Loans from Defendant to Eastern Advisors is Reliable Under Federal Rule of Evidence 702.*

The government's evidence will establish that the "JT Loan Account" within Eastern Advisors was a cover for hundreds of thousands of dollars in payments from defendant to Totani that defendant and Totani never expected to be repaid to Eastern Advisors. Including the "loan" as an asset on the books of Eastern Advisors was a materially false statement to the IRS. Revenue Agent Welch's disclosure letter

indicated that another assumption he made in calculating defendant's tax deficiency was that the "JT Loans Receivable" in Schedule L, Line 14 of the Leasing Employment returns for 2006 through 2014 did not reflect actual loan payments made by Eastern Advisors to Totani, should instead be treated as distributions by Eastern Advisors to defendant, and that defendant owed additional tax to the IRS for the tax years at issue in the indictment. As discussed above, Revenue Agent Welch's assumption is well-supported by the record—Totani herself testified before the grand jury that she never understood the money defendant used to pay her bills and support her lifestyle were loans that she had to repay. *See* Ex. R. 79 at 3.

The heart of defendant's dispute about Revenue Agent Welch's tax deficiency calculation regarding the loan payment portion of the case relates to the differing treatment accorded to a purported loan from defendant to Eastern Advisors. As discussed above, Eastern Advisors' books and records reflect that defendant improperly caused his bookkeeper to label certain payments received by Eastern Advisors as loans from defendant. Contrary to defendant's argument, the government's evidence does not support defendant's interpretation of the appropriate treatment of Eastern Advisors' receipts from third-party corporations.

According to bank records, in or around 2007, defendant directed hundreds of thousands of dollars (approximately $722,617) to Leasing Employment Services, which funds were then wired to the Mexican oregano company (Grupo) over sixteen wires. Only two of those wires were recorded on Leasing Employment Services' books (as miscellaneous expenses, not loans) and <u>none of the wires came from Eastern</u>

Advisors. Accordingly, Eastern Advisors' books and records did not reflect an asset on its books relating to an outstanding loan to Grupo.

Defendant's business partner with Grupo (William Vickerman) told law enforcement that defendant loaned funds to Grupo and that A.A. Sayia (a factoring agent collecting Grupo's outstanding income) was paying Grupo's receipts to Eastern Advisors. After receiving money from A.A. Sayia, defendant caused Eastern Advisors to wire money to Grupo, withholding a portion (at his sole discretion) in Eastern Advisors' bank account and asking Roth to book the leftover funds as a loan from defendant to Eastern Advisors.[5] As discussed above, approximately 85% of the deposits coming into Eastern Advisors' loan account (approximately 369 of the 432 deposits) were funds earned by Grupo and directly remitted by A.A. Sayia or Grupo's clients to Eastern Advisors.

Even if there were evidence supporting defendant's view of the appropriate treatment of the A.A. Sayia and Grupo receipts, the Seventh Circuit has found that "there [is] nothing improper as to [Revenue Agent Welch's] selective summary of the Government's evidence . . . [defendant] had an adequate opportunity to conduct cross-

---

[5] Even if the money paid by A.A. Sayia to Eastern Advisors should be considered a loan payment from the defendant, and it should not, the loan balance is unclear. That loan balance is critical to defendant's claim that the money "loaned" by defendant to Eastern Advisors washes out with the payments to Totani. Records from Vickerman, Eastern Advisors, and defendant's tax returns all show different amounts of the balance for an outstanding loan from Grupo to defendant. *See, e.g.*, Eastern Advisors' Balance Sheet Detail as of December 31, 2014 at Pg. 1, reflecting A.A. Sayia loan as **$792,195.71**, attached as Exhibit C, Eastern Advisors' "Oregano Loan" at Pg. 2 reflecting balance of **$208,021.05**, attached as Exhibit D, and Form 5471 Balance Sheet attached to defendant's 2014 Form 1040X at Pg. 3, reflecting "Loans from shareholders and other related persons" as **$420,117**, attached as Exhibit E, each filed under seal pursuant to the Court's order (R. 61).

examination following [Revenue Agent Welch's] testimony." *Pree*, 408 F.3d at 871. Through his motion, defendant effectively asks the Court to preclude Revenue Agent Welch's testimony because Revenue Agent Welch did not treat Grupo's repayment of a loan from Leasing Employment Services to Grupo by way of A.A. Sayia and other corporate clients through payments to Eastern Advisors as a loan from defendant to Eastern Advisors.

There are a number of problems with defendant's argument. First, defendant's guidance to Roth to book the money coming in from A.A. Sayia and Grupo's clients to Eastern Advisors as a loan is not determinative of whether that money was, in fact, a loan. A case cited by defendant in his brief (R. 85 at 9), makes that very point. *See Jones v. Comm'r*, 74 T.C.M. (CCH) 473 ("[The company] recorded the withdrawals on its books and records as loans to petitioner. While this factor does weigh in favor of finding the amounts withdrawn were loans, this factor *is not determinative without further evidence substantiating the existence of bona fide loans*.") (emphasis added).

Whether or not a distribution should be considered a *bona fide* loan depends on several factors. *See Frierdich v. CIR*, 925 F.2d 180, 182 (7th Cir. 1991) ("The factors derived from the case law and applied by the Tax Court included: (1) the existence or non-existence of a debt instrument; (2) provision for security, interest payments and a fixed payment date; (3) whether or not repayments of the loan were made; (4) the taxpayer's ability to repay the loan; (5) the borrower's receipt of compensation; and (6) the testimony of the taxpayer."); *see also Stanley v. Commissions of Internal Revenue*, T.C. Memo. 2016-196, 2016 WL 6248030, at *3

15

(2016) (citing above factors and adding how the parties' records and conduct reflect the transaction and the likelihood that the loan was disguised compensation for services).

As discussed above, the money purportedly "lent" to Totani was not a loan, although it was booked that way at defendant's direction. Similarly, the payments provided by A.A. Sayia and Grupo's clients to Eastern Advisors should not be considered a loan from defendant to Eastern Advisors. Other than the way the money was booked, there is no evidence that defendant loaned the money to Eastern Advisors (i.e., there is no evidence of a debt instrument, security, interest payments, fixed payment dates, maturity dates, corporate minutes reflecting the loans, loan agreements).

Moreover, when Revenue Agent Welch reviewed Eastern Advisors' books and records, he did not find that the money in the "A.A. Sayia-Other" subaccount even came from defendant—it came from other companies, including A.A. Sayia and other Grupo clients, and went directly to Eastern Advisors, another corporation. "It is a fundamental principle that a corporation is a legal entity that is separate and distinct from its shareholders, directors, and officers from other corporations with which it may be connected." *Gass v. Anna Hosp. Corp.*, 392 Ill. App. 3d 179, 185 (5th Dist. 2009). Thus, a fair and accurate view of the transfers reflects a transfer from corporate entities to another corporation—not a loan from defendant to the corporation.

The cases cited by defendant in support of his argument that payments to Totani should be treated as repayment of his shareholder loans (R. 85 at 8), do not advance his argument. In each of the cases where the court found particular payments were loans, the evidence was significantly more compelling than in defendant's case. *See Jennings v. United States*, 272 F.2d 842, 843-45 (7th Cir. 1959) (payments made by the corporation to defendant were loan repayments based on the existence of interest-bearing promissory notes, corporate resolutions, board minutes, an acknowledged obligation of repayment, and evidence that all parties to the initial transactions agreed that the initial advanced were loan payments); *Illinois Tool Works Inc. v. Comm'r of Internal Revenue*, 116 T.C.M. (CCH) 124, 2018 WL 3751966, at *11 (T.C. 2018) (finding *bona fide* debt based on reviewed and approved loan documents, promissory notes, which required payment of interest and repayment of principal at a fixed maturity date, interest payments, and repayments).

The cases where the courts found no *bona fide* loan still had more evidence of legitimacy than in the present matter. In *Busch v. Comm'r*, 728 F.2d 945 (7th Cir. 1984), the Seventh Circuit affirmed the tax court's determination that withdrawals by a shareholder from a corporation were dividends, not loans, because the evidence reflected that at the time of the withdrawals, the taxpayer did not intend to repay them. The Seventh Circuit found to be appropriate the tax court's reliance on, among other things: (1) the lack of collateral for the purported loan; (2) promissory notes, which lacked a maturity date; and (3) interest rates for the purported loan. *Id.* at 950.

17

In *Jones*, 74 T.C.M. (CCH) 473, the company recorded withdrawals in its books and records as a loan, had a set interest rate of 10 percent of the withdrawn amounts, increased the loan balance for the amount of unpaid interest, included interest income on the corporation's books, and credited the loan account for repayments. *Id.* at *8. The tax court *still* found that there was no *bona fide* creditor-debtor relationship with the company at the times of the withdrawals at issue and that petitioner had "simply used the corporation as his own personal pocketbook, depositing and withdrawing funds at will." *Id.* at *8. Such is the case here where defendant routed money to and from his extramarital romantic partner and to his Mexican business from the Eastern Advisors account.

The government seeks to admit the testimony of Revenue Agent Welch reflecting a tax deficiency calculation that is based on the actual records supplied by defendant and included in his tax filings, which runs contrary to defendant's view of the evidence.[6] Revenue Agent Welch's opinion regarding the treatment of the A.A. Sayia money is reliable and well-supported.

---

[6] Moreover, upon his review of the underlying records reflecting the payments from A.A. Sayia and Grupo's clients to Eastern Advisors, Revenue Agent Welch could have treated the money as income to Eastern Advisors. ***To defendant's benefit***, in his preliminary tax deficiency calculations, Revenue Agent Welch treated the money as receipts of Grupo taken in by Eastern Advisors and thus, money owed by Eastern Advisors to Grupo. That conservative approach reduced both Leasing Employment Services' and defendant's tax deficiencies.

18

        *iii. Revenue Agent Welch's Assumption that Leasing Employment Services Could Not Deduct Commissions Payments Erroneously Made to Totani is Reliable Under Rule 702.*

Revenue Agent Welch appropriately assumed that the payments booked as commissions from Eastern Advisors to Totani were non-deductible and should instead have been treated as distributions to defendant. "To be deductible, a business expense must be both ordinary and necessary. An ordinary expense is one that is common and accepted in your industry. A necessary expense is one that is helpful and appropriate for your trade or business." IRS Publication 535 (2019), available at https://www.irs.gov/pub/irs-pdf/p535.pdf at 3. Payments to a shareholder's extramarital romantic partner, which are personal payments, are neither ordinary nor necessary and are not deductible. *Caledonian Record Pub. Co. v. United States*, 579 F. Supp. 449, 454 (D. Vt. 1983) (finding that corporate payments funding postgraduate education and moving expenses for shareholder's son were not deductible as "ordinary and necessary" business expenditures).

Pursuant to the government's expert disclosure, with regard to the corporate returns, the government expects that Revenue Agent Welch will testify based on certain assumptions, including that the payments to Totani booked as commissions were non-deductible and that on that basis, Leasing Employment Services owed additional tax. Revenue Agent Welch's assumption is well-founded and factually supported by the evidence discussed above and in the government's previously-filed motions *in limine*.

Defendant argues that even if Totani did not earn the payments from Eastern Advisors, they would have been deductible by Leasing Employment Services because

they would have been made to defendant.  R. 85 at 13.[7]  Defendant's argument is factually unsupported.  Between 2003 and 2014, Eastern Advisors *never* issued a wage or commission payment nor Form W-2 or Form 1099 to defendant, indicating that defendant himself did not think that he earned a penny of the Rosemont Billboard Deal money.  Defendant was right not to have previously paid himself income in connection with the deal.  Outfront employees Ipjian and Matson testified before the grand jury that they only briefly dealt with defendant and that deal with the Village of Rosemont was facilitated by Durkin.  *See* Ex. A at 9, 14-15; Ex. B at 10-11[8] (Question: "Was [defendant] involved in the negotiation with Rosemont?" Answer: "No.").[9]

Defendant's argument that "[s]omeone at the company had to earn the commissions" is wrong.  Revenue Agent Welch's preliminary tax deficiency calculations properly treat Totani's share of the commission money directed to

---

[7] To be clear, defendant's argument only pertains to tax deficiency and not criminal liability or materiality.  If Totani did not earn the commissions, Leasing Employment Services' tax filings were false.  *See United States v. Presbitero*, 569 F.3d 691, 701 (7th Cir. 2009), as amended (June 26, 2009) (citing *United States v. Helmsley*, 941 F.2d 71, 92–93 (2d Cir. 1991)) ("It is not a defense to a charge of willfully and knowingly filing a fraudulent tax return that the amount fraudulently deducted could have been deducted for some other reason.").

[8] Exhibits A and B contain the transcripts of the grand jury testimonies of Ipjian and Matson. The exhibits will be filed under seal pursuant to the Court's order granting the government's unopposed motion to file grand jury transcripts, corporate business records, and a portion of defendant's personal income tax return under seal.  *See* R. 61.

[9] Even if, in this hypothetical invited by defendant, the commissions payments would have been directed to defendant, that would undercut defendant's theory that this is a "zero tax-loss" case.  Defendant, as a shareholder of Eastern Advisors, would have been a W-2 employee rather than an independent contractor and Leasing Employment Services would have been accountable for payroll taxes.

Eastern Advisors by Outfront as non-deductible income to Eastern Advisors. Revenue Agent Welch's assumption that the commissions payments to Totani were not deductible by Leasing Employment Services if Totani did not earn them is well-supported by the record.

Finally, defendant claims that "well-established accounting and tax principles" regarding resolving such a dispute in favor of defendant and cites to the Internal Revenue Manual 9.5.9.7.4.18. R. 85 at 13. Part 9 of the Internal Revenue Manual relates to "Criminal Investigation," and is irrelevant to a revenue agent's calculation of a tax deficiency. Defendant's specific citation to the "bank deposit method of proving income" has nothing do with this case.[10] Defendant's repeated citations to Part 9 of the Internal Revenue Manual throughout his motion (*id.* at 8, 10-11, 13), are similarly misplaced.

Accordingly, Revenue Agent Welch's methodology with regard to his calculation of Leasing Employment Services' tax deficiency is reliable and should not be excluded by the Court.

---

[10] The bank deposit method of proving income was not the method of proof employed during the course of the investigation. Instead, investigators utilized the specific items method of proof. *See* Internal Revenue Manual, Parts 9.5.9.1 and 9.5.9.2.1.

## **Conclusion**

For the reasons set forth above, the government respectfully requests that the Court deny defendant's motion *in limine* (R. 85).


Date: February 7, 2022                    Respectfully submitted,


                                         JOHN R. LAUSCH, JR.
                                         United States Attorney

                         By:     */s/ Richard M. Rothblatt*
                                 Richard M. Rothblatt
                                 Andrew C. Erskine
                                 Assistant U.S. Attorneys
                                 219 South Dearborn Street, 5th Floor
                                 Chicago, Illinois 60604
                                 (312) 353-5300