**UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No.: 18 CR 681 |
| v. ) | |
| ) | Hon. Virginia M. Kendall |
| MICHAEL ABRAMSON, ) | |
| ) | |

**DEFENDANT'S AMENDED REPLY TO GOVERNMENT'S RESPONSE**
**TO MOTION TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT[1]**

Defendant, Michael Abramson, by and through his attorneys, Nishay K. Sanan and Cece White, respectfully writes in reply to the government's response to his motion to exclude expert testimony. In support of his motion, Mr. Abramson replies as follows:

**I. Introduction**

The admissibility of expert testimony is governed by the Federal Rules of Evidence and the Supreme Court's holding in *Daubert*, which requires the Court to exercise a gatekeeping function to ensure that such testimony is both reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (7th Cir. 1991) citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See also* Fed. R. of Evid. 702. The Defendant's motion specifically challenges the expert's methodology in calculating the loss amount associated with the allegations in this case. The government expert assumes in his calculations that, if the Totani payments were instead paid to Mr. Abramson, a shareholder in the corporation issuing the payments, the entire amount would be a taxable distribution. The Defendant argues that it would be inconsistent for the expert to treat the payments as distributions to Mr. Abramson without also crediting him for the contributions made to the corporation as a shareholder.

---

[1] The Defendant's Amended Reply is different only in that the Defendant has corrected an error in the prayer for relief. The instant filing is otherwise identical to that filed previously (ECF No. 93).

1

Further, the Defendant's motion argues that the methodology for calculating the corporate income tax loss was flawed in that there would be no corporate tax loss if operating under the same assumption, namely, that the payments were to Mr. Abramson instead of Totani. Overall, the government's expert notice, and its response, fail to provide a sufficient basis for why the expert's loss calculations are reliable. As such, Mr. Abramson respectfully submits that his motion should be granted or, in the alternative, that a hearing should be ordered to resolve the admissibility of the expert's testimony on loss amount.

## II. Personal Income Loss Calculation

The Defendants motion first challenges the expert's methodology for calculating a personal income tax loss of $79,244. Agent Welch reached this number by assuming that any money that Eastern Advisors paid to Totani from 2011-2014 should be considered a payment from Eastern Advisors to Mr. Abramson instead. To be clear, the Defendant contests this allegation. However, in his motion to exclude the testimony of the expert, the Defendant assumes, as the expert did, that the Totani payments were payments to Mr. Abramson. It is under this assumption that the Defendant then contests the specific way loss was calculated. Thus, it is not necessary for the government to argue about whether Eastern Advisor's commission payments or loans to Totani were legitimate - the Defendant's objections to the expert's loss calculations assume they were not.

However, the Defendant's argument is that his personal income, assuming it included the Totani payments, should have nonetheless been calculated in a manner crediting him for his contributions to the corporation. *See e.g., Jones v. Commissioner*, 74 T.C.M (CCH) 473, at *9 (1997) (stating "the amount distributed by [corporation] to [shareholder] is the excess of the total amount he withdrew each year less the amount he paid to the corporation during the same year."). The resulting tax liability depends on whether those contributions are characterized as shareholder loans or capital contributions. Regardless, the amount of money that Mr. Abramson had contributed to

Eastern Advisors would need to be considered, in some form, in the calculation of what amount of the payments from Eastern Advisors to Mr. Abramson would qualify as taxable income. In Agent Welch's calculations, contributions from Mr. Abramson to Eastern Advisors were not considered at all; instead, Agent Welch assumes that the entirety of the money, had it been given to Mr. Abramson, would have been taxable income. The expert notice does not provide a sufficient explanation for calculating the loss amount in this way, nor does the government's response.

The Defendant's argument does not depend on determining definitively whether the funds provided to Eastern Advisors by Mr. Abramson were shareholder loans or capital contributions because the flaw in Agent Welch's methodology is that he failed to consider either scenario in calculating Mr. Abramson's personal tax liability. However, the government makes separate arguments as to why neither were considered by the expert and the Defendant will briefly address those here.

### A. Capital Contributions

The government argues that it was proper for the expert to assume that the Defendant did not make any capital contributions to Eastern Advisors from 2011-2014 because some of the payments that Eastern Advisors attributed to Mr. Abramson were transfers from third parties. (ECF No. 89 at 10). First, the government does not contend that all the funds from Mr. Abramson were transfers from third parties and thus, provides no basis for Agent Welch's failure to credit Mr. Abramson for *any* capital contributions. (*Id.*). Even if only 15% of the transfers attributed to Mr. Abramson were capital contributions from Mr. Abramson, as the government appears to claim, the fact that the expert did not give any credit for those contributions nonetheless calls his loss calculations into question. (*Id.*)

Further, the government has not provided a reason for the expert's conclusion that payments from third parties, which were deposited into an account specifically designated for

3

contributions from Mr. Abramson, cannot qualify as contributions from Mr. Abramson. The only factual support offered in the expert notice is that Agent Welch "did not see any documentation supporting booking those payments from AA Sayia to Eastern Advisors as loans or capital contributions to Eastern Advisors by defendant." The response repeats this claim, pointing to the expert's review of the Eastern Advisors QuickBooks, which showed that the transfers were from third parties. (*Id.*) However, the QuickBooks also attributed these transfers to Mr. Abramson. There is no indication that the expert traced the funds or took any additional actions that would lead him to conclude those payments were intended as capital contributions from a third party or were payments rightfully owed to Eastern Advisors, not the Defendant himself. As the Defendant referenced in his original motion, witnesses involved in these transactions did state that they were directed to pay Eastern Advisors because of a debt owed to Mr. Abramson, not because of a service agreement with Eastern Advisors.

Finally, in opposing that the Defendant made capital contributions to Eastern Advisors, the government cites to cases that do not relate to the issue raised by the Defendant's motion. (See ECF No. 89 at 11-12) citing *AT&T Inc. v United States*, 629 F.3d 505, 511 (5th Cir. 2011); *United States v. Chicago B. & Q. R. Co.*, 412 U.S. 401, 411 (1973). These cases are about whether transfers from non-shareholders to corporations can be considered capital contributions from the non-shareholders themselves in determining the corporation's taxable income. *AT&T Inc.*, 629 F.3d at 511. The Defendant does not claim that either Grupo or Sayia intended to make capital contributions to Eastern Advisors, nor that if they did, their capital contributions would somehow reduce Mr. Abramson's personal income tax liability. The Defendant argues that he personally made capital contributions to Eastern Advisors as a shareholder. The government's objection appears to be that some of the transfers that were attributed to him by the corporation were not transfers from the

Defendant's personal bank account. However, the cases cited by the government do not discuss or resolve that issue.

### B. Shareholder Loans

The government argues that it was proper for the expert to assume that funds transferred to Mr. Abramson from Eastern Advisors would not qualify as the repayment of shareholder loans. (ECF No. 89 at 12). However, in its response, the government references facts it intends to prove at trial that do not resolve the issue or relate to the expert's loss calculation. For example, the government argues that the "JT Loan Account" did not evidence real loans from Eastern Advisors to Totani. (*Id.*). This is irrelevant because the Defendant's motion pertains to the funds attributed to Mr. Abramson in the "Loan – MAA Account," the account reflecting the shareholder loans Mr. Abramson made to Eastern Advisors, as well as its related subaccounts. The Defendant does not argue that any of the JT Loan Account funds should have been considered in the loss calculation and as explained above, the Defendant assumes for the purposes of his motion that the Totani payments were payments to Mr. Abramson.

Further, the government argues that Eastern Advisors did not have an outstanding loan owed to Grupo. (ECF No. 14 at 14). This is again irrelevant. The Defendant's argument is that Eastern Advisors owed him money and thus, if Eastern Advisers transferred money to him instead of Totani, all or a portion of that would be the repayment of a loan, not income. The fact that some of the deposits are from third parties again does not foreclose the possibility that the payments were contributions from Mr. Abramson. The government's response states:

> Defendant's business partner told law enforcement that defendant loaned funds to Grupo and that A.A. Sayia was paying Grupo's receipts to Eastern Advisors. After receiving money from A.A Sayia, Defendant caused Eastern Advisors to wire money to Grupo, withholding a portion (at his sole discretion) in Eastern Advisor's Bank Account and asking Roth to book the leftover funds as a loan from Defendant to Eastern Advisors.

5

(ECF No. 14).

First, it is important to note that none of this was included in the description of how the expert determined the loss amount. Further, while the government appears to believe that this allegation indicates that the funds were not contributed by Mr. Abramson, the transaction described is one in which Eastern Advisors allegedly received funds owed to Mr. Abramson, not to Eastern Advisors. According to the government, the business partner owed money directly to Mr. Abramson, not to Eastern Advisors. A. A. Sayia owed money to Grupo, a corporation owned in part by Mr. Abramson, not to Eastern Advisors. However, Mr. Abramson allegedly instructs his debtors to pay directly to Eastern Advisors, specifically into the accounts designated for shareholder loans from Mr. Abramson. Thus, Eastern Advisors, which is not involved in this transaction according to the government's description, gets a portion of money that was owed to Mr. Abramson personally, not owed to Eastern Advisors. Whether a contribution from Mr. Abramson is ultimately characterized as a shareholder loan or the contribution of capital, it is money that Eastern Advisors received from Mr. Abramson, a shareholder, that Eastern Advisors was otherwise not entitled to.

The government further argues that the fact that the transactions at issue were booked as shareholder loans by Eastern Advisors is not determinative of whether they were, in fact, loans, because that analysis depends on several factors. (ECF No. 89 at 15) citing *Frierdich v. CIR*, 925 F.2d 180, 182 (7th Cir. 1991); *Stanley v. Commissioner*, T.C. Memo. 2016-196, at *3. First, while it may not be determinative, it is certainly relevant that the payments were made into the "Loan-MAA Account," an account designated for shareholder loans that Mr. Abramson made to Eastern Advisors. *See e.g., Stanley*, 2016-196 at *8 (listing one factor as "how the parties' records and conduct reflect the transaction.").

Further, the Defendant agrees that whether a payment to a corporation is a shareholder loan depends on several factors. However, when those factors indicate that a payment to a corporation is

6

not a bona fide loan, it is instead treated as a capital contribution, just as the Defendant's original motion argues. (ECF No. 80 at 8). For example, the government cites to *Jennings v. United States,* 272 F.2d 842 (7th Cir. 1959). There, the taxpayer had given funds to the corporation and the question was how to characterize those funds. *Id.* at 843. The Court phrased the issue as, "whether the advances in question constituted loans to the corporation or were additional capital investments by the taxpayers." *Id.* at 843. Here, just as in *Jennings*, there were funds given to the corporation that were attributed to Mr. Abramson and which could be characterized as either loans to the corporation or capital investments. The Defendant has not argued in his motion that one is definitively true because of any single factor. The Defendant's motion argues that, in either scenario, the expert should have considered the Defendant's contributions in the loss calculations.

### C. Defendant's Personal Income Tax Loss Calculations

In sum, the Defendant's motion argues that if the expert's assumption is that payments to Totani are really payments to Mr. Abramson, the expert must give Mr. Abramson credit for the funds that he contributed to Eastern Advisors when calculating the personal income tax loss. Mr. Abramson's contributions to Eastern Advisors were either shareholder loans or capital contributions. If they were shareholder loans, then the Totani payments, assuming they were instead paid to Mr. Abramson, would be loan repayments. They would not be distributions and there would be no tax loss associated with the personal income taxes.

If, on the other hand, the contributions from Mr. Abramson were intended to be capital contributions, the Totani payments and the Defendant's contributions should be netted to arrive at net distributions. Any net distributions in excess of Eastern Advisor's earnings and profits should then be applied against any capital contributed by Mr. Abramson in the same year, and any additional excess should be treated as capital gains. *See* 26 U.S.C. §§ 301, 316. This is in line with the calculations presented by the Defense's expert, as the government suggests. (ECF No. 89 at 10).

7

However, the primary point is not that one expert's calculations are better than another expert's calculations; the Defendant's argument is that there was no basis for the government's expert to conclude that Mr. Abramson would not be entitled to any credit at all for what he contributed as a shareholder. If the assumption under which the expert is operating is that the Totani payments were payments to Mr. Abramson, then Mr. Abramson would be entitled to deduct amounts contributed to the corporation from those payments in determining his income, under one theory or another.

**III. Corporate Tax Return Loss Calculation**

The Defendant's motion also challenges the methodology of the expert's calculation of the corporate tax loss of $111,315. This was calculated by adding the total amount paid to Totani in commissions back into the parent corporation's net income and applying the corporate tax rate to that amount.

The Defendant's argument in his original motion was that if the money paid to Totani was instead paid to Mr. Abramson, this would not change the tax liability of the corporation because the corporation could still deduct those payments regardless of which person was paid the commission payments. In its response, the government claims that the expert's calculation of the corporate tax loss is based on the opposite premise than that of the personal tax loss – specifically, the Totani payments were not paid to Mr. Abramson, they were paid to Totani, and were thus, non-deductible. (ECF No. 89 at 19). As such, it appears that in calculating the total loss associated with the allegations in this case, the expert assumes both that the Totani payments were paid to Mr. Abramson, and that the Totani payments were paid to Totani. (*Id.*).

The government argues that there would be no reason to attribute the Totani payments to Mr. Abramson because Eastern Advisors never issued payments to Mr. Abramson. (*Id.* at 20). However, the expert's methodology for calculating the personal tax loss is premised on the idea that the Totani payments should be attributed to Mr. Abramson as income. This contradiction is

8

especially troubling in that the same exact payments are at issue in the two calculations for tax years 2011-2014. Thus, in these years, Mr. Abramson's income should have been increased, according to the government, because he received the commission payments and the entire amount qualified as income, and in these same years, the corporation's income should have been increased, according to the government, because the commission payments were paid to Totani, and were therefore nondeductible income to the corporation. Both cannot be true. Overall, the expert's loss calculations are not based on reliable methods.

Based on the above and the arguments contained within the Defendant's original motion, Mr. Abramson respectfully requests that this Court grant his motion to bar the testimony of the government's expert.

Respectfully submitted,

*/s/ Nishay K. Sanan*
nsanan@aol.com

Respectfully submitted,

*/s/ Cece White*
cece@sananlaw.com

Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
Tel: 312-692-0360
Fax: 312-957-0111
