IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 18 CR 681 |
| | ) |
| MICHAEL ABRAMSON. | ) Judge Virginia M. Kendall |
| | ) |

**MEMORANDUM OPINION AND ORDER**

The United States has charged Defendant Michael Abramson with thirteen counts of filing false tax returns in violation of 26 U.S.C. § 7206(1). (Dkt. 1). Abramson moves to exclude testimony of the government's summary expert witness, Internal Revenue Service (IRS) Revenue Agent Michael Welch, under Federal Rule of Evidence 702. (Dkt. 85). For the following reasons, the Court denies Abramson's Motion. [85]

**BACKGROUND**

The government has charged Defendant Michael Abramson with thirteen counts of making false statements in both his personal tax returns and in tax returns that he directed to be prepared and filed for Leasing Employment Services (LES), a business in which he has an ownership interest. (Dkt. 1). Abramson owns two other companies, Eastern Advisors and PayTech, which Abramson claims were consolidated with LES for corporate tax purposes. (Dkt. 85 at 2). Abramson allegedly did not file any corporate tax returns for Eastern Advisors until after the IRS's investigation went overt in fall 2013. (Dkt. 89 at 4). He subsequently filed amended consolidated corporate tax returns for LES from tax years 2006–2012 and consolidated corporate returns for tax years 2013 and 2014 that each included Eastern Advisors. (*Id.*; *see also* dkt. 1 at 7–14, 16).

1

The criminal charges relate certain payments that Eastern Advisors made to Jerilyn Totani, who was involved in an extramarital romantic relationship with Abramson. (Dkt. 85 at 2; dkt. 89 at 2). The government intends to prove that Abramson used Eastern Advisors to divert taxable corporate and personal income to Totani. (Dkt. 89 at 2–4). Abramson allegedly began directing payments from Eastern Advisors to Totani in June 2003. (Dkt. 1 at 3). The payments were classified as "advance on commissions" or "commissions" or "loans" on Eastern Advisors' books. (*Id.*) The government claims Abramson knew these payments were none of these things but were instead personal payments from Abramson to Totani based on income he received from Eastern Advisors. (*Id.*)

Abramson maintains that Eastern Advisors' twice monthly $2,500 payments were contractually agreed commissions that Totani—a licensed real estate broker—earned through her role in bringing a business deal to Eastern Advisors. (Dkt. 85 at 2–3). Abramson also acknowledges that Eastern Advisors made additional loans to Totani for her personal expenses but maintains they were properly classified as such. (*Id.* at 3). He denies making material misstatements on his personal income tax returns or on LES's corporate tax returns regarding these transactions.

According to the government's theory of the case, approximately 85% of the deposits coming into Eastern Advisors' loan account (denoted as "Loan-MAA") were not shareholder loans from Abramson despite the account's name and his claims. (Dkt. 89 at 3). The government says these deposits represented corporate earnings and profits from Eastern Advisors' regular business dealings. (*Id.*) Deposits were made by a broker (A.A. Sayia) or from clients of a Mexican oregano company (Grupo Mexquitic) in which Abramson also had an ownership stake. (*Id.*) Eastern Advisors' business earnings and profits that Abramson directed to Totani, the government argues, should have been declared as taxable distributions from Eastern Advisors to Abramson. The

2

government maintains these payments represented his personal income from Eastern Advisors that he directed to Totani for personal rather than business reasons. (Dkt. 85 at 6–7). As a result, Abramson allegedly understated his income on his personal income taxes.

Abramson, however, contends that the deposits into the Eastern Advisors' "Loan-MAA" account should be treated as nontaxable capital contributions or shareholder loans from Abramson to Eastern Advisors. (Dkt. 89 at 3; dkt. 85 at 4–5). According to Abramson, the commission payments and loans that he directed Eastern Advisors to make to Totani were intended as repayments of Abramson's shareholder loans to Eastern Advisors and thus nontaxable return of capital, rather than taxable distributions on income earned. (Dkt. 85 at 6–7). He denies any false statements on his personal income taxes.

The government further intends to prove that the commission payments and loans to Totani on Eastern Advisors' books were not what they purported to be, so Abramson made material false statements on LES's consolidated corporate tax returns. (*See* dkt. 1 at 7–14, 16). The government intends to prove that the commission payments to Totani were not deductible business expenses, but rather nondeductible personal expenses to pay for Totani's lifestyle. (*Id.*) Similarly, the government intends to prove that the corporation's other assets reporting "loans receivable" to "JT" were not loans but personal payments from Abramson to Totani. (*Id.*) Abramson also denies these allegations.

The government intends to call IRS Revenue Agent Michael Welch as a summary expert witness to testify to tax loss calculations made from analyzing Abramson's personal tax returns and LES's consolidated corporate tax returns. (Dkt. 85 at 1; dkt. 89 at 1). Abramson moves to exclude Agent Welch's testimony under Federal Rule of Evidence 702 and the Supreme Court's framework in *Daubert v. Merrell Dow Pharmaceuticals* as employing unreliable methodology and

3

irrelevant. (Dkt. 85 at 1). After full briefing on the motion, the Court held a *Daubert* hearing on December 14, 2022, to examine Agent Welch. (Dkt. 104). The parties also filed supplemental post-hearing briefs. (Dkts. 113, 114).

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert testimony for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Rule 702 permits opinion testimony from a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" if his or her expertise will assist the trier of fact "to understand the evidence or to determine a fact in issue," and "the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Thus, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (internal quotation marks omitted).

District courts apply *Daubert* flexibly, consistent with the Court's gatekeeping function. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The Court uses a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines: (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or

4

determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Whether to admit expert testimony rests within the Court's sound discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). Once the Court determines that the expert's testimony is admissible, "any questions or problems concerning the expert's opinion and testimony may be thoroughly explored during the cross-examination of the expert witness." *United States v. Perez*, 612 F.3d 879, 886 (7th Cir. 2010).

## DISCUSSION

**A.     Welch's Qualifications**

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (internal citation omitted).

Here, Welch has been an IRS Revenue Agent for over 38 years. (Dkt. 107 at 11). Revenue agents audit tax returns to ensure that they are substantially correct. (*Id.* at 11:19–20). Welch has personally audited "a few hundred" tax returns. (*Id.* at 11:22). He has a bachelor's degree in

5

accounting and a master's degree in taxation. (*Id.* at 13:2–4). He has also undergone the series of five basic revenue agent trainings, additional special enforcement program basic training, summary expert witness training, and training on QuickBooks and other computer accounting software. (*Id.* at 13). Like other IRS revenue agents, Welch completes at least forty hours of continuing professional education every year. (*Id.*) Welch has testified in court over thirty times, including ten or eleven times as an expert witness. (*Id.* at 16).

Abramson does not object to Welch's qualifications for offering an opinion on the alleged tax loss calculations. The Court also finds him qualified to testify on this subject based on his years of specialized experience and training as an IRS revenue agent auditing tax returns.

**B.     Reliability of Welch's Methodology**

Reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). The expert must connect the data employed and the opinion offered. *Id.*

Welch is expected to testify as a summary expert witness. "As a summary witness, an IRS agent may testify as to the agent's analysis of the transaction which may necessarily stem from the testimony of other witnesses. The agent may also explain his analysis of the facts based on his special expertise." *United States v. Pree*, 408 F.3d 855, 870 (7th Cir. 2005) (quoting *United States v. Moore*, 997 F.2d 55, 58 (5th Cir. 1993)). "As an expert witness, an IRS agent's 'opinion as to the proper tax consequences of a transaction is admissible evidence. Similarly, . . . an IRS expert's

6

analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is also admissible evidence.'" *Id.* (quoting *United States v. Windfelder*, 790 F.2d 576, 581 (7th Cir. 1986)).

To form his opinion, Welch reviewed IRS copies of tax returns and amended tax returns for the corporate entity LES; Abramson's personal tax returns; the QuickBooks files for the entities LES, Eastern Advisors, and PayTech; the bank account records for LES, Eastern Advisors, and Abramson; Illinois Secretary of State records for LES, Eastern Advisors, and PayTech; records from Chicago Title Company; the loan register from William Vickerman, who owns a portion of a company called Grupo Mexquitic that produces oregano in Mexico to be sold in the United States; business records subpoenaed from LES, Eastern Advisors, and PayTech; and interviews conducted in the course of the IRS's investigation. (Dkt. 107 at 16–19).

Using these available records and information, Welch prepared two alternative computations for tax loss. (*Id.* at 24:17–24). He based one computation on the LES corporate tax returns that consolidated the three corporations at issue: Eastern Advisors, PayTech, and LES. He based the second solely on Eastern Advisors' records as an independent company. (*Id.* at 23–24). Each alternative computation resulted in different tax losses for the corporate taxes and for Abramson personally. (*Id.* at 25–26). These computations, however, may be revised depending on the evidence introduced at trial. (*Id.* at 61:6–10 ("[I]f I sit through the trial and I hear the witnesses and I review the documents that are entered into evidence over any objections, I then have the information I need to do a more exact computation. But at this point it's based on a draft.")). This is consistent with the type of testimony an IRS agent would typically provide as a summary witness; he applies his knowledge and expertise to the evidence adduced at trial to analyze the tax consequences of certain transactions. *See Pree*, 408 F.3d at 870.

7

Preceding both sets of computations, Welch made assumptions about certain transactions drawn from his review of the records. First, he assumed that the "JT loan account" reported on Eastern Advisors' books was not an actual loan, but rather "actual money going out for the benefit of Mr. Abramson, distributions with respect to stock [in Eastern Advisors]." (*Id.* at 27:5–7). He cited both documentary factors—lack of any loan instruments, no evidence of repayment, no interest, no collateral, no references to such loans in the corporate minutes—and evidence from Totani's interview—where she stated she never expected to have to pay anything back—to make this assumption. (Dkt. 107 at 35–36; 40–42).

Second, he assumed that "Ms. Totani did not earn the commissions that are being deducted on the Eastern Advisors' books and records and thus on the consolidated tax return." (*Id.* at 27:8–12). He cited to the commissions noted in Eastern Advisors' books in the "JT advance" account, from which payments of $2,500 were made to Totani twice per month. (*Id.* at 42:25–43:5). He showed how the total at the end of the year lined up with the commissions deducted as a business expense on LES's amended consolidated corporate tax returns, with any extra money above the commission amount posted to the "JT loan" account. (*Id.* at 43–44). He also explained what evidence in the records would normally be expected to show someone was earning a commission as part of a business deal. (*Id.* at 45–46). Based on the facts available to him during the IRS's investigation, he concluded that these did not appear to be legitimate commission payments according to his knowledge and experience. (*Id.*)

Finally, Welch assumed that the payments from AA Sayia and other companies to Eastern Advisors in its records "represented gross receipts for the Grupo Mexico Company. And they were not from Mr. Abramson, they were from the company AA Saya [sic]." (*Id.* at 27:18–21). Welch thus did not consider these deposits to be capital contributions by Abramson nor shareholder loans

8

from Abramson to Eastern Advisors in his computations. (*Id.* at 27:21–23). Welch matched up Eastern Advisors' bank records with its QuickBooks records to trace payments to Eastern Advisors from AA Sayia and other sources. (*Id.* at 29–30). According to his tracing, none of the approximately 371 line items came from Abramson; they were all from third parties, who were not shareholders in Eastern Advisors. (*Id.* at 30–34). If these payments did not come from Abramson or other shareholders, they could not be shareholder loans or capital contributions, according to his knowledge of relevant tax code and accounting principles. (*Id.* at 36–37). He further said these payments lacked typical characteristics of loans. (*Id.*)

This testimony is also proper for an IRS agent testifying as an expert witness; Welch thoroughly explained his analysis of the transactions based on the facts in the record that necessarily preceded his tax loss computations. *See Pree*, 408 F.3d at 870. The jury need not agree with those underlying facts and the conclusions Welch draws from them. *See Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) ("[S]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."). Abramson can contest these facts or the weight Welch gave to them in drawing his conclusions through cross-examination. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."); *see also, e.g.*, *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("Experts routinely base their opinions on assumptions that are at odds with their adversary's view of the evidence.").

Having drawn these assumptions from the evidence, Welch explained his methodology for calculating the total tax due and owing by the corporation and individual:

> In this case, you have a corporation, and you have a corporation expense that is not being—is assumed not an actual expense, called a commission expense. So you would take the taxable income, either on the Eastern Advisors only basis or on the consolidated basis, and you would not allow that as a deduction. That would include—that would increase taxable income. And then you would go down and compute the corrected taxable income and the corrected tax, and there would be a tax loss to the government.
>
> Then you would have to review all the things on the QuickBooks that represent distributions to Mr. Abramson. And it's a two-step process here. You first have to go and determine what those distributions are. So you have a number per year. Then you have to go to the corporate books and records, tax returns, and you have to compute what's called earnings and profits. And earnings and profits is not something that's defined in the Code, but is basically, in layman's terms, an amount of money that's available to pay dividends. And so then you go and compute the earnings and profits, which would be the taxable income, minus something for federal taxes, minus non-deductible expenses like political contributions, and you would add back interest, non-taxable interest or other non-taxable items, and you would get earnings and profits.
>
> And you would compare that to the amount of the distribution. And under Code Section 301, 312, 316, they are taxable first as dividends to the extent of earnings and profits, and then it's return of capital to the extent of capital in the company. And, finally, if there's any amount left over, it would be a capital gain. And you would do that for each year, for each tax return, both on the Eastern Advisors' level and on the consolidated level" to get the total tax loss in the two alternative scenarios.

(Dkt. 107 at 46:24–48:9). Welch explained why misbooking a loan could affect tax liability: if the loan is not in fact a loan, it would potentially be taxable to the shareholder as a distribution. (*Id.* at 48–49). Similarly, misbooking a commission affects the tax liability because commissions are normally deductible business expenses. But if it is not a legitimate commission, the company's taxable income would theoretically be higher. (*Id.* at 49).

The Court finds the methodology Welch employed reliable. He thoroughly reviewed the entire record—which may be revised based on evidence adduced at trial—and analyzed the transactions at issue in this context according to his knowledge, training, and experience. *See Pree*, 408 F.3d at 870. Welch explained the factual basis in the record for each of his assumptions and

connects it to his conclusions. *See Manpower, Inc.*, 732 F.3d at 806 ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."). He then drew on his knowledge and experience to give his opinions on the tax consequences of the transactions he analyzed. *Pree*, 408 F.3d at 870.

Abramson has objected to the reliability of Welch's methodology on several bases. He first argues that the methodology for calculating the tax loss from Abramson's personal income taxes is unreliable because it is "based on assumptions that are not supported by the facts in this case." (Dkt. 85 at 7). Specifically, he argues that Welch's methodology unreliably treats payments from Eastern Advisors to Totani as taxable dividends and capital gains instead of repayments of Abramson's shareholder loans or non-taxable returns of capital to Eastern Advisors. (*Id.* at 7–12).

Tax classifications like "dividend" and "return of capital" turn on "the objective economic realities of a transaction rather than . . . the particular form the parties employed." *Boulware v. United States*, 552 U.S. 421, 427 (2008). Similarly, whether payments from a closely held corporation to a shareholder should be treated as loan repayment or as distributions is based on the facts and circumstances and the intent of the parties at the time of the transactions. *See Jennings v. United States*, 272 F.2d 842, 845 (7th Cir. 1959); *Busch v. Comm'r*, 728 F.2d 945, 948–49, 951 (7th Cir. 1984). Here, Welch cited facts in the record demonstrating why, in his opinion, Eastern Advisors' payments represented earnings and profits from its business transactions with third parties, taxable as shareholder distributions. (*See* dkt. 107 at 27–37). Critically, Welch traced the payments that came into Eastern Advisors' loan account and concluded that they did not originate with Abramson; they came from AA Sayia as a broker for Grupo Mextique and other third-party clients. (*Id.* at 36:13–16). Welch thus explained why he did not believe these payments were intended as shareholder loans or capital contributions from Abramson. This conclusion and its

11

factual underpinnings can be tested on cross-examination. *See Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360; *Gayton*, 593 F.3d at 616.

Next, Abramson argues that Welch's methodology for calculating the tax loss for LES's consolidated returns is unreliably based on the assumption that the commissions were not legitimately earned by Totani and thus nondeductible. (Dkt. 85 at 12–13). Even if Totani did not earn them, he maintains they were still valid commissions to *himself* for his work on the 2003 billboard deal, so they were properly deducted as business expenses according to standard accounting principles. (*Id.* at 13). Welch cited to evidence in the record to explain why he did not consider the commissions to have been legitimately earned by Totani. (*See* dkt. 107 at 42–46). Based on his review of Eastern Advisors' books, he also never saw Eastern Advisors issue any commission payments, wages, W-2s, or Forms 1099 to Abramson. (*Id.* at 46:14–18). Abramson may cross-examine Welch—as he did at the hearing, (dkt. 107 at 53–57)—regarding evidence indicating Totani earned commissions from Eastern Advisors for her work. *See Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360; *Gayton*, 593 F.3d at 616. He may also offer evidence supporting his alternative argument that he earned commissions from Eastern Advisors, such that the commissions were properly deductible from LES's filings. Neither alternative negates the admissibility of Welch's properly supported opinion. *See Richman*, 415 F. Supp. 2d at 942.

Finally, Abramson argues that documents in discovery contradict Welch's opinion, undermining his reliability as an expert. (Dkt. 85 at 12). But this, again, goes to the weight that a jury should give Welch's opinion, not the reliability of his methodology. *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d at 806; *see also Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it

12

properly leaves questions concerning his methodology, findings, and expertise to cross-examination.").

The Court therefore finds that Welch's opinions are the result of a reliable methodology properly applied for an expert of his type.

**C.     Relevance of Welch's Testimony**

"An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citation omitted). The Rule 702 standard for relevance also incorporates the Court's obligations under Rule 403 to "determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury." *United States v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012).

Welch will testify about the tax loss computations he made for Abramson's personal income taxes and LES's corporate income taxes. Abramson argues that Welch's testimony is not relevant because tax loss is not a required element for a conviction under 26 U.S.C. § 7206(1). (Dkt. 85 at 14). Even if relevant for some other purpose, Abramson further argues the Court should exclude his testimony under Rule 403 because its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. (*Id.* at 15).

To prove a § 7206(1) violation, the government must prove (1) the defendant prepared or caused someone to prepare a tax return; (2) the tax return was false as to a material matter; (3) the defendant signed the return, which contained a written declaration that it was made under penalties of perjury; (4) the defendant knew he had a legal duty to file a truthful tax return, but when he

13

signed it, he did not believe it was truthful as to a material matter; and (5) the defendant filed the return with the IRS. *See Pattern Criminal Jury Instructions of the Seventh Circuit*, 26 U.S.C. § 7206(1) Fraud and False Statements—Elements," 1061 (2022 Ed.); *see also United States v. Pansier*, 576 F.3d 726, 736 (7th Cir. 2009) ("Section 7206(1) is a perjury statute, and therefore requires only that the taxpayer file a return which he does not believe to be true and correct as to every material matter." (internal citations and quotation marks omitted)).

Although tax deficiency is not an element of a § 7206(1) prosecution, Welch's opinion is nevertheless relevant to the materiality of the alleged false statements on Abramson's tax returns and helpful to the jury to understand the evidence. *See Pree*, 408 F.3d at 871 (concluding that Agent Welch's testimony about the tax consequences of a particular transaction were relevant to evidence necessary to prove indictment for § 7206(1) violations); *Windfelder*, 790 F.2d at 581–82 (finding IRS experts' conclusions about tax returns and related financial documents was helpful to jury in § 7206(1) prosecution because their informed conclusions as to the meaning of evidence helpful to the jury in interpreting that evidence); *see also, e.g.*, *United States v. Vallone*, No. 04 CR 0372, 2008 WL 516715, at *5 (N.D. Ill. Feb. 21, 2008) (finding Agent Welch's testimony helpful to the jury to understand tax implications of evidence in prosecution for multiple violations of tax code). Welch's testimony will help the jury here understand the why—according to the government—the alleged false statements on Abramson's tax returns caused him to underestimate the tax liability on both his personal and the corporate returns. This bears on the statements' materiality. Because tax and accounting principles are not within the understanding of the average juror, his testimony will be helpful.

The Court likewise finds that such testimony will not be unduly prejudicial under Rule 403. The government expert's opinion that Abramson's false statements caused him to underestimate

14

his tax liability and that of the corporation is undoubtedly prejudicial, but it is also probative of the statements' materiality. Abramson has provided no explanation or legal precedent as to why such testimony would be fundamentally unfair to him. Abramson will have the opportunity to cross-examine Welch, and he will also offer his own tax expert's opinion on his tax returns. The jury will be properly instructed as to the elements of § 7206(1); Abramson may also propose to the Court a limiting instruction for the jury's consideration of Welch's testimony.

In sum, the Court finds Welch's testimony relevant to understanding the evidence and determining facts at issue.

### D. Welch Does Not Invade Province of the Jury or Reach Improper Legal Conclusions

Finally, at Welch's *Daubert* hearing and in his post-hearing supplemental brief, Abramson raised new arguments that Welch's testimony improperly made conclusions of law and thus improperly invaded the province of the jury. (*See* dkt. 107 at 6:3–8:4; dkt. 114 at 2–7). While experts must refrain from offering legal conclusions that would decide the case, *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003), ultimate factual conclusions—even those within the province of the jury—are proper. *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009); *see also, e.g.*, *In re Dealer Management Sys. Antitrust Litigation*, 581 F. Supp. 3d 1029, 1096–97 (N.D. Ill. 2022). When the application of expertise necessarily overlaps with the applicable legal standard, however, it can be difficult to disentangle the two. Still, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). The Seventh Circuit has long recognized in the context of expert IRS agent testimony that "an IRS expert's analysis of the transaction itself, which necessarily precedes

his or her evaluation of the tax consequences, is . . . admissible evidence." *Pree*, 408 F.3d at 870 (quoting *Windfelder*, 790 F.2d at 581).

The fact that Welch must take evidence into account when making tax loss computations does not mean that he is effectively telling jurors how to decide the case. Welch did not opine that Abramson committed the charges against him. Nor did he instruct on the legal standards or elements for a § 7206(1) violation. He explained his methodology for the tax loss computations and the facts he considered in reaching his conclusions about the taxes due and owing, according to his expertise. Making such computations necessarily involved considering all facts in the record to determine whether, for example, an item booked as a loan had the typical characteristics of a loan according to his tax and accounting expertise. *See Pree*, 408 F.3d at 870. It is expected that the application of such expertise would overlap with a civil tax court's application of the legal definition of a loan. But Welch explained his baseline assumptions for his calculations in terms of the particular facts in this case and what he would generally look for in his experience when classifying transactions and their tax implications. He did not state that a transaction was legally not a loan; he stated that he did not find sufficient evidence that in his experience would normally indicate a transaction to be a loan and made his computations accordingly. In short, he provided "concrete information" against which to measure legal concepts in explaining his assumptions. *See Blount*, 502 F.3d at 680.

Welch's ultimate factual conclusions—such as whether certain payments were deductible from corporate tax returns, or whether certain items represented taxable distributions—are proper, even if they embrace ultimate issues to be considered by the jury. *See Pansier*, 576 F.3d at 738. The jury may disagree with the facts underlying Welch's computations and the conclusions that necessarily follow from them. *See Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360. Indeed, if tax

16

experts could not explain how they reached their opinions by alluding to relevant factors for determining such classifications as loans, contributions to capital, etc., it is hard to see how they could ever offer relevant testimony. The Court concludes that Welch's proposed testimony does not invade the province of the jury.

## Conclusion

The Court finds that IRS Revenue Agent Michael Welch's proposed testimony is admissible under Rule 702 and *Daubert*. The Court denies Defendant Abramson's Motion to exclude Abramson's testimony. [85]

Date: January 25, 2023

                                             _____
                                             Virginia M. Kendall
                                             United States District Judge