**UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No.: 18 CR 681 |
| v. ) | |
| ) | Hon. Virginia M. Kendall |
| MICHAEL ABRAMSON, ) | |
| ) | |

**DEFENDANT'S POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL**

The defendant, Michael Abramson, by and through his attorneys, Nishay K. Sanan and Cece White, respectfully requests that this Court enter judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. In support, Mr. Abramson states the following:

**INTRODUCTION**

The evidence at trial was insufficient to find Michael Abramson guilty of filing false tax returns in that the government failed to prove the statements in the return were false or that Mr. Abramson acted willfully. The government's theory depended on proving that funds Mr. Abramson's real estate brokerage company paid to a licensed real estate broker, were not truly real estate commissions and loans, but rather taxable payments to himself. However, the government's own immunized witness, Jerilyn Totani, testified that she originated the real estate deal, that she had a written commission agreement, and that the funds she received were in fact commissions. Her testimony is unrebutted and corroborated by other evidence. Further, the evidence demonstrated that the allegedly false "Loan Receivable – JT" was a loan. The government may have proven that Totani did not have an obligation to repay the loan, but Mr. Abramson did have such an obligation and thus, the loan was real and an asset, as reported. Eastern Advisors' Accountant testified that Mr. Abramson covered the JT Loan with his own contributions and 3 accountants from the certified public accounting firm that prepared the personal and corporate tax returns testified that it was appropriate to treat the payments as loans. Thus, neither false statement alleged in the indictment was proven false at trial.

1

Even if the government had proven that the corporate tax returns were false, it failed to prove that Mr. Abramson's personal income taxes were false in that distributions to him would not have been taxable, and thus, his income was properly reported.

Finally, the evidence failed to demonstrate that Mr. Abramson acted willfully. While the government claimed that his entire motive was to cover up a secret affair with clever accounting, the evidence overwhelmingly demonstrated that Mr. Abramson made no attempts to hide these payments or to whom they were made. Instead, he disclosed the payments in his books and records, to every accountant that testified, and to the IRS in a manner that was significantly more transparent than the law requires. Thus, while the jury was unable to reach a verdict, the Court should enter a judgment of acquittal on all counts.

## I. Indictment and Trial

The indictment charges Mr. Abramson with 13 counts of filing false tax returns in violation of 26 U.S.C. § 7206(1). ECF No. 1. Counts 1, 2, 11, and 13 charge Mr. Abramson with making false statements on his personal tax returns for tax years 2011-2014. *Id.* at 5-6, 15, 17. Counts 3-10 and 12 charge Mr. Abramson with making false statements on amended or original corporate tax returns for Leasing Employment Services for tax years 2006-2014. *Id.* at 7-14, 16. The case proceeded to jury trial on January 30, 2023. ECF No. 145. On February 9, 2023, the jury began deliberating. ECF No. 153. On February 10, 2023, deliberations concluded with the jury having failed to reach a unanimous verdict and a mistrial was declared. ECF No. 154.

The evidence at trial demonstrated that the allegations all relate to Mr. Abramson's ownership of a real estate brokerage called Eastern Advisors. Eastern Advisors made payments to Jerilyn Totani, a licensed real estate broker who worked as an independent contractor with the business. Mr. Abramson and Totani were also involved in an extramarital affair. The existence of their relationship was a primary focus of the government's evidence at trial. The government's theory was that Mr.

Abramson's real estate brokerage company paid Totani commissions and loans that were not related to her real estate work but were instead non-deductible payments to the corporation and taxable distributions to Mr. Abramson himself. As such, the government argued that there were false statements on the corporate tax returns in that they included these payments to Totani in total business deductions and that there were false statements on Mr. Abramson's personal tax returns in that they failed to include the amounts paid to Totani in Mr. Abramson's total income.

The commission payments relate to an agreement between Eastern Advisors and another company, Outfront Media,[1] which owned and leased advertisement billboards. Eastern Advisors assisted Outfront Media in negotiating a new lease deal with the Village of Rosemont in which Outfront Media would rent billboards and the land on which they stood. Robert Durkin, who, like Totani, was an independent contractor for Eastern Advisors, was the primary contact between Eastern Advisors and Outfront Media. In 2003, Outfront Media started paying Eastern Advisors commissions owed for its assistance in negotiating the billboard lease deal. Pursuant to written independent contractor agreements, Eastern Advisors paid Durkin and Totani 50% of the commissions each. Totani's commissions were advanced in bi-weekly check payments of $2,500, unlike Durkin's which were paid quarterly after Eastern Advisors received the funds from Outfront Media.

The evidence further demonstrated Eastern Advisors loaned funds to third parties, including loans provided to Totani for the payment of her personal bills. These payments were recorded contemporaneously in Eastern Advisors' books as loans to Totani in the "JT loan" account. However, certain payments to Totani were recorded as a part of this loan account only after adjustments were made by Eastern Advisors' accountant Jill Roth in 2014. Specifically, when the

---

[1] The company also went by other names such as Viacom and CBS Outdoor, but Outfront Media will be used throughout this motion for clarity.

advances on commission payments to Totani exceeded 50% of the payments that Eastern Advisors received from Outfront Media, the excess advanced to Totani was recharacterized as a part of the JT loan account. The evidence further demonstrated that Mr. Abramson loaned his personal funds to Eastern Advisors. The money that Eastern Advisors owed to Mr. Abramson was sufficient to cover the amount due to Eastern Advisors in the JT Loan Account. The funds that Abramson loaned to Eastern Advisors were recorded in Eastern Advisors' books and records under the "Loan-MAA" account. This account had multiple subaccounts into which money was deposited, such as AA-Sayia. Jill Roth testified that these accounts were also Mr. Abramson's contributions to Eastern Advisors because they were repayments owed to Mr. Abramson that he directed to Eastern Advisors.

Mr. Abramson hired Krol and Associates, a certified public accounting firm, to prepare his corporate and personal tax returns and three of the firm's accountants testified at trial. In 2014, Krol and Associates prepared consolidated amended returns on behalf of LES that included Eastern Advisors. Prior to this, Eastern Advisors had not filed income taxes. The evidence demonstrated that Mr. Abramson prepared a letter to the IRS seeking an extension to file the consolidated amended returns in which he explained that one reason for their non-filing was the poor health and eventual death of Mr. Abramson's primary contact at Krol and Associates. At trial, the accountants testified that this information was accurate. The extension request was denied, however, and the jury learned that for each relevant year, Eastern Advisors should have, and did not file its own tax returns. There were no charges filed against Mr. Abramson in connection to the corporation's failure to file. Prior to the filing of the returns in 2014, Mr. Abramson gave the accountants full access to Eastern Advisors' books and records to help them prepare the returns. All the payments to Totani were disclosed in these records. Each accountant testified that they rely on the information provided by their client to prepare the returns, but further testified that they have an independent duty to inquire if they have any concerns about the information received from the client. Each testified that

they saw no issue with the commission payments to Totani or with the JT loan account. Each testified that they could have asked Mr. Abramson questions if they were concerned about payments to Totani. They further could have asked accountant Jill Roth or they could have used the QuickBooks data file containing all of the records if they had a reason to suspect something was wrong with the company's accounting. None of the accountants had such concerns.

Both the government and the defense presented expert testimony from experienced and qualified current or former IRS agents. Government expert Agent Welch testified to his conclusions that the commissions were non-deductible, the loan was not a loan, and the payments were distributions to Mr. Abramson, resulting in a tax loss on both personal and corporate returns. He further testified on materiality. Defense expert and former IRS agent Ron Braver testified to his conclusions that the commissions were deductible, the loan was a loan, and that even if the payments were considered distributions to Mr. Abramson, his income was nonetheless accurately reported. Thus, Mr. Braver testified that there were no false statements on the tax returns, but even assuming otherwise, Mr. Abramson had made significant capital contributions to the corporation, which would be netted against the distributions, resulting in no tax loss on either the personal or corporate returns.

## II.     Argument

When the jury has failed to return a verdict, the Court may enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Fed. R. Crim. Pro. 29(c)(2). Rule 29 requires the entry of a judgment of acquittal where "after viewing the evidence in the light most favorable to the United States, the trial court finds that no reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013). Although a jury may infer facts from other

5

facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation. *Id.* Each step in the inferential chain must be supported by evidence that allowed the jury to draw reasonable inferences from basic facts to ultimate facts. *Id.* Further, when the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, the evidence necessarily fails to establish guilt beyond a reasonable doubt. *United States v. Harris*, 942 F.2d 1125, 1130 (7th Cir. 1991) citing *United States v. Delay,* 440 F.2d 556, 568 (7th Cir. 1971). A defendant seeking acquittal under Rule 29 faces a difficult hurdle. *Jones*, 713 F.3d at 339. However, because the government bears the burden of proof, the "height of the hurdle depends directly on the strength of the government's evidence." *Id.*

In the instant case, there was insufficient evidence to prove each count of filing a false tax return in violation of 26 U.S.C. § 7206(1). For a conviction, the government must prove the following elements beyond a reasonable doubt: (1) the defendant prepared or caused someone to prepare an income tax return; (2) the income tax return was false as to a material matter, as charged in the Count; (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; (4) the defendant acted willfully, that is, he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe it was truthful as to a material matter; and (5) the defendant filed or caused someone to file the income tax return with the Internal Revenue Service (IRS). Seventh Circuit Pattern Criminal Jury Instructions, 26 U.S.C. § 7206(1) Elements (2020 ed.). Here, the government failed to prove that the income tax returns were false as to a material matter, or that the defendant acted willfully. Thus, while the jury was unable to reach a verdict, the Court should enter a judgment of acquittal on all counts.

### A. There was Insufficient Evidence that the Tax Returns were False as to a Material Matter

The evidence was insufficient to establish that the corporate tax returns or the personal tax returns were false as to a material matter. In connection to the corporate returns at issue in Counts

6

3-10 and 12, the government was required to prove that each was false as to a material matter in that they (1) stated total deductions that included commission payments to Jerilyn Totani, and (2) stated that the company had a loan receivable referred to as "JT." ECF No. *Id.* at 7-14, 16. The government thus had to prove that the commission payments to Jerilyn Totani were non-deductible to the corporation, and that the "Loan Receivable – JT" listed on the returns was not a loan. The government failed to do so.

### 1. The Government Failed to Prove Commission Payments were Nondeductible

The government failed to prove that the commission payments to Totani were nondeductible to the corporation. The government did not present a single witness who could testify that Totani did not earn the commissions. When Totani herself testified on behalf of the government as an immunized witness, the government did not ask her about how she earned the commission payments or whether she performed any work on behalf of Eastern Advisors. The government instead presented evidence that Totani and Mr. Abramson had a romantic relationship, that Mr. Abramson paid for her condo and gave her gifts, and that Mr. Abramson may have wanted to hide his relationship with Totani from his wife in the past. The fact that Mr. Abramson and Totani were romantically involved is not sufficient to prove that payments from a real estate brokerage to a real estate agent, pursuant to an independent contractor agreement, were nondeductible to the brokerage.

The government also presented evidence that employees of Outfront Media did not know Totani and worked only with Robert Durkin, but Totani worked for Eastern Advisors, not Outfront Media. Outfront Media employees would have no reason to know who Totani was or whether she worked for Eastern Advisors. There was no evidence to suggest that the commission payments were premised on Totani having direct contact with Outfront Media employees nor did Totani claim to work with Outfront Media employees. This evidence proved only that Durkin, the other

7

independent contractor who received 50% of the commission payments, served as the contact person for Outfront Media. This evidence has no bearing on whether Totani worked for Eastern Advisors in some capacity, nor does it prove that the commission payments to Totani were nondeductible to the corporation.

The government further relied on evidence that payments were advanced to Totani and later recharacterized as loans if the advance exceeded 50% of the commissions owed to Totani under the independent contractor agreement. Eastern Advisors accountant, Jill Roth, testified that there was nothing unusual about paying commissions in advance. She further testified that in 2014, the company's accounting records were a mess, and it was part of her job to reconcile past entries. She recharacterized the payments from the commission account to the JT loan account to accurately track those payments, not to conceal them. She further testified that she did not know what specific work Totani had performed to earn the commissions, but she knew payments to Durkin and Totani were connected to the billboards. The fact that Eastern Advisors did not record the payments in a timely manner does not support an inference that Totani did not perform any work to earn the payments.

The government also presented testimony from Agent Welch that the commissions were not earned in that he treated them as nondeductible to calculate the tax loss. He testified that he believed they were nondeductible because the accounting records were not reconciled properly at the end of each year, because there were no 1099's issued to Totani, because the two employees from Outfront Media did not know Totani, and because Totani spent part of the year in Las Vegas. None of this proves that Totani did not perform some type of work for Eastern Advisors that would earn her a commission. Agent Welch admitted that he did not hear testimony from any witnesses about whether she performed any work for Eastern Advisors. He admitted that he concluded that Totani did not earn the commissions based on having no evidence either way. There was evidence that

Totani earned the commissions in the defense case after Agent Welch testified. However, even if there had been no evidence either way, this would indicate that "the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt [and] the evidence necessarily fails to establish guilt beyond a reasonable doubt." *Harris*, 942 F.2d at 1130 citing *Delay,* 440 F.2d at 568.

After the government rested, Totani testified for the defense that she earned the commission payments in two ways. First, she testified that she brought information to Mr. Abramson after overhearing a conversation at a bowling alley. Totani's mother was on a bowling team with a close friend Norean Mitchell, who is an employee at Outfront Media. Totani testified that she was eavesdropping on a conversation between Mitchell and an unknown person. She did not know exactly what the conversation was about, but she knew it involved the mayor of Rosemont and a dispute over billboards and she knew where Mitchell worked. She passed along the information to Mr. Abramson, telling him she'd expect a cut if it resulted in a deal. In rebuttal, the government presented the testimony of Norean Mitchell who testified that she would not have had a conversation about work at the bowling alley and that she did not work in the leasing department. However, she admitted that she did have detailed knowledge about the billboards because of her position, that she did not remember whether any such conversation had taken place, and that she could potentially get in trouble with her employer for sharing confidential information with friends. The jury thus heard evidence that Totani earned the commission by bringing an Outfront Media deal to Mr. Abramson, which was corroborated by the fact that Totani's mother was close personal friends with an employee of Outfront Media who worked on billboards and who Totani had met multiple times years before the deal that Totani testified had earned her the commissions.

Second, Totani testified that she took photographs of the billboards on behalf of Eastern Advisors. Witnesses for Outfront Media explained that photographs are taken as proof of

9

performance for the client. The evidence further demonstrated that Eastern Advisors earned a percentage of commission based on Outfront Media's performance and thus, Eastern Advisors would have its own motivation for wanting photographs as proof of performance. Totani's mother, Geraldine, also testified that she accompanied Totani more than once while she took photographs. Further, the defense introduced evidence that Totani paid taxes on the commissions she earned, that she had her real estate license throughout the relevant tax years, and that the brokerage that her license was registered with was Eastern Advisors. Defense expert Mr. Braver testified that he believed the commissions were properly deducted based on this evidence, his expertise in civil tax audits and criminal tax investigations, his review of the QuickBooks records characterizing them as commission payments, and the testimony of multiple government witnesses including Jill Roth and the accountants from Krol and Associates.

In sum, the government failed to present evidence to demonstrate that the commission payments were non-deductible. The government relied on the mere fact of a romantic relationship to suggest that any payment to Totani must have been fraudulent. There was, however, significant evidence demonstrating that she did perform work on behalf of Eastern Advisors and that the commission payments were properly deductible. Thus, no reasonable juror could have found that the government had proven beyond a reasonable doubt that the tax returns at issue in counts 3-10 and 12 were false as to a material matter for including commission payments in total deductions.

### 2. The Government Failed to Prove that the Asset Listed on the Returns as "Loan Receivable – JT" was not a Loan

The government failed to prove that the asset listed as "loan receivable – JT" was not a loan. The government again relied heavily on the existence of a romantic relationship between Totani and Mr. Abramson to suggest that any money transferred to her must have been fraudulent. Further, the government's evidence included the absence of a written loan agreement or repayment schedule, Totani's testimony that she did not believe she was obligated to repay, and the fact that she did not

make repayments. The government may have proven that the loan receivable was not a loan between Eastern Advisors and Jerilyn Totani, but this does not prove that the tax returns were false as to a material matter - the tax returns state only that it is a loan that will be repaid to Eastern Advisors, not that Totani is the one obligated to repay it.

As defense expert Mr. Braver testified, the loan receivable could be a related party transaction in which a corporation loans money to someone related to a shareholder. In this circumstance, the item listed on the tax return as an asset is still an asset and there is no false statement - it is simply a loan repaid by Mr. Abramson. Indeed, the evidence demonstrated that Mr. Abramson consistently transferred funds into the corporation using a specific account for his shareholder loans. The evidence thus demonstrated that there was a loan receivable in each year that it was claimed. Government witnesses and Eastern Advisors Accountant Jill Roth testified that the JT loan account was a loan repaid by Mr. Abramson's own contributions to the corporation as a shareholder. The government proved only that Totani was not the one obligated to repay the balance to Eastern Advisors. Thus, the government failed to present sufficient evidence to demonstrate that the loan listed on the returns was not a loan. Therefore, no reasonable juror could have found that the government had proven beyond a reasonable doubt that the tax returns at issue in counts 3-10 and 12 were false as to a material matter for including a loan that was not a loan.

Additionally, if the Court finds that the government did prove that the "Loan receivable – JT" loan was not a loan, the Court should nonetheless grant judgment of acquittal on Counts 3-10 and 12 because including this statement in the return, even if it was proven false, was not proven to be material. "A false matter is material if it is capable of influencing the IRS or has the potential for hindering the IRS' efforts to monitor and verify the tax liability of the taxpayer." *See* Seventh Circuit Pattern Criminal Jury Instructions, Definition of Materiality, (2020 ed.), *Also see* ECF No. 152.

First, the evidence demonstrated that listing the loan did not impact Eastern Advisors' tax liability. The government was not required to prove a tax loss, but this is nonetheless relevant to materiality. *See e.g., United States v. Clifton*, 127 F.3d 969, 971 (10th Cir. 1997) (stating, that where a "taxpayer's failure to report all taxable income will not affect the computation," this "might very well affect the jury's deliberations on the element of materiality.); *and United States v. Uchimura*, 125 F.3d 1282, 1286 n.5 (9th Cir. 1997) (stating that the fact "that no additional tax is owed of course has a bearing on materiality"). Agent Welch's testimony included calculations associated with the commission payments if they were not deductible, but the jury heard evidence that the corporation's tax liability was not altered by the loan. Agent Welch further testified that the IRS looks at a balance sheet to get a full picture of the business' finances. However, the jury heard evidence from Mr. Braver that it would be proper to simply net out shareholder loans instead of listing specific loans receivable as assets and outstanding debts to shareholders as liabilities. Mr. Abramson included more information than was required. While this element may be proven in cases where there is no tax liability or where the statement only has some potential for influencing the IRS, the difficulty for a defendant seeking acquittal under Rule 29 "depends directly on the strength of the government's evidence." *Jones*, 713 F.3d at 339. Here, where the government failed to secure a conviction, the fact that there was very little evidence supporting materiality, and no tax liability associated with this false statement, supports the defendant's motion for acquittal.

Further, this statement was not material because even if the loan was a distribution to Mr. Abramson, as the government claims, its inclusion on the tax returns would have no potential impact on the IRS. Eastern Advisors Jill Roth testified that Mr. Abramson deposited money to cover the JT loan account. Roth further testified that the money in the "MAA-Loan," account, as well as each of its subaccounts, such as "AA-Sayia," was Mr. Abramson's money that he contributed to Eastern Advisors as a shareholder. She confirmed that even when that money was transferred

from a person or entity other than Mr. Abramson himself, it was because he was being repaid. The money that the corporation owed to Mr. Abramson consistently covered the balance owed to the corporation on the JT loan account. The tax return thus reflected a liability to Mr. Abramson and an asset to the corporation in the form of a loan receivable. Because the corporation owed Mr. Abramson money, removing this loan would have simply decreased the money that Eastern Advisors owed to Mr. Abramson. This would not hinder the IRS' ability to monitor or verify Eastern Advisors' tax liability. Thus, the government failed to establish this statements' materiality in addition to failing to prove it was false. Overall, the government failed to present sufficient evidence that any of the corporate tax returns were false as to a material matter. Thus, the Court should grant judgment of acquittal on counts 3-10 and 12.

### 3. The Government Failed to Prove that the Personal Income Tax Returns Were False as to a Material Matter

In connection to the personal income tax returns at issue in Counts 1, 2, 11, and 13, the government was required to prove that they were false as to a material matter in that they underreported the defendant's total income. The government thus had to prove that Mr. Abramson earned taxable income in tax years 2011-2014 that should have been included on his personal tax returns. The government failed to do so. Agent Welch testified that all payments to Totani should be treated instead as distributions to Mr. Abramson. His reasoning was that if the payments transferred to Totani were not commissions or loans, they were instead payments for her personal benefit as Mr. Abramson's girlfriend, which should have properly been distributed to Mr. Abramson first, who then could have transferred the funds to Totani if that was his intention. The issue with this logic is that the evidence demonstrated that if the same funds had been transferred to Mr. Abramson, it would not have been taxable income. Agent Welch testified otherwise only because he failed to credit Mr. Abramson for a large number of his capital contributions. He credited him only for those

13

located within the larger account for Mr. Abramson's loans, and refused to give any credit for the subaccounts located within that same account.

Agent Welch's position was contradicted by other government witnesses and the government's own evidence as well as the defense's expert. For example, Jill Roth testified that Eastern Advisors owed Mr. Abramson money and that the MAA-Loan account, and each of its subaccounts, were shareholder loans from Mr. Abramson. She confirmed that even when that money was transferred from a person or entity other than Mr. Abramson himself, it was because he was being paid back by that person or entity. Each of the accountants confirmed that the MAA-Loan Account reflected a balance owed to Mr. Abramson. Further, the government's own exhibits, such as the Krol accountant's worksheets, and the Eastern Advisors QuickBook data, clearly identified all these transactions as a part of Mr. Abramson's shareholder loan account.

Further, Mr. Braver testified to the calculation of personal income tax, even assuming that the payments were distributions to Mr. Abramson himself. Mr. Braver testified that it would be proper to net the assets and liabilities and that Mr. Abramson's income in each tax year at issue would not have changed. Thus, the evidence favored a theory of innocence on this element for each of the personal income tax returns, or was at least balanced in that the experts disagreed. Thus, the government failed to prove that Mr. Abramson earned additional income tax in the relevant years, and therefore, failed to prove that the personal income tax returns were false as to a material matter. The Court should grant the defendant judgment of acquittal on Counts 1, 2, 11, and 13.

### B. There was Insufficient Evidence that the Defendant Acted Willfully

The government failed to prove that Mr. Abramson acted willfully. A defendant acts willfully if he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe that it was truthful as to a material matter. *See* Seventh Circuit Pattern Criminal Jury Instructions, 26 U.S.C. § 7206(1) Elements (2020 ed.). The government offered evidence that Mr.

Abramson was aware of his legal duty to file a truthful tax return, but it failed to demonstrate that he did not believe his tax returns were truthful. The government's theory throughout the trial was that Mr. Abramson was knowingly hiding his affair with Totani by using the company to pay her expenses. However, the evidence overwhelmingly demonstrated that Mr. Abramson consistently disclosed that his company was paying Totani. He publicly registered as her real estate broker. He tracked all loan and commission payments in accounts specifically identified as related to Totani. He disclosed payments to Totani to his accountant, Ms. Roth, to each of the 3 accountants at Krol and Associates, and to the IRS, identifying Totani by name and initial. As Agent Braver testified, there was no need for Mr. Abramson to disclose who these loans were related to and there was no need for him to list each individual subaccount. The jury heard evidence establishing that Mr. Abramson was more transparent than he needed to be. If he his intention was to hide these payments, he could have simply stated, "shareholder loans," on his returns, netting the totals. The government's theory for willfulness was contradicted by its own evidence and no reasonable trier of fact could have found this element was proven beyond a reasonable doubt. Mr. Abramson and his company may have been negligent in their recordkeeping. However, the government failed to prove that Mr. Abramson acted willfully in filing false tax returns.

### III.   Conclusion

For these reasons, the defendant, Michael Abramson, respectfully requests that this Court enter judgment of acquittal on all counts.

Respectfully submitted,

*/s/ Nishay K. Sanan*
nsanan@aol.com

*/s/ Cece White*
cece@sananlaw.com

Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
Tel: 312-692-0360
Fax: 312-957-0111