IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) <br> ) <br> ) No. 18 CR 681 |
| v. | ) <br> ) Judge Virginia M. Kendall |
| MICHAEL ABRAMSON. | ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

The United States charged Defendant Michael Abramson with thirteen counts of filing false tax returns in violation of 26 U.S.C. § 7206(2). (Dkt. 1). A jury trial was held, but the jury was unable to reach a verdict. (Dkt. 153; Dkt. 164 at 1542–43). Abramson moves for judgment of acquittal following his trial. (Dkt. 162). For the following reasons, the motion is denied. [162]

**BACKGROUND**

The indictment charges Michael Abramson with thirteen counts of making false statements in corporate and individual tax filings, in violation of 26 U.S.C. § 7206(1). (Dkt. 1). Counts 1, 2, 11, and 13 charge Abramson with making false statements on his personal income tax returns for tax years 2011 through 2014. (*Id.* at 5–6, 15, 17). Counts 3–10 and 12 charge him with making false statements on amended or original corporate tax returns for his business Leasing Employment Services for tax years 2006 through 2014. (*Id.* at 7–14, 16).

Abramson's jury trial began on January 30, 2023. (Dkt. 146). After the government rested its case on February 6, Abramson moved under Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal on Counts 3 through 9 of the indictment. (Dkt. 164 at 931–36). The Court denied the motion. (*Id.* at 936). Abramson also moved for a judgment of acquittal on Counts 11 and 13, which the Court likewise denied. (*Id.* at 937).

1

The jury began deliberating on February 9, and on February 10, it announced that it could not reach a verdict. (Dkt. 153; Dkt. 164 at 1542–43). The Court declared a mistrial and discharged the jury. (Dkt. 164 at 1545; Dkt. 154). Abramson's retrial is set for February 5, 2024. (Dkt. 168). Abramson now moves under Federal Rule of Criminal Procedure 29(c) for judgment of acquittal on all counts of the indictment. (Dkt. 162).

## LEGAL STANDARD

"A judgment of acquittal must be granted when the 'evidence is insufficient to sustain a conviction.'" *United States v. Filer*, 56 F.4th 421, 425 (7th Cir. 2022) (citing *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013), quoting Fed. R. Crim. P. 29(a) & (c)). Applying Rule 29, the Court asks "whether, viewing the evidence in the light most favorable to the prosecution, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citing *Jones*, 713 F.3d at 340, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This is a high, nearly insurmountable hurdle," but "the height of the hurdle depends directly on the strength of the government's evidence." *Id.* (first quoting *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022), then quoting *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019)).

## DISCUSSION

To convict a person for filing a false tax return in violation of 26 U.S.C. § 7206(1), the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant prepared or caused someone to prepare an income tax return; (2) the income tax return was false as to a material matter, as charged in the Count; (3) the defendant signed the income tax return, which contained a written declaration that it was made under penalties of perjury; (4) the defendant acted willfully, that is, he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe it was truthful as to a material matter; and (5) the

2

defendant filed or caused someone to file the income tax return with the Internal Revenue Service (IRS). Seventh Circuit Pattern Criminal Jury Instructions, 26 U.S.C. § 7206(1) Elements (2020 ed.); *see also United States v. Pree*, 408 F.3d 855, 857 (7th Cir. 2005).

Abramson does not contest the sufficiency of the government's evidence on the first, third, or fifth elements. As to the second element, Abramson argues that the government failed to prove beyond a reasonable doubt that either the corporate or the personal tax returns contained material false statements. Specifically, for Counts 3–10 and 12, he contends that the government failed to prove that the corporate tax returns reported (1) false commission payments to Jerilyn Totani, and (2) a "Loan Receivable – JT" that was not a loan. Further, for Counts 1, 2, 11, and 13, he argues that the government failed to prove that Abramson underreported his income on his personal tax returns. Finally, as to the fourth element, he claims that the government failed to prove that Abramson acted willfully as to any false statements made in any corporate or personal tax returns on all counts.

According to the government's theory of the case, Abramson used his company—Eastern Advisors, Inc.—to funnel income to his girlfriend, Jerilyn Totani, both to hide their relationship from his wife and to avoid paying taxes on that income. The government argued at trial that Abramson invented a sham story that Totani worked for Eastern Advisors. The payments from Eastern Advisors to her were neither commissions that she had earned nor loans from the company. Totani did not bring Eastern Advisors the opportunity to make a brokerage deal between the Village of Rosemont and Outfront Media to lease billboard advertising space, nor did she work from 2004 through 2014 taking pictures of the billboards as proof of performance for Eastern Advisors. Further, the payments to Totani reported as loans—and, thus, corporate assets of Eastern Advisors—were not truly loans. Per the government, Abramson's representations about Eastern

Advisors' corporate deductions and assets reported on original and amended corporate tax returns (filed as consolidated returns with Leasing Employment Services) were false. They were also material to the IRS's ability to audit the company. Moreover, the payments to Totani were, in fact, corporate distributions to Abramson and thus personal income, but they were not reported as such on his personal income taxes. He therefore paid less in taxes than he should have.

A.  Government's Evidence

*Relationship Between Abramson and Totani*

Totani testified at trial that she met Abramson in 1995 when she was an exotic dancer at a gentleman's club. (Dkt. 164 at 245). They began a romantic relationship although Abramson was married. (*Id.* at 246–48). At the beginning of their relationship, Abramson regularly gave her between $300 and $500 per week in cash. (*Id.* at 249). Totani wanted to stop dancing and asked him to support her financially, which he agreed to do. (*Id.* at 249–50). She also wanted to be closer to him in Chicago, so Abramson rented an apartment for her at $1,200 per month at 1122 North Clark Street. (*Id.* at 250–52). When the building converted to condominiums, he bought her unit. (*Id.* at 264–65).

Richard Forcone, a business acquaintance of Abramson's, testified that Abramson had called and asked him for a favor: to put a condo in Chicago in his name. (Dkt. 164 at 225–26). According to Forcone, Abramson wanted to keep it off his taxes and hide it from his wife because his girlfriend was going to live there. (Dkt. 164 at 226–27). IRS Special Agent Jason Gibson testified that Totani understood that her condo was in Forcone's name so that Abramson's family would not find out. (*Id.* at 723). And Kelly Beyer Wyzykowski of the Chicago Title Land Trust Company likewise described how the Clark Street condo was put in a land trust, with Forcone as both power-of-direction holder and beneficiary of the trust. (Dkt. 164 at 2016–10 (citing GX 410)).

Totani also described how Abramson continued providing for her while she lived in the Clark Street condo. In addition to paying for rent and later purchasing it, he covered all utilities, gave her $500 in cash per week, renovated the condo, and purchased several luxury vehicles for her, including a bright yellow Ferrari, a Corvette, a Porsche, and a motorcycle. (Dkt. 164 at 257–58, 267, 269–72, 281–83, 286). She testified that Abramson paid for her credit card bills, which included payments for travel to the Virgin Islands, California, Law Vegas, and for stays at resorts, spas treatments, restaurants, and shopping excursions. (*Id.* at 289–99). Totani never expected to have to pay back what she spent. (*Id.* at 289). She never executed a written loan agreement nor had any documents evidencing an obligation to repay either Abramson or his companies. (*Id.* at 310).

Agent Gibson testified that Totani received payments from Eastern Advisors toward her American Express credit card and Chase bank account, and the Court admitted several related exhibits into evidence. (Dkt. 164 at 75–79 (citing GX 200A–200G); *id.* at 102–06). Totani also received payments for her doctors' bills, insurance, and other expenses both directly from Abramson as well as from his companies, Eastern Advisors and PayTech. (*Id.* at 79). Jill Roth, the bookkeeper for Abramson's companies from 2008 through 2014, corroborated this testimony, and the Court received into evidence emails between Roth and Abramson in which he directed her to pay Totani's expenses through Eastern Advisors. (*Id.* at 394, 426–31 (citing GX 600–602)). Roth booked payments to Totani's American Express cards under the JT Loan Account in Eastern's records at Abramson's direction. (*Id.* at 421–22).

Totani maintained a sexual relationship with Abramson until 2014, and she is still close with him. (Dkt. 164 at 247–48). She described Abramson as her "best friend" and said that she would die for him. (Dkt. 164 at 1143–44).

5

### *Business Deal Between Outfront Media and Eastern Advisors*

Ron Ipjian testified that around 2000, his company Outfront Media[1] retained Abramson when they were considering filing a lawsuit against the Village of Rosemont over a dispute regarding Outfront's leasing of Rosemont billboards. (Dkt. 164 at 334–35, 342–44). He did not remember Abramson soliciting Outfront's business but recalled considering two or three attorneys. (*Id.* at 343). But when Outfront decided to negotiate with the Village of Rosemont to lease the billboards, they worked with Robert Durkin to consult on the deal. (*Id.* at 345–48). Ipjian described the brokerage agreement between Outfront (then called Viacom) and Eastern Advisors, with which Robert Durkin was associated. (*Id.* at 348–50 (citing GX 400)). Ipjian knew of no one else's involvement with the billboard deal. (*Id.*)

After the deal came through, Outfront paid Eastern Advisors quarterly commissions on the leases. (*Id.* at 353). Outfront also conducted its own proof-of-performance checks on the billboards—verifying that advertisements were displayed properly on the leased billboards. (Dkt. 164 at 336–37). Ipjian was not aware of anyone conducting proof-of-performance checks for Eastern Advisors, and the brokerage agreement said nothing of Eastern making such checks. (*Id.* at 353–54, 359).

Another Outfront employee, Kathryn Graham, testified that she processed the commission payments to Eastern Advisors for the billboard leases. She saw Durkin each quarter when he came to pick up the checks. (Dkt. 164 at 364–66). Durkin was the only person at Eastern Advisors named in the brokerage agreement and that she ever dealt with. (*Id.* at 375–76).

---

[1] The company also went by other names such as Viacom and CBS Outdoor, but Outfront Media will be used for clarity.

### *Corporate Tax Returns for Abramson's Businesses*

Abramson owned Leasing Employment Services, as well as Eastern Advisors and PayTech. (Dkt. 164 at 64). Jill Roth kept the companies' books. (Dkt. 164 at 394). She testified that from 2008 through 2014, at Abramson's direction she caused Eastern Advisors to make bimonthly payments of $2,500 to Jerilyn Totani. (*Id.* at 401–02). The payments were initially booked as "Advance on commissions." (*Id.* at 402). She did not know, at that time, what Totani had done to earn those payments. (*Id.*) By contrast, she said that Robert Durkin, who also received commission payments from Eastern Advisors, did not receive advances. (*Id.* at 403).

For tax years 2003 through 2013, no tax returns were filed for Eastern Advisors. (Dkt. 164 at 171–73 (citing GX 18)). Agent Gibson testified that in September 2013, Abramson received an email asking for extensive information regarding money transfers from Eastern Advisors. (Dkt. 164 at 704–07). Another email sent a month later informed Abramson that the Mexican equivalent to the IRS was auditing Eastern Advisors. (*Id.* at 707). The emails pertained to transfers between Eastern Advisors and another company Abramson was involved in—Grupo Mexquitic—and they requested factoring invoices and fiscals.

In March 2014, Abramson instructed Jill Roth to go back through the books and recharacterize Eastern's expenses that related to Totani. So Roth went through the company's accounts and reconciled the advance commission payments against the commission revenue that came in from Outfront Media. Roth moved payments to Totani from the "Advance on commissions" account and rebooked them either as "Commissions" or "Loans." (*Id.* at 404–08 (citing GX 123)). She took the amount that Outfront Media had paid in commissions for each prior year, divided it in half, and then applied this amount to the advance on commissions that had been

7

paid to Totani. (Dkt. 164 at 407). If there had not been sufficient incoming commission payments to cover the advances, Roth was to book the difference in the "JT Loan" account. (*Id.* at 407–08).

Roth testified that Abramson asked her to recharacterize the expenses because he had to start preparing tax returns. (*Id.* at 406, 469–70). He also told her to issue a Form 1099—the tax form used to document payments made to independent contractors—to Totani for the first time in 2014, for tax year 2013. (*Id.* at 431–34). Abramson also asked her around that time to prepare corporate tax returns for his companies. But from 2008 to 2014, Roth had never prepared corporate tax returns before and did not know how. (*Id.* at 434–35). Abramson also asked her around that time to prepare—for the first time—consolidated financial statements for Leasing Employment Services, Eastern Advisors, and PayTech. (*Id.* at 435).

Abramson then went to his long-time accounting firm, Krol & Associates, to have them prepare amended consolidated corporate tax returns for the three companies for tax years 2006 through 2012. Gregg Szulczynski, a CPA with Krol & Associates, testified that he prepared amended consolidated returns for those years, in addition to original consolidated corporate tax returns for tax years 2013 and 2014. (Dkt. 164 at 477–78). Szulczynski had prepared the corporate tax returns for Leasing Employment Services for many years—beginning before 2006—and Abramson was his long-time client. (*Id.* at 476–77). But Szulczynski said he first heard about the consolidation of Leasing Employment Services and Eastern Advisors in May 2014. (*Id.* at 488–94). He had never even seen the QuickBooks files for Eastern before. (*Id.* at 636–37). Szulczynski followed up with Abramson asking questions about when Leasing Employment Services had acquired Eastern Advisors and PayTech. (Dkt. 164 at 492–93). Although Abramson answered his questions, Szulczynski testified that he never received documentation of the acquisition. (*Id.* at 494).

Agent Gibson testified that Eastern Advisors' corporate records showed Abramson—not Leasing Employment Services—was the business's sole owner from 2006 through 2014, and the relevant corporate records were entered into evidence showing no change in ownership during that time. (Dkt. 164 at 716–20 (citing GX 412)). The same was true for PayTech, the other reported wholly owned subsidiary of Leasing Employment Services. (Dkt. 164 at 713–16 (citing GX 413)). Agent Gibson also testified regarding an application sent on behalf of Eastern Advisors—as an independent entity—for an extension of time to file taxes, submitted in 2012 for tax year 2011. (Dkt. 164 at 720–22 (citing GX 19)).

In August 2014, Abramson sent a private letter ruling ("PLR") request to the IRS, requesting additional time for filing amended consolidated corporate tax returns for tax years 2006 through 2012. (Dkt. 164 at 83 (citing GX 17); *id.* at 129–30). The PLR request stated that Leasing Employment Services owns all stock for Eastern Advisors and PayTech. (*See* GX 17 at 2). It also states: "The responsible partner at the public accounting firm who had handled the tax compliance matters for the Parent [Leasing] for many years was seriously injured in an automobile accident in 2006, then suffered a stroke, then was stricken with lung cancer and ultimately died in March of 2011." (*See* GX 17 at 2). The amended returns filed with the PLR request stated that, "Due to a clerical error, activity from Eastern Advisors, Inc. and PayTech, Inc. were erroneously omitted from the return when originally filed." (Dkt. 164 (citing, e.g., GX 3)). The IRS issued a response in March 2015 to Abramson's PLR request, which stated: "In order to fully address the issues in the PLR request, we asked for additional information via phone calls on December 15, 2014 and January 28, 2015. . . . Because the response period has now passed and the requested information has not been received, the PLR request will not be processed." (DX 1).

9

IRS Revenue Agent Michael Welch testified that Leasing Employment Services' amended and original consolidated corporate tax returns list "JT Loan" as a corporate asset under Schedule L, line 14. Its tax returns deduct "JT Commissions" as a business expense under either line 2 or line 26. (Dkt. 164 at 747–50). He testified that Eastern Advisors' QuickBooks records showed the commission payments to Robert Durkin and Jerilyn Totani were paid differently. Whereas Durkin received variable, quarterly commissions after money from Outfront Media came in, Totani was paid bimonthly advances of $2,500, regardless of how much came in from Outfront. (Dkt. 164 at 756–57). He also testified that in 2009, Durkin had a loan account with Eastern, to which his commission was applied when money came in. (*Id.* at 757–58). By contrast, there was no reduction in the $2,500 twice monthly payments to Totani to pay down the JT Loan balance with Eastern. (*Id.* at 819). Abramson's accountant testified that each year, the JT Loan balance increased, as reflected in the line item Loan Receivable-JT on the corporate tax returns (Line 14 in Schedule L). The loan balance was $122,545 in 2006; $150,557 in 2007; $276,761 in 2008; $374,186 in 2009; $457,239 in 2010; $535,257 in 2011; $662,417 in 2012; $733,614 in 2013; and $779,538 in 2014. (*Id.* at 516–43).

Agent Welch explained that he saw no evidence that Eastern's payments to Totani booked as "JT Loan" were loans; they had none of the indicia of loans that he was trained to look for as an IRS auditor. (*Id.* at 814–20). He testified that if the payments were not loans, they should have been considered shareholder distributions to Abramson and potentially taxable income either as dividends or capital gains. (*Id.* at 820). He said this income should have been included in "Total Income" but was not. (*Id.*) Likewise, if the $2,500 twice monthly payments to Totani were not commissions, then they were not proper business deductions for Leasing Employment Services to

10

claim. (*Id.* at 825). If they were shareholder distributions, then they also should have been included in the calculation of Abramson's total income on his personal returns. (*Id.*)

Ron Braver, who testified for the defense as an expert in accounting, stated that he considered the "JT Loan" account to be a shareholder loan. That is, "JT Loan" was a loan from Abramson to himself through Eastern Advisors, that he was obligated to pay back to Eastern. (Dkt. 164 at 1347–50). He testified that "it's really just he's supporting his girlfriend through Eastern Advisors and recording it." (*Id.* at 1348–49). Braver, however, agreed that although he treated the "JT Loan" account as a shareholder loan from Abramson's company to himself, there was no loan agreement, no promissory note, no interest rate or interest payments, no maturity dates, no schedule for repayments, and no corporate minutes reflecting a loan. (*Id.* at 1353–54). Abramson made repayments from time to time. (*Id.*)

### *Jerilyn Totani's Testimony of Involvement with Eastern Advisors*

When the defense called Jerilyn Totani, she claimed to have earned the commission from the billboard deal with Outfront Media. She testified that in 2001, she overheard her mother's friend, Norean Mitchell—who worked for Outfront—talking with someone in a bowling alley about issues related to the Village of Rosemont and some billboards. She then told Abramson about it. (Dkt. 164 at 1067–69). She said she expected to be compensated if something came of the deal. (*Id.* at 1069). She also testified that she has a real estate license, and she entered into an independent contractor agreement with Eastern Advisors in August of 2003. (*Id.* at 1071 (citing DX 7)). Further, she claimed that after the deal between Outfront and Eastern came through, she began taking pictures of the billboards in 2004 and would email them to Abramson as proof-of-performance checks. (*Id.* at 1073–74). But she could locate no emails or photos before December

11

2014. (*Id.* at 1206–07). She also admitted that in 2014, Abramson told her that she would have to start taking pictures of the billboards more often because of the investigation. (*Id.* at 1212).

The jury also heard selections of Totani's grand jury testimony from 2018. At that time, she said, "I did not know and do not know how Michael got this deal. I don't know who worked on it." (Dkt. 164 at 1178). She also stated before the grand jury, "Michael told me that I brought the deal." (*Id.* at 1457). Further, Totani then testified that, "Michael later reminded me that I had signed an independent contractor agreement in 2003 related to the deal and being paid by Eastern Advisors. That independent contractor agreement is GJ Exhibit Totani 1. Until Michael reminded me about the agreement, I did not remember that it existed." (*Id.*) Finally, she stated before the grand jury, "Michael also told me that the government would think that the checks that I received from Eastern Advisors were gifts, and that I hadn't heard—and that I hadn't earned the money." (*Id.* at 1458).

**B.     Sufficient Evidence to Support Finding Returns Contained Material False Statements**

    **1.     Commissions on Corporate Returns**

The government introduced sufficient evidence for a juror to find beyond a reasonable doubt that the line item "Total Deductions" on the corporate tax returns were false because they included commissions paid to Totani that she did not earn by working for Eastern. The government's evidence showed that Abramson financially supported Totani. He had a strong motive to hide his financial support: he did not want his wife to find out about their relationship. He went to great lengths to hide it. He concealed his purchase and ownership of the Clark Street condo, specifically mentioning to Forcone that he wanted to keep it off his taxes so his wife would not find out. Similarly, then, he wanted to hide the money he used to support her, so he used Eastern Advisors as a means of funneling his income to her, without paying taxes on it. He never

12

filed tax returns for Eastern from 2003 through 2013. This is consistent with hiding the flow of money to his girlfriend.

In late 2013, Abramson discovered that Mexican tax authorities were looking into Eastern Advisors' transactions. After this point, the government's evidence demonstrated a significant change in how Abramson documented and reported Eastern Advisors' financial records. In 2014, he had his bookkeeper issue Form 1099s to Totani for the first time. He instructed her to prepare consolidated financial statements for tax returns for the first time. He also told her to recharacterize the records pertaining to Eastern's payments to Totani. He then took the newly prepared, consolidated financial statements to his accountants to file amended tax returns for Leasing Employment Services going back six years. Although the amended returns showed Leasing Employment Services owned both Eastern Advisors and PayTech, corporate records showed that Abramson owned those companies. He had never treated them as consolidated entities before 2014 because they were not. Together, the evidence supports the inference that Abramson realized that investigators were scrutinizing Eastern Advisors' records, so he then began creating a cover story. He lied to his accountants and claimed that Eastern was always part of Leasing. He then blamed the failure to file on his accountants' "clerical error" and the long-term illness of a senior accountant. But the accountant who had worked on the returns for Leasing Employment Services since before 2006 had never heard of Leasing's acquisition of Eastern nor seen Eastern's books before 2014. This supports the government's theory of a cover up.

Part of the cover story involved Abramson telling Totani to say that she brought Eastern the billboard deal between Outfront Media and the Village of Rosemont in 2001. He then deducted her maintenance payments as "commissions" on the amended and original consolidated tax returns. But the government sufficiently showed that Totani did not bring the billboard deal to

13

Abramson. Ipjian testified that Outfront retained Abramson regarding a potential lawsuit. The evidence supports a reasonable inference that Abramson learned of the negotiations between the Village of Rosemont and Outfront through this involvement, not from anything his girlfriend told him. Outfront then worked with Robert Durkin of Eastern Advisors to broker the deal. The brokerage agreement named Durkin alone. No one other than Totani testified about her involvement with the deal. Moreover, her testimony was not reliable. Her trial testimony about this deal and her role in it contradicted her grand jury testimony.

This conclusion is further supported by the different ways Eastern paid commissions to Durkin—who negotiated the deal, and whom everyone at Outfront associated with Eastern—compared to Totani. Durkin's commissions varied depending on how much income came in from Outfront. He was paid quarterly. And his commissions went to pay down his loan balance with Eastern. But Totani was always paid the same $2,500 bimonthly "advance" on her commission, regardless of how much Outfront paid Eastern. It never varied, and it never went to pay down the JT Loan balance. In fact, the loan balance increased over time when the "advances" on commission did not keep pace with the actual income from Outfront. The payments to Totani are more consistent with Abramson's practice of giving his girlfriend a steady source of income to support her lifestyle than with paying an independent contractor commissions on a long-term deal.

Additionally, the government showed that Totani's other purported rationale for earning "commissions" from Eastern made little sense. Outfront had its own employees to check the billboards. She had no proof that she regularly took photos of the billboards from 2004 through November 2014. That she had only photos from December 2014 is consistent with the inference that this was part of Abramson's cover story concocted after he learned of scrutiny into Eastern's finances. He wanted to bolster his false claim that Totani earned her commissions.

Finally, the government demonstrated these false statements were material. "A false statement is 'material' when it has 'the potential for hindering the IRS's efforts to monitor and verify the tax liability' of the corporation and the taxpayer." *United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998) (quoting *United States v. Greenberg*, 735 F.2d 29, 32 (2d Cir. 1984)). At trial, Agent Welch testified that if it is an ordinary and necessary business expense, a commission is deductible against corporate income. This affects the taxable income calculation. (Dkt. 164 at 746). But here, the government showed that Totani's "commissions" were not an ordinary and necessary business expense. They were money from Abramson to his girlfriend. So falsely claiming them as deductions affects the IRS's ability to calculate the corporation's taxable income. They are material. Furthermore, although not necessary to prove materiality, Agent Welch also explained how the false commissions caused a tax loss. He walked the jury through his corporate income tax calculations. (Dkt. 164 at 831–43 (citing GX 701)). He found a corporate tax loss regardless of whether the three companies were treated as consolidated or separate entities. (*Id.* at 842–43).

### 2. Loans on Corporate Returns

The government also offered sufficient proof for a juror to find beyond a reasonable doubt that the amounts reported on Schedule L, Line 14 of the corporate returns were false because Eastern Advisors' "JT Loan" account was not a loan. The listed amounts on the returns, therefore, were not loans receivable or assets for Eastern Advisors. The evidence established that although Eastern Advisors' QuickBooks documented payments to Totani in the "JT Loan" account, she never had to pay them back. She never understood these payments as a loan. Abramson never intended her to pay them back. No documents existed that showed any indicia of a loan. And they were not paid back—the loan balance kept increasing every year, reaching nearly $780,000 by the end of 2014. This ballooning balance reinforces the falsity of Abramson's cover story that Totani

worked for the company. While Durkin's commissions went to pay down a loan account he had with Eastern, Totani's "commissions" never did. And when income from Outfront did not cover the amount of money advanced to Totani, the difference was booked as a "loan."

Although the defense's tax expert Ron Braver testified that he treated the JT Loan account as a shareholder loan from Abramson's company to himself, Braver admitted that no written documents evidenced a loan agreement between Eastern and Abramson. Abramson sometimes put his own money into the account, but he had no repayment schedule, no interest, nor any other formalities of a loan. A reasonable juror could conclude beyond a reasonable doubt that this was not a loan. Rather, it was another way for Abramson to funnel money to his girlfriend through Eastern, tax free.

The false statement is also material. The JT Loan Receivable constituted approximately 70 percent of the balance sheet on the corporate tax returns. (Dkt. 164 at 772). Agent Welch testified that such a large item on a company's balance sheet would affect how an IRS revenue agent would audit the return. An agent would need to ask more questions to verify its legitimacy. (*Id.*) He also stated that line items included in "other assets"—like the JT Loan Receivable—have the potential to affect the tabulation and collection of corporate income tax. (*Id.* at 843). The false loans reported as assets thus impacted and potentially hindered the IRS's ability "to monitor and verify the tax liability" of Eastern Advisors. *Peters*, 153 F.3d at 461.

### 3. Total Income on Personal Returns

The government also provided sufficient evidence for a juror to find beyond a reasonable doubt that Abramson made false statements on the Total Income line reported on his personal tax returns. The commissions paid to Totani were not ordinary and necessary business expenses, and the payments booked as loans were not loans. They were gifts of money from Abramson to his

girlfriend, paid through Eastern Advisors. As such, they should have been considered corporate distributions to Abramson—Eastern's sole shareholder—and reported as income on his personal tax returns. Agent Welch testified that he treated these payments as distributions to Abramson, which Abramson had not reported on his personal income taxes from 2011 through 2014. (Dkt. 164 at 819–25). According to his analysis, the distributions should have been included in the total income calculated on his tax returns. (*Id.* at 820, 825). Though not necessary, Agent Welch also showed how the underreported total income caused a tax loss on Abramson's personal income taxes. (*Id.* at 843 (citing GX 701)). These false statements thus further hindered the IRS's ability to verify and monitor Abramson's tax liability, so they are material. *Peters*, 153 F.3d at 461.

**C.     Sufficient Evidence to Support Finding of Willfulness**

Finally, the government introduced sufficient evidence for a juror to find beyond a reasonable doubt that Abramson acted willfully. A defendant acts willfully if he knew that he had a legal duty to file a truthful tax return, but when he signed the return, he did not believe that it was truthful as to a material matter. *See* Seventh Circuit Pattern Criminal Jury Instructions, 26 U.S.C. § 7206(1) Elements (2020 ed.). The government established that Abramson was aware of his legal duty to file a truthful tax return. Indeed, Abramson was a partner at the law firm Arnstein & Lehr LLP. He was admitted to the U.S. Tax Court and had handled a tax case. (Dkt. 164 at 100–01 (citing GX 303)). All tax returns clearly stated the legal obligation to submit truthful statements. Abramson was sophisticated and knowledgeable about the law, more so than most people.

Drawing all reasonable inferences in the government's favor, the evidence established that Abramson knew he was falsely reporting Eastern Advisors' payments to Totani as commissions or loans. Abramson had a strong motive to conceal his means of diverting his personal income to her through Eastern Advisors; he did not want his wife to learn of their relationship. So he used

17

Eastern Advisors as a cover for many years to support her, without reporting its corporate income to the IRS. When Eastern came under scrutiny, he created the cover story about Totani working for Eastern Advisors and told her to say that she brought him the billboards deal. He told her to take photos of the billboards because of the investigation. He also knew that she would be willing to go along with this sham story—even testify to it under oath—because of their relationship and his financial support for her over many decades. Indeed, Totani declared that Abramson meant so much to her that she would die for him.

Abramson also directed his bookkeeper Jill Roth to recharacterize the payments to Totani in March 2014, after he learned in fall 2013 that Eastern Advisors was under scrutiny. He directed Roth to account for all the "advances" on Totani's "commissions," and then to book the rest as a loan—a loan which he knew increased each year without regular repayments, from either Totani or himself. He also directed Roth to prepare consolidated financial statements for his three companies, although he knew that Leasing Employment Services was not the majority shareholder for Eastern or PayTech. Abramson knew this because *he* was always the sole shareholder for both companies. But he nevertheless represented to his accountants at Krol & Associates that Leasing owned both companies, despite failing to provide documentation showing when it acquired them. Krol's accountants then relied on the financial documents Abramson provided in preparing the corporate tax returns and attributed prior omissions to clerical error.

Abramson argues that the government failed to prove he acted willfully because he disclosed more than necessary. He accounted for all payments to Totani over the years and their specific subaccounts when he did not need to. But disclosing all payments does not make them truthful. The government's evidence established that the payments were neither commissions nor

loans, and Abramson knew it. A juror could conclude beyond a reasonable doubt that he acted willfully in causing tax returns containing false statements to be filed.

## CONCLUSION

For these reasons, the Court denies Defendant Michael Abramson's Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29(c). [162]

Date: May 23, 2023

_____
Virginia M. Kendall
United States District Judge